# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRAVIS ADKINS,<br><br>                    *Plaintiff*,<br><br>v.<br><br>THE DAILY WIRE, LLC, LUKE<br>ROSIAK, and JASMINE BATTLE,<br><br><br>                    *Defendants*. | Case No.: 1:25-cv-4399-DLF<br><br>**ORAL HEARING REQUESTED** |

## THE DAILY WIRE, LLC AND LUKE ROSIAK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR IMPROPER VENUE, OR, IN THE ALTERNATIVE, FAILURE TO STATE A CLAIM

Defendants The Daily Wire, LLC, and Luke Rosiak hereby move to dismiss Plaintiff Travis Adkins' First Amended Complaint [Dkt. 9] for improper venue, or, in the alternative, failure to state a claim upon which relief may be granted.

This motion is made pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6) and is supported by the accompanying Memorandum of Points and Authorities, the Declarations of Luke Rosiak and Jesse D. Franklin-Murdock and exhibits thereto, the Statement of Material Facts, and such argument counsel may present at the hearing, and the entire record and file herein.

Pursuant to Local Rule 7(f), The Daily Wire, LLC, and Luke Rosiak respectfully request an oral hearing on their motion.

[*signature page to follow.*]

1

Dated: March 30, 2026

Respectfully submitted,


*/s/ Jesse D. Franklin-Murdock*
Karin M. Sweigart
(Bar #CA00145)
Jesse D. Franklin-Murdock
(Bar #CA00147)
**SWEIGART MURDOCK, LLP**
1160 Battery Street, Suite 100
San Francisco, California 94111
(415) 873-0123
Karin.Sweigart@sm-llp.com
Jesse@sm-llp.com

*Counsel for Defendants*
*The Daily Wire, LLC & Luke Rosiak*

2

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................................. 3

    A.    The Media Defendants Publish a Series of Articles about USADF and Adkins. ............... 3

    B.    The Media Defendants' Reporting on Adkins' Selection as President and CEO of USADF (Statement 1). ....................................................................................................... 5

    C.    The Media Defendants' Reporting on Adkins' Tailor Sending the Bill to USADF (Statement 2). ..................................................................................................................... 7

    D.    The Media Defendants' Reporting on Adkins' Travel-Related Demands (Statement 3)... 8

    E.    The Media Defendants' Reporting on Adkins' Reluctance to Hire Non-Black Individuals and Veterans (Statement 4). ............................................................................................... 9

    F.    The Media Defendants Republish Portions of Their Reporting About USADF and Adkins. ............................................................................................................................. 11

III.   ARGUMENT ................................................................................................................... 11

    A.    Venue Is Improper in the District of Columbia. ............................................................... 11

        1.    Governing law for motions to dismiss based on improper venue................................ 11

        2.    The events giving rise to this action took place outside of this District. ..................... 12

        3.    The Court should dismiss the FAC or transfer the case to the Middle District of Tennessee................................................................................................................... 15

    B.    Adkins Fails to State a Claim for Defamation. ................................................................. 16

        1.    Governing law applicable to motions to dismiss for failure to state a claim. .............. 16

        2.    Adkins cannot state a defamation claim based on Statement 1. .................................. 17

        3.    Adkins cannot state a defamation claim based on Statement 2. .................................. 24

        4.    Adkins cannot state a defamation claim based on Statement 3. .................................. 27

        5.    Adkins cannot state a defamation claim based on Statement 4. .................................. 29

        6.    Adkins should not be given leave to amend. ............................................................... 32

IV.    CONCLUSION................................................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ...................................................... 6

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) ................................................................. 18

*Blackmon-Malloy v. United States Capitol Police Bd.*, No. CV 01-2221 (EGS), 2024 WL
4298853 (D.D.C. Sept. 26, 2024) ............................................................................................ 30

*\*Corsi v. Stone*, No. CV 19-324 (TJK), 2020 WL 999053 (D.D.C. Mar. 1, 2020) ...................... 12

*Delta Sigma Theta Sorority Inc. v. Bivins*, 20 F. Supp. 3d 207 (D.D.C. 2014) ........................... 12

*Dimondstein v. Stidman*, 986 F.3d 870 (D.C. Cir. 2021) ............................................................ 14

*Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 43 (D.D.C. 2022) ......................................... 23, 25

*Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 496 F. Supp. 2d 137 (D.D.C. 2007)
...................................................................................................................................... 14, 15

*Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65 (D.C. Cir. 2015) ........................................... 16

*\*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989) .............................. 19, 20, 21, 22

*Jackson v. Donovan*, 844 F. Supp. 2d 74 (D.D.C. 2012) ............................................................. 17

*\*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ......................................... 19, 20, 21

*Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018) ....................................... 17

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) .......................................................... 22, 31

*Manion v. Lima Memorial Hosp.*, Civ. A. No. 92-5452, 1992 WL 368158 (E.D. Pa. Dec. 3,
1992) .............................................................................................................................. 13

*McGee v. D.C.*, 646 F. Supp. 2d 115 (D.D.C. 2009) .................................................................. 32

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016) ........................................................ 27

*Nigerians in Diaspora Org. Americas v. Ogbonnia*, 203 F. Supp. 3d 45 (D.D.C. 2016) ............. 12

*\*Corsi v. InfoWars, LLC,* No. CV 19-656 (TJK), 2020 WL 1156864, at *2 (D.D.C. Mar. 10,
2020) ............................................................................................................................ 13, 14

*Pac. Maritime Ass'n v. N.L.R.B.*, 905 F. Supp. 2d 55 (D.D.C. 2012) .................................... 15, 16

*Robertson v. D.C.*, 269 A.3d 1022 (D.C. 2022) .................................................................... 17, 23

*\*Smartmatic USA Corp. v. Herring Networks, Inc.*, 610 F. Supp. 3d 92 (D.D.C. 2022) . 11, 12, 15

*\*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231 (D.C. Cir. 2021) ...................................... 19, 22

*Talley v. Time, Inc.*, 923 F.3d 878 (10th Cir. 2019) .................................................................. 22

*\*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ....................................................... 19, 20, 21

*\*US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24 (D.D.C. 2022) ...................................... passim

*US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42 (D.D.C. 2021) .............................................. 12

*Van der Stelt v. Georgetown Univ.*, 774 F. Supp. 3d 90 (D.D.C. 2025) ..................................... 18

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ................................................. 23

**Statutes**

28 U.S.C. § 1391 ................................................................................................................... 11, 12

**Rules**

Fed. R. Civ. P. 12(b)(3)...................................................................................................... 11

**Other Authorities**

United States Courts, "Federal Judicial Caseload Statistics," Table C-1 ...................................... 17

## I.     INTRODUCTION

Plaintiff Travis Adkins is the former president and CEO of the United States African Development Foundation ("USADF"). In 2025, Defendant The Daily Wire, LLC ("Daily Wire") and its investigative reporter Defendant Luke Rosiak (together, the "Media Defendants") published a series of articles about Adkins and USADF. The Media Defendants' articles included shocking revelations about what took place at USADF under Adkins' leadership, including ethical lapses, financial improprieties, employment discrimination, and more. Adkins alleges that the Media Defendants' reporting included four defamatory statements: that Adkins obtained his position without applying ("Statement 1"); that Adkins' personal tailoring bill was sent to USADF ("Statement 2"); that Adkins demanded $1,000-a-night-hotels ("Statement 3"); and that Adkins made discriminatory comments related to personnel decisions at the agency ("Statement 4").

Each of Adkins' four attempts to allege a defamation claim against the Media Defendants in his First Amended Complaint ("FAC") [Dkt. 9] is fatally flawed. While Adkins traffics in speculation about the Media Defendants' motives, political beliefs, business model, and perspective on USADF, Adkins failed to allege any facts constituting clear and convincing evidence of actual malice on the Media Defendants' part, i.e., knowledge of falsity or serious doubts as to the truth of the matter. Statement 1 closely tracks Adkins' own deposition testimony, which makes the statement substantially true and subject to the fair report privilege. Moreover, there is nothing defamatory about the allegation that someone received a job without submitting an application. Statements 2 and 3 are not false: Adkins does not argue the literal substance of the statements are false and defamatory, instead arguing that the Media Defendants really were saying something other than what they printed. Statement 4 is largely based on an affidavit in an EEOC proceeding, so it too is shielded by the fair report privilege.

1

The Court need not even reach the question of the merits of Adkins' FAC because he filed it in the wrong District. First, Adkins concedes that none of the Defendants are residents of the District of Columbia. Second, Adkins cannot establish that a substantial portion of the events giving rise to his claims took place in this District. At its heart, the FAC is about statements that were (1) written by a reporter in Virginia; and (2) published by a media organization in Tennessee. Adkins' attempt to shoehorn this action into this District by focusing on *his own* underlying conduct, rather than the Media Defendants' publishing of the statements he alleges are defamatory, has no support in D.C. Circuit case law. The Court should therefore either dismiss the action for improper venue or transfer this action to the Middle District of Tennessee.

Adkins' three-year tenure at USADF ended in a cloud of impropriety. Ultimately, courts, inspectors general, and the public will decide whether Adkins engaged in financial misdeeds, skated government ethics rules, and defied anti-discrimination laws. By reporting on credible allegations of misconduct on Adkins' part, the Media Defendants did what journalists are supposed to and what the First Amendment guarantees their right to do: inform the public about the misdeeds of those in power. As a former public official with a virtual megaphone and the ability to broadcast his message, Adkins has an obvious remedy if he believes the Media Defendants got the story wrong: provide his side of the story and deny that he engaged in the misconduct of which others accused him. But Adkins has no remedy in court because the Media Defendants neither published a false, defamatory, and unprivileged statement about him nor published any statement with actual malice.

The Court should therefore (1) dismiss Adkins' FAC based on improper venue; (2) transfer this case to the Middle District of Tennessee, where the articles at issue were published; or, if the

Court concludes venue is proper in this District, (3) dismiss Adkins' FAC for failure to state a claim.

## II.    FACTUAL BACKGROUND

The Media Defendants' recitation of the facts is based on the allegations in the FAC, which the Media Defendants accept as true for purposes of this Motion only.

### A.  The Media Defendants Publish a Series of Articles about USADF and Adkins.

Adkins was the president and CEO of USADF, an independent federal agency based in Washington, D.C., between January 2022 and February 2025. FAC ¶¶ 11, 15. Defendant Battle was Adkins' administrative assistant from February to September 2022, and Adkins alleges she was a source for the articles underlying Adkins' lawsuit. Daily Wire is a media company organized under Texas law with its principal place of business in Nashville, Tennessee, and Rosiak is a Virginia-based investigative reporter for Daily Wire. FAC ¶¶ 12–13.

In January 2025, the newly formed Department of Government Efficiency ("DOGE") "began working to shutter federal agencies and programs," and on March 5, 2025, a dispute emerged between USADF and DOGE when USADF staff barred DOGE personnel from entering its offices. FAC ¶¶ 28, 32–33. Adkins maintain that the Media Defendants decided to target USADF (according to Adkins, "the exemplar of DOGE resistance") by publishing "a series of articles aimed at discrediting USADF and vindicating DOGE," which targeted its former leadership (including Adkins) as villains. FAC ¶¶ 34–35. Adkins attributes the negative facts the Media Defendants reported to "two willing accomplices, former USADF employees with well-known and obvious axes to grind against [] Adkins and the agency: Mateo Orama Reyes Dunne and Defendant Jasmine Battle." FAC ¶ 39.

3

Between May 6 and May 14, 2025, the Daily Wire published five articles about USDADF and Adkins authored by Rosiak. FAC ¶ 60. Of these, Adkins' defamation claims are based only on statements in the May 8, 9, and 14 articles. FAC ¶ 65 & Exs. A–C. While Adkins contends the articles contained four defamatory statements about him, Adkins is curiously silent about other damning allegations about him that appear in the various articles (in addition to shocking misdeeds committed by his predecessor at USADF and other USADF personnel). The Media Defendants' reporting included the following:

- Adkins had a lien against him for unpaid federal taxes from 2015 until February 2021. Dkt. 9-1 at 5.

- Landlords in New York and Washington, D.C. contended in court filings that Adkins owed them money. *Id.*

- Adkins would hire workers as contractors at USADF rather than government employees to get around federal rules and hide overhead expenses, including by paying workers with government credit cards in "micropurchases" and causing one employee to restart her employment every five weeks, each time being paid by a different pass-through LLC, and sometimes working for long periods without pay. Dkt. 9-1 at 6–7.

- Adkins referred to a former junior employee as "the white b—h." Dkt. 9-2 at 4.

- Adkins' assistant received a deficient paycheck followed by a $17,000 wire from Kenya. Dkt. 9-3 at 4.

- Another USADF employee was paid through an entity in Mauritania with no payroll, state, or federal withholdings. Dkt. 9-3 at 5.

  The FAC is not based on any of this reporting.

4

**B. The Media Defendants' Reporting on Adkins' Selection as President and CEO of USADF (Statement 1).**

The May 8, 9, and 14 articles reported that USADF "hired . . . Adkins, without Adkins even applying," referencing Adkins' deposition testimony, and that "Adkins testified during Mr. Dunne's EEOC proceeding that he was selected to lead USADF 'without even applying for the job, and that he couldn't recall when or how he managed to be selected.'" FAC ¶ 65 & n.9. Rosiak also posted on X that Adkins' predecessor "was replaced in 2021 by his friend Travis Adkins without even applying." FAC ¶ 123.

On February 12, 2024, Adkins gave a deposition related to Dunne's EEOC charge against USADF, in which he gave the following testimony:

> Q       . . . And when did you submit an application to join USADF?
> A       I did not submit an application to join USADF.
> Q       How did you come to be considered for president and CEO of USADF?
> A       I wouldn't be able to answer that question. You would have to answer [sic] that question to those who sought me out for the position.
> Q       Who were the people who sought you out for the position?
> A       The board members of USADF.
> Q       All of them? That's a question. Was it all of them together?
> A       I can't answer if it was all of them together. They make decisions, obviously, in the collective, and so that is why I said the board members.
> Q       Who -- which member or members of the board contacted you?
> A       I believe Iqbal Paroo.
> Q       Oak. And how did -- to the best of your knowledge, based on discussions you had with Iqbal Paroo or other board members, how did they become aware of your name?
> A       You would have to ask them.
> Q       Do you have any information or understanding of how the board became -- became aware of you as a potential candidate?
> A       You would have to ask them.
> * * * *
> Q       Were you the only candidate considered by the USADF board?
> A       You would have to ask the board members.
> Q       Are you aware of any competing candidates?
> A       You would have to ask the board members.
> Q       No. I'm asking if you are aware of any competing candidates.

5

A Not to my knowledge.

\* \* \* \*

Q What information were you asked to submit [as part of the selection process]?

A I don't recall. There's not a way for me to recall all of the information I was asked to submit.

Q What are examples of information you were asked to submit?

A I'm not sure that I would proffer examples of things that I don't recollect that I was asked to submit.

Q Do you recall any types of information that you were asked to submit?

A I'm sure they have my CV or bio. I don't recall any other documents.

Franklin-Murdock Decl., Ex. 1 at 12:12–13:14, 13:22–14:4, 15:18–16:4.[1]

In the FAC, Adkins provided a more fulsome explanation regarding his selection to lead USADF, recalling details he professed not to recall in his deposition. Adkins maintains that he was "invited to apply for the position," and that he subsequently "submitted his statement of interest, CV, and list of professional references to the Chair of the Selection Committee in October 2021," followed by a "series of interviews with USADF board members in November 2021," after which he "was chosen as USADF's president and CEO." FAC ¶ 66. Adkins contends that when he stated under oath that he did not submit an application, he meant "the literal 'form used for making a request,' of the sort one submits to obtain any number of jobs in the federal government." FAC ¶ 72.

Adkins claims the Media Defendants knew what Adkins meant when he said he never submitted an application because they had Adkins' full deposition transcript, but nonetheless

---

[1] The Court should consider Adkins' deposition without converting this Motion into a motion for summary judgment because Adkins relies on and summarizes his deposition in the FAC, thus incorporating it by reference into the FAC. *See* FAC ¶ 68–69; *see also Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." (citation and internal quotation marks omitted)).

reported that "Adkins had said he 'never applied' for the job because it fit with their false preconceived narrative: that [] Adkins was an unqualified hire chosen by his predecessor to perpetuate a culture of corruption and misconduct at USADF, rendering USADF a prime target for DOGE's mission to rid the government of fraud and waste." FAC ¶ 73. Adkins also faults the Media Defendants for not seeking comment on this issue from Adkins prior to publication. FAC ¶ 74.

### C. The Media Defendants' Reporting on Adkins' Tailor Sending the Bill to USADF (Statement 2).

Adkins contends the Media Defendants defamed him by publishing the following in the May 8, 2026 article: "Adkins, for his part, brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements, the former assistant told the Daily Wire, speaking on condition of anonymity. **He had a tailor fit him for three custom suits, and sent the bill to the agency, she alleged.**" FAC ¶ 76 & Dkt. 9-1 at 5–6 (emphasis added). Adkins maintains the emphasized language is false because "Adkins paid for his suits with his own money, not with government funds." FAC ¶ 77.

In post-publication correspondence, Daily Wire defended its reporting, staying that Adkins' "personal tailor sent the bill for [] Adkins' personal expenses to [] Adkins' taxpayer-funded assistant at her taxpayer-funded email address for her to handle on her taxpayer-funded time." (Adkins does not deny this. *See generally*, FAC.)

Adkins claims that it is "implausible" that "the article's allegation about custom suits was to be understood literally" because (1) the statement was in a section of the article entitled, "Using poverty funds for luxury"; and (2) there was "no point" in reporting that Adkins' assistant received Adkins' tailoring bill via email and forwarded it to Adkins." FAC ¶¶ 78–80. Relying on a

smattering of comments, Adkins alleges that Daily Wire's readers understood the article to mean that Adkins "embezzled funds from the government for his own personal gain." FAC ¶ 82. Rosiak further stated on a podcast that USADF officials spending money "that was supposed to go to poor Africans and using it for themselves to do luxury travel and to buy high-end suits." FAC ¶ 83.

### D. The Media Defendants' Reporting on Adkins' Travel-Related Demands (Statement 3).

Adkins takes issue with the same portion of the May 8 article quoted above, this time objecting to the Media Defendants' reporting on his travel-related demands, which also appeared in the May 14 article: **"Adkins, for his part, brushed off government rules about travel costs and demanded $1,000-a-night hotels**, summarily firing an assistant who raised concerns about his travel arrangements, the former assistant told the Daily Wire, speaking on condition of anonymity. He had a tailor fit him for three custom suits, and sent the bill to the agency, she alleged." FAC ¶ 87 & Dkt. 9-1 at 5–6 (emphasis added). Adkins maintains that the claims that he brushed off travel rules, demanded $1,000-a-night hotels, and summarily fired Defendant Battle for raising concerns about his travel arrangements are each false. FAC ¶ 88.

Adkins contends that annual audit reports by the Office of the Inspector General and the audit firm Williams, Adley & Co. show no wrongdoing at USADF regarding travel and charge-card policies under Adkins' tenure. FAC ¶ 89. Adkins alleges that Rosiak either reviewed (and ignored) the audit reports of USADF's finances, or purposefully avoided doing so, given that he had used other OIG reports for his reporting on USADF. FAC ¶¶ 91–92. Adkins further contends that it is implausible that Adkins flouted government rules on travel expenses because of the bureaucratic complexity involved in billing the government for $1,000-a-night hotels. *See* FAC ¶ 96.

According to Adkins, Battle never raised concerns about "travel-rule violations," and quit the agency after Adkins sent her home from a business trip for gross incompetence and insubordination. FAC ¶ 93.

**E. The Media Defendants' Reporting on Adkins' Reluctance to Hire Non-Black Individuals and Veterans (Statement 4).**

The May 9 and 14 articles contained several statements about Adkins' hiring preferences, including the following:

- "Adkins bragged about concealing operations from the board, saying '**them white motherf—ers**, they don't need to know…I don't think I should tell them sh–,' according to the assistant." FAC ¶ 99 & Dkts. 9-2 at 4 & 9-3 at 15. Interestingly, Adkins only filed suit based on the emphasized language; he does not deny concealing operations from the board or telling his assistant he didn't think he "should tell them sh–." *See* FAC ¶ 99.

- "Adkins' former assistant, who is black, said in a sworn affidavit that 'On at least three occasions, [] **Adkins told me that he wanted his entire team (to include the General Counsel) to consist only of Black people. He wanted all of his direct reports to be Black.**' '**He was very adamant in only hiring African Americans**, **mainly female, and he told me many times he would not hire a white person or a veteran**. I said that's discrimination, and he said 'I'm the president and CEO, I can do what I want,' the assistant told The Daily Wire on condition of anonymity." FAC ¶ 99 & Dkts. 9-2 at 4 & 9-3 at 15 (emphasis added). Once again, Adkins only filed suit over the emphasized language and did not deny stating that he said he is the president and CEO and can do what he wants. *See* FAC ¶¶ 99, 221.

Rosiak further posted on X that "Adkins said he would not hire whites or veterans." FAC ¶ 123.

In post-publication correspondence, Daily Wire explained that its reporting exposed "Adkins' supposed 'desires' not to hire non-Black people at USADF." FAC ¶ 109.

As purported proof of the falsity of these statements, Adkins cites the fact that he hired "several" non-Black people and veterans and "military affiliates" at USADF and promoted three non-Black people at the agency. FAC ¶¶ 101–03, 111. Adkins also contends it is implausible that he referred to the board as "them white motherf—ers" because 40% of the board was non-white. FAC ¶ 103.

Adkins maintains that the Media Defendants knew it was false that he refused to hire non-Black people because (1) it was implausible that Adkins expressed his opinion on the matter to his assistant who had only been hired several months ago; (2) Adkins and multiple witnesses gave contradictory testimony in Dunne's EEOC action; (3) Adkins and three other USADF officials and affiliates testified in their EEOC depositions that Adkins "harbored no such prejudices";[2] and (4) the administrative law judge rejected Dunne's EEOC charge. FAC ¶¶ 105–08. Adkins also contends it is implausible he had ill will toward veterans because his grandfather was a decorated military veteran. FAC ¶ 112.

Battle did not confirm or deny her alleged statements to Daily Wire to Adkins, and Adkins alleges that if the Media Defendants "accurately reported what she told them, she simply invented the allegation from whole cloth." FAC ¶ 118.

---

[2] In fact, Adkins evaded questions about his hiring questions in his deposition, refusing to state whether USADF's General Counsel was African American, stating that he "do[esn't] have a belief about [her] racial identification." Franklin-Murdock Decl., Ex. 1 at 34:9–16. Adkins further purported not to know the "race and color" of Dunne, the complainant in the EEOC action. *Id.* at 38:15–16.

**F.  The Media Defendants Republish Portions of Their Reporting About USADF and Adkins.**

On December 29, 2025, after receiving Adkins' original complaint, the Media Defendants republished the May 9 article as part of Daily Wire's "Best of 2025" series, which included the statements regarding Adkins not applying for his job at USADF and his statements indicating his desire not to hire veterans and non-Black individuals. FAC ¶ 144.

**III.    ARGUMENT**

**A.  Venue Is Improper in the District of Columbia.**

**1.  Governing law for motions to dismiss based on improper venue.**

A defendant may move to dismiss a complaint for "improper venue." Fed. R. Civ. P. 12(b)(3). Venue is proper in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b). Where venue is improper, the court may either dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Smartmatic USA Corp. v. Herring Networks, Inc.*, 610 F. Supp. 3d 92, 100 (D.D.C. 2022) (citing 28 U.S.C. § 1406(a)).

"The court may resolve the motion on the basis of the complaint alone, or, as necessary, examine facts outside the complaint that are presented by the parties, while drawing reasonable inferences in favor of the plaintiff." *Delta Sigma Theta Sorority Inc. v. Bivins*, 20 F. Supp. 3d 207,

11

211 (D.D.C. 2014) (citation omitted). "'[T]he burden remains on the plaintiff to establish that venue is proper since it is the plaintiff's obligation to institute the action in a permissible forum.'" *Nigerians in Diaspora Org. Americas v. Ogbonnia*, 203 F. Supp. 3d 45, 46 (D.D.C. 2016) (quoting *McCain v. Bank of Am.*, 13 F. Supp. 3d 45, 51 (D.D.C. 2014), *aff'd* 603 F. App'x 836 (D.C. Cir. 2015)). "'Courts in this circuit must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia.'" *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 68 (D.D.C. 2021) (quoting *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993)).

### 2.   The events giving rise to this action took place outside of this District.

Adkins' defamation claims against a Tennessee media outlet, a Virginia reporter, and a alleged source from Maryland do not belong in this District. The Court should therefore dismiss the case for improper venue, or, in the alternative, transfer the case to the Middle District of Tennessee, where Daily Wire published the articles at issue.

None of the Defendants reside in this District. FAC ¶¶ 12–14. Adkins thus cannot argue that venue is proper in this District under 28 U.S.C. § 1391(b)(1). Adkins must thus establish that a "substantial part of the events or omissions giving rise to the claim" occurred here. 28 U.S.C. § 1391(b)(2).

Courts have consistently found in defamation cases that events giving rise to a defamation case occurred where the alleged defamation was published. *See Corsi v. Stone*, No. CV 19-324 (TJK), 2020 WL 999053, at *2 (D.D.C. Mar. 1, 2020) ("[T]he only events which give rise to [the plaintiff's] claims—whether packaged as defamation, intentional infliction of emotional distress, or assault claims—are [the defendant's] alleged statements. And those statements occurred elsewhere."); *Smartmatic USA Corp.*, 610 F. Supp. 3d at 100 (finding venue to be proper in the

District of Columbia because "Smartmatic asserts that OAN disseminated allegedly false and defamatory statements in the District"). "[O]ther courts facing venue disputes in defamation cases have found that the claim arose where the statements were published, not where the injury necessarily occurred." *Manion v. Lima Memorial Hosp.*, Civ. A. No. 92-5452, 1992 WL 368158, at *2 (E.D. Pa. Dec. 3, 1992) (citing *Klauder v. Nunno Enter. v. Hereford Assoc.*, 723 F. Supp. 336, 342 (E.D. Pa. 1989); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1088–90 (S.D.N.Y. 1984); *Jaffe v. Dolan*, 264 F. Supp. 845, 848 (E.D.N.Y. 1967)).

The FAC makes clear that the events giving rise to Adkins' claims occurred outside of this District. The articles were published by Daily Wire, which has its headquarters in Nashville, Tennessee. FAC ¶ 12. Rosiak, who wrote the articles, lives in Virginia. FAC ¶ 13. Adkins tries to plead around the glaring venue problem by alleging that Rosiak focuses on events in D.C. and relied on D.C. sources in reporting the articles. *Id.* Rosiak's declaration, however, establishes that (1) he lives in Virginia, as Adkins alleges; (2) he did not write the articles while physically present in D.C.; (2) he did not interview any sources for the Articles while physically present in D.C.; (3) he did not conduct any reporting related to the articles while physically present in D.C.; and (4) he did not publish any posts on X related to the articles, USADF, or Adkins while physically present in D.C. Rosiak Decl. ¶¶ 5–9. This case is therefore similar to *Corsi v. InfoWars, LLC*, where the court concluded venue in a defamation action was improper in this District, where "all the statements at issue were made 'on programs originating' Texas, and none were made in the District of Columbia." No. CV 19-656 (TJK), 2020 WL 1156864, at *2 (D.D.C. Mar. 10, 2020). While Adkins will inevitably try to complicate matters, the venue analysis is straightforward: Adkins' claims are based on statements the Media Defendants published, and those statements were not

published in D.C. Adkins should therefore have brought this action in the Middle District of Tennessee, where the Daily Wire published the articles at issue.

The Media Defendants anticipate Adkins might argue that he was harmed by Defendants' alleged conduct in this District. The D.C. Circuit has "yet to consider . . . the significance of where the harm caused by defamation is felt" in assessing venue. *Dimondstein v. Stidman*, 986 F.3d 870, 871 (D.C. Cir. 2021). Existing Circuit law therefore would not support this theory. "Because venue is intended to protect defendants, 'courts often focus on the relevant activities of the defendant … in determining where a substantial part of the underlying events occurred.'" *Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 496 F. Supp. 2d 137, 142 (D.D.C. 2007) (quoting *Abramoff v. Shake Consulting, L.L.C.*, 288 F. Supp. 2d 1, 14 (D.D.C. 2003)), *cited with approval*, *Stone*, 2020 WL 999053, at *2.

The Media Defendants further anticipate that Adkins might argue Defendants' alleged conduct was targeted at the District of Columbia or otherwise intended to bring about effects in D.C. Adkins' theories about why the Media Defendants published their reporting on USADF and Adkins have no bearing on the Court's venue analysis. In *Corsi*, the plaintiff argued "that venue is proper in this District because [the defendant's] conduct was 'targeted' at the District of Columbia, because his statements were allegedly intended to influence his criminal prosecution here." 2020 WL 999053, at *2. The court rejected this argument: "[the defendant's] motivation for saying and writing the things he did has nothing to do with *where that conduct occurred*, and [the plaintiff] cites no cases in which courts have adopted his novel theory." *Id.*

Finally, the Media Defendants anticipate Adkins, unable to tie any of the Defendants' actions to D.C., will argue that venue is proper because the Media Defendants reported on events in D.C. This is huge stretch, and it would untether the venue analysis from an examination of the

14

*defendants'* actions that gave rise to the claim. If this were the law, a defamation plaintiff could sue a media company in a far-flung locale provided the article had issue had something to with events in that locale. The Court should instead follow the weight of authority in examining the defendant's activities, not background facts or speculation about where a statement may cause the greatest effect. *See Great Socialist People's Libyan Arab Jamahiriya*, 496 F. Supp. 2d at 142.

**3. The Court should dismiss the FAC or transfer the case to the Middle District of Tennessee.**

As venue is improper in this District, the Court may dismiss the case or transfer it to a jurisdiction where venue is proper. *Smartmatic USA Corp.*, 610 F. Supp. 3d at 100. The Media Defendants urge the Court to simply dismiss the action without prejudice, and Adkins can refile in a district where venue is proper. If the Court is inclined to transfer the action, the Middle District of Tennessee, where Daily Wire published the articles, would be the proper district.

Courts evaluate motions to transfer by assessing private-interest and public interest factors "implicated by the proposed transfer of [the] action." *Pac. Maritime Ass'n v. N.L.R.B.*, 905 F. Supp. 2d 55, 60 (D.D.C. 2012). The private-interest factors include:

> (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent they may actually be unavailable for trial in one forum; and (6) the ease of access to sources of proof.

*Id.* (citation and internal quotation marks omitted). As Adkins is suing a media organization for articles it published, all factors weigh in favor of transfer, except the first factor relating to Adkins' choice of forum. The Media Defendants' choice of forum (the Middle District of Tennessee) is both where the claim arose and where the majority of its witnesses are expected to be present.

15

The public-interest factors are "(1) the transferee forum's familiarity with the governing laws and the pendency of related actions in that forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Id.* at 62 (citation and internal quotation marks omitted). There is no reason the Middle District of Tennessee cannot be expected to handle a defamation action. For the twelve-month period ending in March 21, 2025, this District had 3,673 filed cases and 5,243 pending cases; in the Middle District of Tennessee, there were 1,745 filed cases and 1,839 pending cases. United States Courts, "Federal Judicial Caseload Statistics," Table C-1, *available at* https://www.uscourts.gov/data-table-report-names/federal-judicial-caseload-statistics.       This District is therefore far more congested. Finally, the Middle District of Tennessee has an interest in deciding the liability of a media company based in that district.

If the Court reaches the question of transfer, both the private-interest and public-interest factors favor a transfer to the Middle District of Tennessee.

### B. Adkins Fails to State a Claim for Defamation.

Even if the Court concludes that venue is proper in this District, the Court should nonetheless dismiss the FAC because each of Adkins' defamation claims lacks actual malice, along with other fundamental defects.

### 1. Governing law applicable to motions to dismiss for failure to state a claim.

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

16

*Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 153 (D.D.C. 2018) (quoting *Iqbal*, 556 U.S. at 678). "Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the 'grounds' of 'entitle[ment] to relief,' a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Jackson v. Donovan*, 844 F. Supp. 2d 74, 77 (D.D.C. 2012), *aff'd sub nom. Jackson v. Todman*, 516 F. App'x 3 (D.C. Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (alterations in original).

### 2.    Adkins cannot state a defamation claim based on Statement 1.

Adkins has no viable defamation against the Media Defendants for reporting that he became president and CEO of USADF "without even applying for the job." FAC ¶ 65. As the Media Defendants' reporting hews closely to Adkins' own testimony about his employment with USADF in an EEOC deposition, the statement is substantially true and was certainly published without actual malice. Even if the reporting was false (and not consistent with Adkins' own testimony), Adkins would still have no defamation claim because the statement is not defamatory. And because Adkins' statement first appeared in a deposition, the Media Defendants are shielded by the fair report privilege. *See US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 30–31 (D.D.C. 2022) (citation omitted).

"To prove a claim of defamation, a plaintiff must show that (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement amounted to at least negligence; and (4) publication of the statement caused the plaintiff special harm or the statement was actionable as a matter of law irrespective of special harm." *Robertson v. D.C.*, 269 A.3d 1022, 1031–32 (D.C. 2022) (citation omitted). Adkins cannot satisfy the first three elements.

17

**Substantial Truth.** The core of any defamation claim is a false statement. Here, the Media Defendants' reporting was, at a minimum, substantially true. "The truth of the communication is a complete defense in a libel action." *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 90 (D.D.C. 2019) (citation omitted). A true statement includes a "substantially true (i.e., not literally true)" statement, namely where "'the gist of the statement is true or that the statement is substantially true, as it would be understood by its intended audience.'" *Id.* (quoting *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004)). "Substantial truth 'will succeed as a defense if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn.'" *Van der Stelt v. Georgetown Univ.*, 774 F. Supp. 3d 90, 119 (D.D.C. 2025) (quoting *Armstrong v. Thompson*, 80 A.3d 177, 184 (D.C. 2013)).

Comparing Adkins' deposition testimony with the Media Defendants' reporting, it is clear the Media Defendants' reporting that Adkins received his position at USADF "without even applying for the job" is at least substantially true. FAC ¶ 65. In his deposition, Adkins testified that he "did not submit an application to join USADF," that he did not know how he came to be considered for the position beyond being contacted by a board member, that he was unaware of any competing applicants, and that he only recalled submitting his "CV or Bio." Franklin-Murdock Decl., Ex. 1 at 12:12–13:14, 13:22–14:4, 15:18–16:4. As a matter of literal truth, Adkins did not submit an "application." The circumstances of Adkins' selection, as expressed in his deposition, make it substantially true that he did not apply for the position in any sense of the word, as he was contacted by a board member and selected after submitting scant documentation. Clearly, Adkins' hire was not the result of a traditional, competitive hiring process.

**No Actual Malice.** Because it is at least substantially true that Adkins did not apply for his job at USADF, the Court need not reach the question of actual malice. Nonetheless, Adkins failed

to allege all facts necessary to show the Media Defendants believed their reporting to be false or had serious doubts as to its falsity.

"To prevail on a defamation claim, a public-official or public-figure plaintiff must therefore also demonstrate that the defendant acted with 'actual malice.'" *Byrne*, 600 F. Supp. 3d at 30–31 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964)) (other citations omitted); *see also Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (treating a former public official as a public official in applying the actual malice standard). To allege actual malice, the plaintiff must "allege[] facts that, if proven at trial, would demonstrate that [the defendant] harbored serious doubts as to the truth of some of his allegedly defamatory statements." *Byrne*, 600 F. Supp. 3d at 33 (citing *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016)).

The D.C. Circuit "has made clear that 'preconceived notions' or 'suspicion[s]' usually do little to show actual malice" as "virtually any work of investigative journalism begins with some measure of suspicion." *Tah*, 991 F.3d at 241 (quoting *Jankovic*, 822 F.3d at 597) (alterations in original). "Thus, 'concoct[ing] a pre-conceived storyline' by itself is 'not antithetical to the truthful presentation of facts.'" *Id.* (quoting *Jankovic*, 822 F.3d at 597) (alterations in original). The D.C. Circuit has likewise "made clear that evidence of ill will 'is insufficient by itself to support a finding of actual malice.'" *Id.* at 243 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (en banc)) (other citation omitted). "[A] newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 665 (1989).

"Nor is it enough for the plaintiff to offer evidence of 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily

19

adhered to by responsible publishers.'" *Jankovic*, 822 F.3d at 590 (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 664–65 (1989)); *see also id.* at 594 ("An honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully.") (citations omitted). Journalists only have the "obligation to investigate further" when they actually discover information that cause them to doubt their conclusions, or information provided by a source." *Id.* at 594–95 (citations omitted).

A public official plaintiff like Adkins must instead adduce "*clear and convincing* evidence 'to permit the conclusion that the defendant[s] in fact entertained serious doubt as to the truth of [their] publication.'" *Tavoulareas*, 817 F.2d at 788 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)) (alternations in original). Circumstantial evidence is allowed, but it must "support an inference of subjective recklessness," including "'(1) evidence that indicates the defendant fabricated the story, or (2) evidence that suggests the allegedly defamatory statements are so inherently improbable that only a reckless man would have put them in circulation, or (3) evidence that demonstrates that there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Byrne*, 600 F. Supp. 3d at 33 (quoting *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 281 (D.D.C. 2017)).

None of Adkins' actual malice allegations clear the high bar established by Supreme Court and D.C. Circuit case law.

- *First*, Adkins argues that the Media Defendants reviewed Adkins' EEOC deposition transcript, which contradicts their reporting. FAC ¶ 164. The opposite is true. As explained in the preceding substantial truth section, Adkins stated in his deposition that he did not submit an application—just as the Media Defendants reported.

- *Second*, Adkins faults the Media Defendants for not confirming the facts regarding Adkins' lack of an application with Adkins prior to publication. FAC ¶ 165. But a defendant only has a "duty to corroborate the defamatory allegation" when the journalist "'has reason to doubt the veracity of its source.'" *Jankovic*, 822 F.3d at 590 (quoting *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1509 (D.C. Cir. 1996)). The source here was Adkins' own deposition testimony, and nothing in the FAC suggests that the Media Defendants doubted that Adkins meant what he said: that he did not submit an application for his position at USADF.

- *Third¸* Adkins tries to establish actual malice through the Media Defendants' purported motive for publishing the articles, that is, their knowledge that "such an allegation would generate revenue from their intended audience." FAC ¶ 166. The publisher's motive does not establish actual malice, so this argument fails. *Harte-Hanks Commc'ns*, 491 U.S. at 665. The question is not *why* the speaker published the speech at issue but whether the speaker *believed it was false*. *See Tavoulareas*, 817 F.2d at 788 (citation omitted). A desire to generate revenue or generate bad publicity for the subject of an article sheds no light on the publisher's belief as to the truth of the matters reported.

- *Fourth*, Adkins argues that the Media Defendants "purposefully omitted any description or acknowledgment of [] Adkins' application process from their articles because it contradicted their preconceived narrative that [] Adkins was an undeserving lackey and that USADF was a hotbed of corruption and ethical abuses." FAC ¶ 167. But a plaintiff cannot establish actual malice "by showing that a publisher misinterpreted the source material or omitted details favorable to the plaintiff. . . . A publisher's decision to omit details favorable to the plaintiff does not, itself, show actual malice." *Talley v. Time, Inc.*,

21

923 F.3d 878, 896 (10th Cir. 2019) (citing *Time, Inc. v. Pape*, 401 U.S. 279, 282, 290–92 (1971)).

- *Fifth*, Adkins alleges that the Media Defendants' refusal to retract shows actual malice. FAC ¶ 168. The opposite is true: the Media Defendants stood by their reporting, indicating that they believed it to be true, both pre- and post-publication. "[P]ublishers need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (quoting *Harte-Hanks Commc'ns,* 491 U.S. at 691 n. 37).

- *Sixth*, Adkins alleges the Media Defendants were "motivated by ill will and inherent bias." FAC ¶ 169. Even if this were true, neither ill will nor bias establishes actual malice. *See Tah*, 991 F.3d at 241, 243.

- *Seventh*, Adkins argues that the Media Defendants published the December 29 article with actual malice because they republished their reporting despite notice of Adkins' original complaint. FAC ¶ 170. The opposite is true: the Media Defendants' republishing indicates confidence in their original reporting. Adkins' protests of defamation does not mean the Media Defendants suddenly believed their reporting to be false.

Adkins thus failed to allege any facts showing the Media Defendants believed Statement 1 to be false or harbored serious doubts as to its truth at the time of publication. Adkins failed to fill this hole through his piecemeal efforts to string together evidence of actual malice.

**Not Defamatory.** Even if Adkins can somehow skate by on falsity and actual malice, Statement 1 does not rise to the level of defamation. "A statement is defamatory 'if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of

the community.'" *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (quoting

*Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293–94 (D.C. Cir. 1988)). "An 'allegedly

defamatory remark must be more than unpleasant or offensive; the language must make the

plaintiff appear odious, infamous, or ridiculous.'" *Id.* (quoting *Howard Univ. v. Vest*, 484 A.2d

958, 989 (D.C. 1984)). "[A]s numerous courts have held, 'mere allegations of unsatisfactory job

performance do not generally rise to the level of defamation per se.'" *Robertson*, 269 A.3d at 1032

(quoting *Mann v. Heckler & Koch Def., Inc.*, 639 F. Supp. 2d 619, 635 (E.D. Va. 2009)) (other

citations omitted).

Statement 1 is far below the threshold for defamation. At most, Statement 1 carries

damaging implications for USADF and its board for selecting a president and CEO without making

him submit an application. Adkins argues that Statement 1 "convey[s] that [] Adkins did not earn

his position" and was "instead simply handed the position as a lackey," FAC ¶ 159, but the Media

Defendants did not report this.[3] They simply reported that Adkins did not submit an application,

which does not rise to the level of damaging Adkins in his trade and business. "Whether a statement

is capable of defamatory meaning is a question of law," so Count 1 should be dismissed at this

stage. *See Weyrich*, 235 F.3d at 627.

**Fair Report Privilege.** Adkins cannot state a defamation claim based on Statement 1

because the Media Defendants' reporting was shielded by the fair report privilege. The fair report

---

[3] In Washington, D.C., defamation by implication is a separate claim requiring additional elements. "Because '[d]efamation by implication' is "an area of law fraught with subtle complexities,' plaintiffs must make an 'especially rigorous showing, . . . in addition to the elements of defamation, that 'the defendant *intends* or *endorses* the defamatory inference.'" *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 43 (D.D.C. 2022), *aff'd*, 119 F.4th 67 (D.C. Cir. 2024) (first quoting, *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000), then quoting *Armstrong v. Thompson*, 80 A.3d 177, 183–84 (D.C. 2013)). The Court should not entertain Adkins' attempt to stretch his defamation *per se* claim into a defamation by implication claim.

23

privilege abrogates "'the common law rule that one who repeats or republishes a defamation uttered by another adopts it as his own'" when two conditions are met. *Byrne*, 600 F. Supp. 3d at 34 (quoting *Myers v. D.C. Hous. Auth.*, No. 1:20-CV-00700-APM, 2021 WL 1167032, at *2 (D.D.C. Mar. 26, 2021)). "First, the statement must be a fair and accurate report of a qualified government source. . . . Second, it must be apparent that the author attributed the statement to the government source." *Id.* (citations omitted). "'[R]eports of judicial proceedings' as well as court documents" fall within the fair report privilege's purview. *Id.* (citing *Von Kahl v. Bureau of Nat. Affairs, Inc.*, 810 F. Supp. 2d 138, 144 (D.D.C. 2011); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 258 (D.D.C. 2013)).

Both conditions are met here. In his EEOC deposition, Adkins did indeed say that he "did not submit an application to join USADF." Franklin-Murdock Decl., Ex. 1 at 12:12–13:14. And in each of the articles at issue, Rosiak attributed his reporting that USADF hired Adkins "without Adkins even applying" and "without even applying for the job" to Adkins' deposition or sworn testimony (i.e., his deposition). Dkts. 9-1 at 7, 9-2 at 6, 9-3 at 17, & 9-4 at 4. The Media Defendants were thus privileged in reporting what Adkins stated in his deposition, and Adkins has no defamation claim based on this reporting.

### 3. Adkins cannot state a defamation claim based on Statement 2.

Adkins' defamation claim based on the Media Defendants' reporting on Adkins' tailoring bill being sent to USADF fails because the Media Defendants never stated that USADF *paid* for the suits, and Adkins does not deny the bill was indeed sent to his assistant through official USADF channels. Accordingly, the Media Defendants' reporting was not false, and, at a minimum, lacking in actual malice.

24

**No Falsity.** Adkins has no defamation claim based Statement 2 because he does not and cannot deny the literal truth of the Media Defendants' reporting. The May 8 article reported that Adkins "had a tailor fit him for three custom suits, and sent to the bill to the agency." Dkt. 9-1 at 6. In post-publication correspondence, Daily Wire confirmed the literal substance of its reporting: "Adkins' 'personal tailor sent the bill for [] Adkins' personal expenses to [] Adkins' taxpayer-funded assistant at her taxpayer-funded email address for her to handle on her taxpayer-funded time." FAC ¶ 78. Adkins concedes that this is literally what the article reported. *See id.* ("The Daily Wire has claimed . . . that the article's allegation about custom suits was to be understood literally—to convey merely that [] Adkins' tailor sent [] Battle an invoice for [] Adkins' suits, even though [] Adkins ultimately paid for those suits."). Adkins never denies what he concedes is the literal substance of the Media Defendants' reporting. Adkins thus cannot establish falsity.

Without literal falsity, Adkins twists the article into an allegation that he "embezzled—or attempted to embezzle—funds from USADF to pay for custom suits." FAC ¶ 178. The Court should reject Adkins' attempt to stretch the Media Defendants' actual reporting into an insinuation about embezzlement for two reasons. First, Adkins rests his argument on his conclusory assertion that "there would be no point in reporting that a former assistant received an innocuous email and forwarded it to her boss," and that "[n]o reasonable person would deem such an occurrence newsworthy." FAC ¶ 80. Adkins cannot rewrite Statement 2 based on his misguided belief that his apparent use of a government-funded assistant to manage his personal expenses was "innocuous" and not "newsworthy." Second, Adkins' claim is for defamation *per se*, not defamation by implication, and he never attempts to allege the elements of the latter, separate claim. *See Florio*, 619 F. Supp. 3d at 43. Third, Adkins cannot meet the elements of defamation by implication because if the Media Defendants wanted to report that Adkins used government funds to pay for

25

the suits, they would have said so. Instead, the articles simply pointed out, truthfully, that Adkins' tailoring bills were sent to USADF.

**No Actual Malice.** Adkins' concession that the Media Defendants relied on Adkins' assistant for their reporting about Adkins' tailoring bill forecloses actual malice. Adkins alleges that the Media Defendants "attribute the defamatory statement to Defendant Battle,[4] who purportedly gave the statement to them in advance of publication." FAC ¶ 182. While Adkins alleges that Battle refused to confirm to Adkins what she told Daily Wire, Adkins does not dispute that Statement 3 was based on information from a source, as they reported.

Adkins argues that the Media Defendants' "lacked any evidence, beyond [] Battle's say-so, that [] Battle, [] Adkins, or anyone else ever sought government reimbursement for [] Adkins' suits." FAC ¶ 186. Once again, Adkins misconstrues the substance of Statement 2: the Media Defendants reported that the tailoring bill was sent to USADF, not that Adkins tried to make USADF pay for his suits. And the Media Defendants' reliance on a source shows that they did not believe Statement 2 to be false or doubt its truth at the time of publication.

Next, Adkins tries to diminish the Media Defendants' alleged reliance on Battle, claiming "they did so knowing she was an entirely unreliable source." FAC ¶ 187. But Adkins failed to allege facts showing any actual doubts the Media Defendants harbored as to Battle's reliability. Adkins argues the Media Defendants knew Battle was unreliable because (1) "Battle was among [Mateo] Dunne's star witnesses for his twice rejected discrimination and retaliation claims" before the EEOC, and (2) Battle's affidavit in the EEOC proceeding "pushed false factual assertions," namely Battle's unawareness of an investigation by USADF into Dunne. FAC ¶¶ 56–57. This argument fails for several reasons. First, Adkins' allegations regarding Battle's supposed

---

[4] Battle is not named in any of the articles at issue. *See generally* Dkts. 9-1, 9-2, 9-3 & 9-4.

26

unreliability does not mean the *Media Defendants* subjectively believed Battle to be unreliable at the time of publication. Second, even assuming *arguendo* that the Media Defendants had reason to be suspicious of Battle's credibility, this does not mean everything she said was wrong or that the Media Defendants believed her information about Adkins' tailoring bill to be false. Reliance on even a biased source does not establish actual malice. *See Montgomery v. Risen*, 197 F. Supp. 3d 219, 263 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) (citations omitted).

Adkins further argues that Statement 2 was "inherently improbable." FAC ¶ 188. "[E]vidence that suggests the allegedly defamatory statements are so inherently improbable that only a reckless man would have put them in circulation" can constitute circumstantial evidence of actual malice. *Byrne*, 600 F. Supp. 3d at 33 (citing *Zimmerman*, 246 F. Supp. 3d at 281). But Adkins' inherent improbability argument here fails because he only alleges it is implausible that "Adkins could have gotten the federal government to pay for three custom-tailored suits," not that his tailoring bill was sent to USADF, which is all the Media Defendants reported, and which Adkins does not even deny. FAC ¶ 188. Adkins cannot argue it was inherently improbable that his tailoring bill was sent to USADF when he does not even deny that it took place.

Adkins finally falls back on the same flawed actual malice theories asserted in Count 1. The Court should reject Adkins' attempt to allege actual malice based on Adkins' allegations about the Media Defendants' decision not to seek comment from Adkins about the matter before publication, or their motives, "preconceived narrative," and "ill will and inherent bias" for the same reasons explained above. *See* FAC ¶¶ 189–92; Section, IV.B.2, *supra*.

### 4. Adkins cannot state a defamation claim based on Statement 3.

Adkins has no defamation claim based on the Media Defendants' reporting that he demanded $1,000-a-night hotels. While Adkins insisted he never stayed in such a hotel on the

government dime, demanding an expensive hotel and staying in an expensive hotel are two different things. Adkins conflates the two, arguing the Media Defendants must have known he did not actually stay in such a hotel using USADF funds. But the Media Defendants never reported that he did, and Adkins' failure to plead facts showing the Media Defendants knew their reporting about Adkins' *demands* was false prevents Adkins from making the required falsity and actual malice showings.

**No Falsity.** As with Statement 2, Adkins asks the Court to ignore the literal meaning of Statement 3, i.e., that Adkins *demanded* $1,000-a-night hotels. Adkins rewrites Statement 3 in the FAC, arguing that it conveyed "the false factual assertion that Adkins embezzled funds from USADF to pay for unauthorized hotel accommodations beyond what is allowed under federal law." FAC ¶ 200. Adkins' creative "paraphrasing" belies the weakness of his claim: a *demand* for an expensive hotel room is not necessarily coupled with the *purchase* of an expensive hotel room. If Adkins had demanded that a staffer book an expensive hotel room, only to be rebuffed, Statement 3 would be true, but Adkins' extrapolated version would not be true. And Adkins is careful only to deny that he never stayed in such a hotel using taxpayer funds; he does not specifically and unequivocally deny ever *demanding* a $1,000-a-night hotel. *See* FAC ¶¶ 200–02. Without a clear denial of the claim that he demanded a $1,000-a-night hotel, Adkins cannot meet the basic falsity requirement.

**No Actual Malice.** Even if the Court looks past falsity, Count 3 still fails to clear the actual malice hurdle. Adkins alleges that the Media Defendants admitted "they had no knowledge or evidence that [] Battle, [] Adkins, or anyone else ever sought reimbursement for, or requested the government to for, any hotel accommodations beyond those allowed under federal law." FAC ¶ 208. Once again, Adkins conflates a *demand* with a *purchase*. The Media Defendants did not need

28

knowledge or evidence that Adkins actually tried to stay in a $1,000-a-night hotel with government funds because all Statement 3 said was that he *demanded* such a hotel. And the FAC is silent as to any knowledge of falsity or serious doubts regarding that claim. Adkins' inherently improbability allegations, FAC ¶¶ 210–11, fail to establish actual malice for the same reason: Adkins addresses only the inherently improbability of obtaining a $1,000-a-night hotel with government funds, not his simply demanding one.

Adkins once again relies on the same failed actual malice theories that the Media Defendants refuted above: the Media Defendants not seeking pre-publication comment from Adkins; the Media Defendants' supposed profit motive; their supposed preconceived narrative; and their supposed ill will. *See* FAC ¶¶ 212–15; Sections IV.B.2–3, *supra*.

**5.   Adkins cannot state a defamation claim based on Statement 4.**

Adkins cannot state a defamation claim based on the Media Defendants' reporting of Adkins' discriminatory comments related to his employment of subordinates at USADF. Even if Adkins denies stating that he "wanted his entire team (to include the General Counsel) to consist only of Black people," stating that he "wanted all of his direct reports to be black," that he "refused to hire white people," that "he was very adamant in hiring only African Americans, mainly female," that he "told [Battle] many times he would not hire a white person or a veteran," and that he referred to white people on USADF's board as "them white motherf—ers," FAC ¶¶ 221–22, Adkins cannot establish actual malice or overcome the fair report privilege.

**No Actual Malice.** As with Statements 2 and 3, Adkins cannot establish actual malice for Statement 4 because the Media Defendants relied on a source, and nothing in the FAC indicates knowledge of falsity or serious doubts as to the truth on the part of the Media Defendants. *See*

29

FAC ¶ 229 (conceding that Statement 4 was attributed to a source). Adkins tries to plug this hole with a number of arguments, none of which add up to actual malice.

- *First*, Adkins argues the Media Defendants published Statement 4 with actual malice because they "knew, and later admitted, that during [] Adkins' tenue, non-Black employees were hired and promoted at USADF." FAC ¶ 233. This proves nothing. Even if Adkins ultimately hired or promoted several non-Black employees, it is entirely possible that he still said racist things in private.

- *Second*, Adkins argues that it is "inherently improbable" and "preposterous" that he made such racist comments to his assistant. FAC ¶ 235. One need only peruse Title VII cases to see that it is not improbably at all that a manager, even the head of a federal agency, would make racist comments at work. *See, e.g.*, *Blackmon-Malloy v. United States Capitol Police Bd.*, No. CV 01-2221 (EGS), 2024 WL 4298853, at *2 (D.D.C. Sept. 26, 2024) (detailing the racist language alleged to be pervasive within the United States Capitol Police). Moreover, the Media Defendants reported that Adkins referred to a former junior employee as "the white b—h." Dkt. 9-2 at 4. As Adkins did not sue over this statement, presumably he admits saying it. This alone renders it entirely probable that he made the *other* statements attributed to him.

- *Third*, Adkins discounts the Media Defendants' reliance on Battle's affidavit from the EEOC proceeding, stating, "they were aware that the affidavit itself contained falsehoods." FAC ¶ 236. Even accepting Adkins' contention that the Media Defendants knew Battle's affidavit misstated the facts as to USADF's investigation of Dunne, FAC ¶ 57, Adkins offers no facts that indicate any disbelief on the Media Defendants' part as to the portion of the affidavit that covers Adkins' racist statements, i.e., the part that matters.

30

- *Fourth*, Adkins relies on conflicting testimony from the EEOC proceeding, namely Adkins' denials and supporting testimony from several other USADF employees. FAC ¶ 237.The existence of conflicting evidence is not tantamount to actual malice. The fact that others may have denied Adkins' racism does not mean the Media Defendants did not believe their source's evidence of it. *See Lohrenz*, 350 F.3d at 1285.

- *Fifth*, as to the anti-veteran comment, Adkins relies on similar arguments that the Media Defendants already rebutted, namely, the Media Defendants' alleged reliance on Battle, the supposed improbability of an agency head saying such things to his assistant, the conflicting testimony of other witnesses in the EEOC proceedings, and Rosiak not seeking comment on this matter from Adkins prior to publication. FAC ¶ 239.

Adkins' actual malice showing is especially weak with respect to the "them white motherf—ers" comment, arguing that it is inherently improbable that Adkins used such language to refer to a board that was 40% Black. FAC ¶ 235. Adkins' argument rings hollow in light of the fact that he did not sue the Media Defendants for reporting that Adkins referred to a former junior employee as "the white b—h," Dkt. 9-2 at 4, or that he concealed operations from the board, telling his assistant he didn't think he "should tell them sh–." Dkts. 9-2 at 4 & 9-3 at 15; FAC ¶ 99. Given Adkins' other apparent statements, it is nowhere near inherently improbable that he referred to the Board in disparaging and racialized terms.

**Fair Report Privilege.** The Media Defendants were further privileged to report significant portions of Statement 4 under the fair report privilege. As explained, the fair report privilege requires (1) "a fair and accurate report of a qualified government source," and (2) clear attribution of the statement to the source. *Byrne*, 600 F. Supp. 3d at 34 (citations omitted). Adkins concedes that Battle's affidavit in the EEOC action was the source of most of Adkins' discriminatory

31

comments that the Media Defendants published. *See* FAC ¶¶ 57, 115, 236; *see also* Dkts. 9-2 at 4, 9 (attributing Adkins' statements about wanting his entire team and all of his direct reports to be Black to Adkins' "former assistant['s] . . . sworn affidavit" and Adkins' statement that he "did not want any white people working for him" to "an affidavit from a black employee"); 9-3 at 15, 19 (same) & 9-4 at 3, 6 (same). Adkins therefore cannot sue the Media Defendants for their accurate reporting of the comments arising from a sworn affidavit.

### 6.   Adkins should not be given leave to amend.

The Court should not provide Adkins with leave to amend as any amendment would be futile. *See McGee v. D.C.*, 646 F. Supp. 2d 115, 119 (D.D.C. 2009) ("Denial of leave to amend based on futility is warranted if the proposed claim would not survive a motion to dismiss." (citing *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1099 (D.C. Cir. 1996)). Adkins' FAC fails for two overarching reasons. First, none of the statements at issue can support a defamation claim because of the nature of the statements themselves. The statements are some combination of true, not defamatory, or shielded by the fair report privilege. No additional facts can transform these non-actionable statements into statements capable of supporting a defamation claim. Second, Adkins fails to allege actual malice with sufficient factual specificity. As Adkins has already amended his complaint once, if he had additional facts to clear the imposing hurdle of actual malice, presumably he would already have alleged them. Leave to amend would therefore be futile.

[*continued on following page.*]

32

## IV.    CONCLUSION

The Court should dismiss the case for improper venue, or, in the alternative, transfer it to the Middle District of Tennessee where Daily Wire published the articles at issue. If the Court concludes venue to be proper, the Complaint should be dismissed for failure to state a claim.

Dated: March 30, 2026                                  Respectfully submitted,


                                        */s/ Jesse D. Franklin-Murdock*
                                        Karin M. Sweigart
                                        (Bar #CA00145)
                                        Jesse D. Franklin-Murdock
                                        (Bar #CA00147)
                                        **SWEIGART MURDOCK, LLP**
                                        1160 Battery Street, Suite 100
                                        San Francisco, California 94111
                                        (415) 873-0123
                                        Karin.Sweigart@sm-llp.com
                                        Jesse@sm-llp.com

                                        *Counsel for Defendants*
                                        *The Daily Wire, LLC & Luke Rosiak*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing documents were duly served on all counsel of record via the Court's CM/ECF platform on the date listed below.

Dated: March 30, 2026                          Respectfully submitted,


                                               */s/ Jesse D. Franklin-Murdock*
                                               Karin M. Sweigart
                                               (Bar #CA00145)
                                               Jesse D. Franklin-Murdock
                                               (Bar #CA00147)
                                               **SWEIGART MURDOCK, LLP**
                                               1160 Battery Street, Suite 100
                                               San Francisco, California 94111
                                               (415) 873-0123
                                               Karin.Sweigart@sm-llp.com
                                               Jesse@sm-llp.com

                                               *Counsel for Defendants*
                                               *The Daily Wire, LLC & Luke Rosiak*

34