**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRAVIS ADKINS,<br><br>    Plaintiff,<br><br>  v.<br><br>THE DAILY WIRE, LLC, LUKE ROSIAK,<br>and JASMINE BATTLE,<br><br>    Defendants. | Civil Action No. 25-4399-DLF |

**MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF DEFENDANT BATTLE'S MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.     MISMANAGEMENT AND CORRUPTION AFFLICTED PLAINTIFF'S AGENCY .... 3

        A.    Letter from the Ranking Member of the Senate Foreign Relations Committee ............ 3

        B.    Prosecution of Plaintiff's Finance Director .................................................... 4

        C.    Findings of Mismanagement and Failure to Report Fraud ............................... 5

        D.    Jasmine Battle's Tenure ................................................................................... 8

        E.    The Articles and the Statements Attributed to Defendant Battle ..................... 8

    II.    PLAINTIFF SUES ................................................................................................... 9

ARGUMENT ..................................................................................................................... 9

    I.     PLAINTIFF HAS FAILED TO ESTABLISH PERSONAL JURISDICTION ................... 9

        A.    Jurisdiction Has Not Been Established Under the District's Long-Arm Statute ........... 11

        B.    Personal Jurisdiction Would Not Satisfy Due Process Requirements ......................... 14

    II.    PLAINTIFF HAS FAILED TO STATE A CLAIM ....................................................... 16

        A.    Legal Standard ................................................................................................. 16

        B.    The Amended Complaint Fails to Adequately Allege Published Statements ............... 19

        C.    Several Allegedly Defamatory Statements Connect Be Attributed by Implication ...... 22

        D.    Several of the Statements Are Substantially True ........................................................ 27

            1.    The Tailor's Bill Allegation Is True, and Plaintiff Admits It ................................. 28

2.    The Hotel-Demand Allegation Is Not Alleged to Be False.......................................30

E.    Statements Derived from Defendant Battle's Affidavit Are Privileged........................32

F.    Several Statements Are Protected Opinion or Are Not Objectively Verifiable ............33

G.    The Amended Complaint Fails to Adequately Plead Actual Malice........................35

H.    Plaintiff Cannot Prove an Actionable Injury...............................................37

1.    The allegedly defamatory statements do not constitute defamation per se ..............39

2.    The Amended Complaint fails to adequately plead injury.......................................40

CONCLUSION....................................................................................................44

ii

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013) ...................................................... 27, 35

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) ......................................................... 36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................. 10, 19, 28, 35

*Associated Producers, Ltd. v. Vanderbilt Univ.*, 76 F. Supp. 3d 154 (D.D.C. 2014) ......... 9, 10, 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 19

*Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216 (D.D.C. 2004) ............................................. 27

*Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017) .................................. 15, 16

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ....................................................... 14

*BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1 (D.D.C. 2021) ..................................... 17

*Caldwell v. Hayden*, 42 App. D.C. 166 (D.C. Cir. 1914) ..................................................... 38

*Caudle v. Thomason*, 942 F. Supp. 635 (D.D.C. 1996) .......................................................... 19

*Church of Scientology v. Cazares*, 638 F.2d 1272 (5th Cir. 1981) ......................................... 21

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ...................................................................... 10

*Dall v. Pearson*, 246 F. Supp. 812 (D.D.C. 1963) ................................................................ 28

*EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621 (D.C. Cir. 1997) ........................ 17

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018) ........................................................ 17

*Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) .................................................. 28

*Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*,
    774 A.2d 332 (D.C. 2001) ................................................................................ 32

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351 (2021) ..................... 10, 15

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ........................................................................ 19

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ................................................ 35, 38, 40, 41

*Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915 (2011) ......................... 10, 15

*Grossman v. Goemans*, 631 F. Supp. 972 (D.D.C. 1986) ...................................................... 38

*GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d. 1343 (D.C. Cir. 2000) .......................... 10

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000) ...................................... 34

*Harmon v. Liss*, 116 A.2d 693 (D.C. 1955) ........................................................................ 38

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............................ 37

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ............................. 14

*Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78 (D.D.C. 2022) ..................................... 27

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016) .................................... 36

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) ............................................................... 18

*Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (D.C. 1970) ............................................. 38

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ............................................................ 3, 8

*Kahl v. National Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) .............................................. 17

*Larue v. Johnson*, No. 16-cv-00504,
     2018 U.S. Dist. LEXIS 238815 (D.D.C. Feb. 22, 2018) ............................................. 38

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ......................... 19, 36

*Libre by Nexus v. BuzzFeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018) ................................... 18

*Mason v. American Prospect, Inc.*, No. 23-cv-2238,
     2024 U.S. Dist. LEXIS 176674 (D.D.C. Sept. 30, 2024) ........................................... 35

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) ............................... 28, 37

*McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 717 F.2d 1460 (D.C. Cir. 1983) ............. 23

*McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996)...................................12

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)...................................................... 18, 33

*Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) ................................... 19, 28, 35

*Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217 (D.C. Cir. 1986) ............................13

*Murray v. Shaw*, No. 24-cv-00640,
    2025 U.S. Dist. LEXIS 56247 (D.D.C. Mar. 26, 2025)......................................... 25, 39

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)............................................................35

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) ......................................................... 33, 34

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005) ......................................................................18

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986)....................................... 28, 32

*Raboya v. Shrybman & Assocs.*, 777 F. Supp. 58 (D.D.C. 1991)..................................... 38, 40

*Ratchford v. Café Dupont, LLC*, No. 24-cv-2062,
    2025 U.S. Dist. LEXIS 156747 at **3-5 (D.D.C. Aug. 14, 2025)...............................16

*Rush v. Savchuk*, 444 U.S. 320 (1980)..................................................................................11

*Second Amendment Found. v. United States Conf. of Mayors*,
    274 F.3d 521 (D.C. Cir. 2001) .......................................................................................10

*Shaheen v. Smith*, 994 F. Supp. 2d 77 (D.D.C. 2013)............................................................14

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000) .......................................15

*Solers, Inc. v. Doe*, 977 A.2d 941 (D.C. 2009).....................................................................18

*Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.*,
    877 F.2d 1010 (D.C. Cir. 1989) .....................................................................................23

*St. Amant v. Thompson*, 390 U.S. 727 (1968) .............................................................. 19, 37

*Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988)................................................................35

*Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1 (D.D.C. 2001) ..................................32

*Stovell v. James*, 810 F. Supp. 2d 237 (D.D.C. 2011) ............................................................. 19

*Tah v. Global Witness Publ., Inc.*, 991 F.3d 231 (D.C. Cir. 2021) ........................................... 37

*Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 98 (D.D.C. 2019) ................................... 10

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ........................................ 18, 19

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ................................... 23, 24

*World-Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980)) .................................................... 15

*Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257 (D.D.C. 2017) ............................... 18

**Statutes**

D.C. Code § 12-301(a)(4) ....................................................................................................... 16

D.C. Code § 13-422 ................................................................................................................ 10

D.C. Code § 13-423(a)(3) ....................................................................................................... 11

D.C. Code § 13-423(a)(4) .................................................................................................. 13, 14

**INTRODUCTION**

Plaintiff Travis Adkins presided over one of the most corrupt federal agencies in recent memory.  During his tenure as president of the United States African Development Foundation,[1] the Senate Foreign Relations Committee named him personally as potentially "complicit in, corrupt and potentially unlawful practices" and placed a congressional hold on the agency's funding.  His own chief financial officer pleaded guilty to public corruption for acts that ran through every year of Plaintiff's leadership.  The USAID Office of Inspector General issued a management advisory addressed to Adkins personally, finding that senior officials under his watch had known of or suspected grant fund misuse and failed to report it to the proper authorities.  The U.S. Government Accountability Office found that the agency had no strategic approach to fraud prevention and that its procurement officials had engaged in "questionable practices."

Defendant Jasmine Battle, a seasoned and well-respected administrative professional, whose career included working with former cabinet-level officials witnessed this dysfunction firsthand, served as Plaintiff's assistant for seven months in 2022.  What she saw troubled her, and she did what conscientious public servants are supposed to do.  She reported it to Plaintiff, to the EEOC, and to oversight bodies like Congress.  Plaintiff, now under a microscope for what occurred during his tenure as president, is seeking to silence her.  And now Defendant Battle finds herself in a seemingly partisan crossfire because she had the courage to be a whistleblower. The irony here is that she is not even the most prominently featured whistleblower in Plaintiff's Amended Complaint.

---

[1]    The USADF president also holds the title of chief executive officer.  For purposes of this motion, this additional title will be omitted.

1

Plaintiff's Amended Complaint fails at every level.  It fails because Plaintiff has not established that this Court has personal jurisdiction over Defendant Battle, a private Maryland resident whose alleged communications with a Virginia-based reporter have no demonstrated nexus to the District of Columbia.  It also fails because the Complaint does not actually allege, as a matter of fact rather than inference, that Defendant Battle made the specific statements attributed to an anonymous former assistant.  The Amended Complaint pleads liability only conditionally, "to the extent Defendant Battle published" the challenged statements, an acknowledgment of uncertainty that is not a pleading of fact.  It fails because the two statements most directly attributed to Defendant Battle—that Adkins sent a tailor's bill to the agency and that he demanded expensive hotels—are either true by Plaintiff's own admission or undenied in the Amended Complaint.  It fails because the defamatory implications alleged by Plaintiff flow entirely from the other defendants' editorial choices, none of which are attributable to a source who communicated facts privately to a reporter.  And it fails because even if the per se theory were viable, Plaintiff is a public figure who must plead actual injury causally connected to specific statements allegedly made by Defendant Battle.  The claims against Defendant Battle should be dismissed.

**BACKGROUND**

Plaintiff Travis Adkins became the USADF's president in January 2022 after serving as a political appointee at USAID during the administration of President Biden.  (Am. Compl. ¶¶ 11, 36; *id.* Ex. C Luke Rosiak, *This Foreign Aid Agency Locked Its Doors to Keep DOGE Out. Now We Know Why.*, THE DAILY WIRE (May 14, 2025), at *4.)[2]  According to Plaintiff, USADF board

---

[2]     Given that the other defendants' articles, which are included in the exhibits to the Amended Complaint, are the wellspring of Plaintiff's allegations, Defendant Battle will, for

2

members sought him out for the position.  He ultimately replaced his friend, C.D. Glin, as USADF president.  (*See, e.g.,* Am. Compl. ¶ 156.)

## I.    MISMANAGEMENT AND CORRUPTION AFFLICTED PLAINTIFF'S AGENCY

### A.  Letter from the Ranking Member of the Senate Foreign Relations Committee

The hallmark of Plaintiff's tenure was mismanagement and corruption.  On November 1, 2023, more than 18 months before Defendant The Daily Wire published any challenged article, Senator James E. Risch, then Ranking Member of the Senate Foreign Relations Committee, sent a formal letter to the Acting Deputy Inspector General of USAID, demanding an immediate investigation into USADF.  The letter named Plaintiff personally, stating that he "may be complicit in, corrupt and potentially unlawful practices."  (Ex. A (Letter from Sen. James E. Risch to Nicole Angarella (Nov. 1, 2023) at 1).)[3]

The Senate Letter catalogued five categories of misconduct, each touching directly on Plaintiff's responsibilities as president.  First, it alleged "misuse of official funds" through "a non-transparent, alternative payment mechanism" that enabled foreign partners to tap USADF funds held overseas and route payments to U.S.-based employees in violation of federal rules. (*Id.* at 1-2.)  It alleged that grant awards had been structured specifically to "circumvent the $250,000 small grant cap and evade oversight," and that grant funds legally required to be spent overseas were instead used to pay two U.S.-based communications staff.  (*Id.*)

---

purposes of the Motion to Dismiss, rely on the facts in the exhibits to the extent that Plaintiff does not specifically allege are false.

[3]    The letter, which will be referred as the Senate Letter, is a public record available on the Senate Foreign Relation Committee's website at https://www.foreign.senate.gov/imo/media/doc/ usadf_letter.pdf.  As such, the Court may take judicial notice of it.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (holding that "public records [are] subject to judicial notice on a motion to dismiss") (citations omitted).

Next, the Senate Letter documented "conflicts of interest and inappropriate partnerships." (*Id*. at 2.)  Third, the Senate Letter flagged "gross mismanagement," noting that USADF had operated without a full-time general counsel or legal advisor for a full year, from April 2022 through April 2023.  (*Id.*)  The letter alleged that USADF's senior leaders had "deliberately sought to avoid hiring qualified finance and contracting officers in an effort to evade internal scrutiny and limit internal controls."  (*Id.*)  It then specifically alleged a $2 million deposit by Mathieu Zahui, Plaintiff's finance director, into a bank account in Ghana in February 2023 that lacked the required dual-signature authorization.  (*Id*.)

Fourth, the Senate Letter cited credible reports of a "toxic workplace," including that USADF leadership had "actively sought to exclude veterans and individuals who are not of African descent from hiring" and had retaliated against employees who raised concerns about misconduct.  (*Id*. at 3.)  Fifth, and perhaps most damning, the Senate Letter described "attempts by USADF to suppress evidence of wrongdoing," including the suspension of USADF's general counsel and a report that Zahui had recently traveled to African countries to "close bank accounts and take possession of documentation that might 'negatively reflect upon USADF.'"  (*Id*.)

**B.  Prosecution of Plaintiff's Finance Director**

The most consequential confirmation of the whistleblower information referenced in the Senate Letter came in January 2026, when Mathieu Zahui, Plaintiff's finance director, was convicted of receiving illegal gratuities as a public official and making false statements to federal law enforcement.  *United States v. Zahui*, No. 26-cr-16 (D.D.C. Jan. 30, 2026).  The Statement of Offense, stipulated to by Zahui, describes years of corruption running through the USADF's financial management systems while Plaintiff served as president.  (Ex. B Statement of Offense, *United States v. Zahui*, No. 26-cr-16 (D.D.C. Feb. 23, 2026).)

4

As part of his guilty plea, Zahui admitted to steering nearly $800,000 in sole-source contracts to a company owned by a personal friend. (*See id.* at ¶¶ 5-11.) Zahui purposely ignored the USADF's restriction on awarding sole-source contracts valued at more than $100,000, instead directing the initial contract to be extended well beyond the restriction. (*Id.* at ¶¶ 7-8.) He then arranged for the USADF to pay its other vendors and contractors through the friend's company at fraudulent markups ranging from 17 to 66 percent, approving invoices for work the company never performed. (*Id.* at ¶ 9.) In total, Zahui caused USADF to pay at least $600,000 through fraudulent pass-through invoices, of which his friend's company retained over $130,000 in unjustified markups. (*Id.*) While all of this was happening, the friend was transmitting personal cash payments directly into Zahui's bank account. Zahui received $12,000 this way, in eight separate transfers, as compensation for the official acts he had performed and would continue to perform. (*Id.* at ¶ 12.) When federal investigators later interviewed him, Zahui lied and denied having received any benefits from the friend at all. (*Id.* at ¶ 14.)

### C. Findings of Mismanagement and Failure to Report Fraud

Over the last several years, the USAID Office of Inspector General issued a series of reports exposing mismanagement and failure to report fraud during Plaintiff's tenure as USADF president. In August 2024, USAID OIG issued a management advisory, reporting, among other things, that USADF officials under Plaintiff's leadership "knew of suspected misuse of foundation funds and equipment purchased through foundation grants but failed to report this information to OIG as required." (Ex. C USAID OIG, *Nonreporting of Suspected Misuse of USADF Grant Funds and Equipment*, Mgmt. Advisory E-ADF-24-001-A (Aug. 29, 2024) at 1.)[4]

---

[4]    This management advisory is an official government record available on USAID OIG's website at https://oig.usaid.gov/node/7074. Furthermore, the Amended Complaint references

The known but concealed misuse of taxpayer funds included one grantee routing USADF funds to a family member and another grantee using a grant-funded vehicle for unauthorized purposes, resulting in a fatal collision. (*Id.*) The OIG further reported that USADF "staff responsible for grant oversight" were unaware of, or misinformed about, the OIG's role in detecting fraud. (*Id.* at 1-2.) As an example of the USADF's failure to appropriately handle known instances of waste, fraud, and abuse, the Management Advisory noted that the OIG's fraud hotline received just five reports about USADF during Plaintiff's entire tenure. (*Id.* at 2.) Significantly, in his response to the OIG Management Advisory, Plaintiff did not dispute the examples of misused grant funds or his agency's failure to report known instances of waste, fraud, and abuse to the appropriate authorities or the examples of misused grant funds. (*See id.* at 4-6 (responding to the Management Advisory under Plaintiff's name).)

The USAID OIG followed up this report with a formal evaluation of the USADF's strategic partnerships and grants administration covering fiscal years 2022 through 2024. (Ex. D USAID OIG, *U.S. African Development Foundation: Gaps in Policy and Guidance Hindered Strategic Partnerships and Grants Administration*, Report E-ADF-25-004-M (Aug. 28, 2025) at 1.)[5] The results were damning across every dimension of agency management for which Plaintiff bore responsibility. USADF had drafted a strategic partnership policy in May 2022, three months after Plaintiff took over, but never finalized it, leaving the agency to manage an expanding portfolio of private-sector and governmental partnerships with no formal policies or

OIG reports as evidence showing the challenged statements are false. (*See, e.g.,* Am. Compl. ¶ 6.) Accordingly, the Court should take judicial notice of the report.

[5]    This evaluation report is an official government record available on USAID OIG's website at https://shorturl.at/PjQg5. Furthermore, the Amended Complaint references OIG reports as evidence showing the challenged statements are false. (*See, e.g.,* Am. Compl. ¶ 6.) Accordingly, the Court should take judicial notice of the report.

procedures governing due diligence, financing, or funds management. (*Id.* at 6-7.) Of the $69 million that the USADF's 32 active strategic partners pledged to contribute between FY 2022 and FY 2024, the agency collected only $17 million, or 25 percent. (*Id.* at 8.) Furthermore, its public reporting on those partnerships used inconsistent terminology that the OIG found "could mislead readers." (*Id.* at 9.) On grants administration, the agency's core statutory function, the OIG found that USADF lacked clear guidance and procedures, failed to meet its own disbursement and reporting timelines, and had no policies, procedures, or staff training governing the use of its grants management database, resulting in grants being "inconsistently administered" and required documentation going unmaintained. (*See, e.g., id.* at 1.) Critically, USAID OIG noted that during this same evaluation, it had "discovered that USADF officials knew of suspected misuse of Foundation funds and equipment purchased from Foundation grants but failed to report this information to OIG as required," reinforcing the finding that gave rise to the Management Advisory addressed to Plaintiff personally. (*Id.* at 2-3.)

Shortly after the USAID OIG evaluation report, the U.S. Government Accountability Office issued its examination of USADF's fraud risk management for fiscal years 2020 through 2024, concluding that USADF "had some policies and procedures to mitigate fraud, waste, and abuse, but no strategic approach." (Ex. E (GAO, *U.S. African Development Foundation: Strategic Approach Needed to Mitigate Fraud Risks*, GAO-25-107574 (Sept. 15, 2025).) [6] The GAO found that USADF "did not have a dedicated individual or entity to lead fraud risk management activities" and had not followed leading federal practices to assess, plan, or mitigate

---

[6]     This report is an official government record available on GAO's website. *U.S. African Development Foundation: Strategic Approach Needed to Mitigate Fraud Risks*, GAO-25-107574 (Sept. 15, 2025) available at https://www.gao.gov/products/gao-25-107574. Accordingly, the Court should take judicial notice of the report.

fraud risks.  (*Id.*)  The GAO further found that many of USADF's existing policies were "outdated or undocumented" and that USADF's procurement officials "engaged in questionable practices when making foreign assistance awards, such as steering contracts to former USADF contractual employees," conduct directly paralleling Zahui's criminal conduct.  (*Id.*)

### D.  Jasmine Battle's Tenure

Defendant Jasmine Battle is a seasoned administrative professional who has spent her career supporting some of the most senior figures in American public life.  Those who relied on Defendant Battle for her professionalism and insight are former cabinet-level officials.  (Ex. F Battle Aff. ¶ 2.)[7]  She is, by any measure, a serious person with serious credentials — the kind of professional whose discretion and judgment senior officials rely upon at the highest levels of government.

In February 2022, Defendant Battle took a position as Special Assistant to Travis Adkins, the newly installed president of USADF.  (*Id.* ¶ 3.)  And she worked in that capacity for seven months, through September 2022, before her time at the agency came to an end.  (Am. Compl. ¶ 14.)  Plaintiff, of course, tells a self-serving story about how Defendant Battle's tenure ended. But Plaintiff's account is not an established fact, and the Amended Complaint offers no corroborating source, no documentary evidence, and no sworn statement in support of it.

### E.  The Articles and the Statements Attributed to Defendant Battle

Defendant The Daily Wire published a series of investigative articles about USADF in May 2025.  The Amended Complaint alleges that two of the four articles in the series contained

---

[7]  The Amended Complaint quotes extensively from Defendant Battle's affidavit submitted in Dunne's EEO case.  Because Defendant Battle's affidavit is referred to in the complaint and is an integral part of Plaintiff's claims and because he does not dispute the document's authenticity, the Court may rely on it in this motion to dismiss.  *Kaempe*, 367 F.3d at 965.

statements from Defendant Battle about Plaintiff.  In fact, those articles attribute the statements identified by the Amended Complaint to a source described only as a former assistant.  (*See, e.g.,* Am. Compl. ¶¶ 55, 76, 87, 99.)  The articles did not name Defendant Battle as the source.

## II.    PLAINTIFF SUES

Late 2025, Plaintiff brought this lawsuit against Defendant The Daily Wire and Defendant Luke Rosiak, as well as Defendant Battle.  The Amended Complaint identifies four statements it characterizes as defamatory: (1) that Plaintiff was appointed to lead USADF "without even applying for the job"; (2) that Plaintiff "had a tailor fit him for three custom suits, and sent the bill to the agency"; (3) that Plaintiff "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements"; and (4) that Plaintiff "wanted his entire team (to include the General Counsel) to consist only of Black people," "wanted all of his direct reports to be Black," "was very adamant in only hiring African Americans, mainly female," and "told [her] many times he would not hire a white person or a veteran," and referred to USADF's board as "them white motherf---ers."  (*See* Am. Compl. ¶¶ 155, 176, 198, 221.)

ARGUMENT

## I.    PLAINTIFF HAS FAILED TO ESTABLISH PERSONAL JURISDICTION

As a threshold matter, Plaintiff has failed to prove that the Court has the authority to exercise personal jurisdiction over Defendant Battle.  Plaintiff bears the burden of establishing personal jurisdiction over each defendant.  *Associated Producers, Ltd. v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 161 (D.D.C. 2014).  At the pleading stage, he "must allege specific acts connecting the defendant with the forum," not simply mere labels or "legal conclusions" and "naked assertion[s] devoid of further factual enhancement."  *Second Amendment Found. v.*

9

*United States Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Furthermore, the Court "need not treat all of a plaintiff's allegations as true; rather, the Court "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *Associated Producers, Ltd.*, 76 F. Supp. 3d at 161 (citation omitted).  In his Amended Complaint, Plaintiff has failed to plead facts sufficient to meet his burden of establishing personal jurisdiction over Defendant Battle.  Accordingly, all claims against Defendant Battle should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

Personal jurisdiction essentially exists in two forms, either "general or all-purpose jurisdiction" or "specific or case-linked jurisdiction." *Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 98, 105 (D.D.C. 2019) (citing *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)).  Because Defendant Battle obviously does not live in the District of Columbia, (*see* Am. Compl. ¶ 14),[8] the sole inquiry here is whether specific jurisdiction exists.  Courts in this circuit utilize a two-part inquiry into whether a plaintiff has met his burden of showing that specific jurisdiction exists.  "A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d. 1343, 1347 (D.C. Cir. 2000).

---

[8]    In the District, general jurisdiction is governed by D.C. Code § 13-422, which confers jurisdiction over resident defendants.  Since at least *Goodyear*, 564 U.S. at 915, and *Daimler AG v. Bauman*, 571 U.S. 117 (2014), courts have consistently held that general jurisdiction is available only where a defendant's affiliations with the forum are so continuous and systematic as to render it essentially at home there.  Paradigmatic cases of general jurisdiction exist where an individual is domiciled. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 358-59 (2021).

The Amended Complaint's jurisdictional allegations as to Defendant Battle are strikingly thin. The complaint makes no defendant-specific jurisdictional allegations whatsoever with respect to Defendant Battle. Instead, it offers only a collective, boilerplate assertion that this Court has personal jurisdiction over "Defendants" because their acts caused "tortious injury in the District of Columbia to a District of Columbia resident" and because they "regularly do or solicit business, engage in persistent courses of conduct, and derive substantial revenue from services performed in the District of Columbia." (Am. Compl. ¶ 17.) These collective allegations, lumping together a national media company based in Tennessee, a Virginia-based journalist, and a private Maryland resident, cannot substitute for the particularized showing required for each defendant individually. *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980) ("The requirements of *International Shoe*, however, must be met as to each defendant over whom a state court exercises jurisdiction.").

**A. Jurisdiction Has Not Been Established Under the District's Long-Arm Statute**

Construing the jurisdictional facts in the Amended Complaint in a light most favorable to the assertion of personal jurisdiction, *Associated Producers, Ltd.*, 76 F. Supp. 3d at 161 (citation omitted), it appears that the most relevant provision of the District's long-arm statute would be D.C. Code § 13-423(a)(3). Plaintiff's Amended Complaint does not identify the specific statutory authority granting this Court personal jurisdiction over Defendant Battle. In relevant portions, Plaintiff first asserts that the Court has personal jurisdiction "over Defendants" because they "caused tortious injury in the District of Columbia … by acts or omissions occurring in the District of Columbia." (Am. Compl. ¶ 17.) This invokes language reminiscent of Subsection (a)(3), which authorizes the exercise of specific jurisdiction over a non-resident whose acts allegedly caused "tortious injury in the District of Columbia by an act or omission in the District

11

of Columba."

Subsection (a)(3) requires that tortious act itself occur within D.C. rather than merely because the plaintiff suffered harm in D.C. *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016). It is, according to the D.C. Circuit, "a precise and intentionally restricted tort section, which stops short of the outer limits of due process, and which confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts.'" *Id.* (citation omitted). The gravamen of Subsection (a)(3), therefore, is that the alleged tortious act was committed by the defendant while in the District. In the case of the tort of defamation, this means that the jurisdictional nexus is where the allegedly defamatory statement was published. *See,* e.g., *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) (holding no specific jurisdiction over a non-resident defendant where allegedly defamatory statements were made in another state). If that allegedly defamatory statement was published in another venue, Subsection (a)(3) does not support the exercise of jurisdiction over a Maryland resident who publishes a defamatory statement in Virginia, even if that defendant subsequently directs the statement into the District. *See, e.g., Forras*, 812 F.3d at 1107 ("The relevant act, we explained was the uttering of defamatory statements, and the printing and mailing of the newspaper, all of which happened outside of the District.") (citation modified).

Plaintiff's jurisdictional claim under Subsection (a)(3) fails at the outset because the Amended Complaint nowhere alleges that Defendant Battle's communications with Defendant Rosiak, the only acts that could conceivably give rise to liability, occurred in the District of Columbia. Defendant Battle is a Maryland resident and Defendant Rosiak is a Virginia resident. (Am. Compl. ¶¶ 13-14.) Subsection (a)(3) requires that the tortious act itself occur in the

District, not merely that its effects be felt there.  *See Forras*, 812 F.3d at 1106-07; *see also Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 218-21 (D.C. Cir. 1986).  Given that all defendants are residents of jurisdictions other than the District and given that the Amended Complaint offers no allegation that their communications occurred in the District, Plaintiff has failed to plead the foundational fact Subsection (a)(3) requires for Defendant Battle.

Separately, the Amended Complaint asserts that the "Court also has personal jurisdiction over Defendants because they regularly do or solicit business, engage in persistent courses of conduct, and derive substantial revenue from services performed in the District of Columbia."  Here, Plaintiff is almost certainly invoking D.C. Code § 13-423(a)(4), which provides that personal jurisdiction in the District of Columbia exists where a person causes "tortious injury in the District of Columbia by an act or omission outside of the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."

Because Subsection (a)(4) reaches tortious conduct beyond the territorial limits of the District, an exercise of jurisdiction under the District's long-arm statute requires "something more."  *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987).  This "something more" requires that a defendant (1) "regularly does or solicits business" in the District, (2) "engages in any other persistent course of conduct" in the District, or (3) "derives substantial revenue from goods used or consumed, or services rendered, in the District."  D.C. Code § 13-423(a)(4).

Plaintiff's jurisdictional claim under Subsection (a)(4) fares no better than his claim under Subsection (a)(3).  Even assuming Defendant Battle's alleged statements were made outside of D.C., which, as noted, the complaint fails to contradict, Subsection (a)(4) requires the additional showing that Defendant Battle "regularly does or solicits business, engages in any

13

other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). The Amended Complaint's only hook for this prong is the bare allegation that Defendant Battle "continues to work in Washington, D.C. today." (Am. Compl. ¶ 14.) This conclusory assertion is statutorily insufficient in three respects.

As an initial matter, the Amended Complaint identifies no employer, no industry, no nature of work, no revenues, and no other detail that would permit the Court to assess whether Defendant Battle "regularly does or solicits business" in D.C. within the meaning of the statute. A conclusory assertion that someone "works in D.C." does not satisfy this standard. *See Shaheen v. Smith*, 994 F. Supp. 2d 77, 81 (D.D.C. 2013) ("A court need not accept the plaintiff's conclusory statements or bare allegations regarding the defendant's actions in a selected forum.") (citation modified). Furthermore, her alleged defamatory statements to a reporter about events that occurred years earlier during her brief tenure at USADF bear no discernible relationship to whatever she currently does for work. Finally, Defendant Battle's prior employment at USADF ended nearly three years before the articles were published.

### B. Personal Jurisdiction Would Not Satisfy Due Process Requirements

Even if the long-arm statute were satisfied, asserting personal jurisdiction over Defendant Battle would offend the Due Process Clause of the Fifth Amendment. The constitutional requirements for specific jurisdiction, as opposed to those in a state's long-arm statute, requires, among other things, that "the litigation results from alleged injuries that 'arise out of or relate to' those" activities that the defendant has purposefully directed at residents of the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *see also Shoppers Food Warehouse v. Moreno*,

746 A.2d 320, 328 (D.C. 2000) (noting fair notice associated with due process "is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities") (citation omitted). "[T]he primary concern" of the constitutional inquiry, however, is "the burden on the defendant." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 263 (2017) (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 292 (1980)). This burden includes both the practical problems of litigating in the forum and the more abstract matters of submitting to the coercive power of a state with minimal legitimate interest in the claims. *Id.* Consequently,

> [e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

*World-Wide Volkswagen*, 444 U.S. at 294 (citation modified).

Plaintiff's failure to meet the "arising-out-of" requirement reinforces his failure to meet his burden of showing that Defendant Battle is subject to the specific jurisdiction of the Court. Specific jurisdiction demands that a plaintiff's suit must *arise out of or relate to* the defendant's contacts with the forum. *Ford Motor Co*, 592 U.S. at 362. Put differently, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulations." *Bristol-Myers*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919). Defendant Battle's current employment, even if adequately pled, has no relationship to her alleged statements about events that occurred years ago, during her tenure at USADF. Assuming, without any support from the Amended Complaint, that the alleged publication of defamatory statements to Defendant occurred within the District of Columbia's one-year statute of limitations for defamation, D.C.

15

Code § 12-301(a)(4), her prior employment at USADF ended in September 2022, long before an actionable claim of defamation could have accrued.  Furthermore, historical forum contacts that neither caused nor related to the claims at issue cannot establish specific jurisdiction.  See *Bristol-Myers*, 582 U.S. at 264 ("There must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.  When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.") (citation modified).

Because the Amended Complaint's jurisdictional deficiency as to Defendant Battle is structural, rooted in its failure to set forth facts sufficient to establish a nexus between the District and her alleged tortious acts, an amendment cannot cure it.  Plaintiff cannot overcome the jurisdictional facts of his claim: Defendant Battle is a Maryland resident who allegedly spoke to a Virginia-based reporter.  No amount of repleading will change those facts or supply the nexus required by the District's long-arm statute and the Constitution.  Dismissal for lack of personal jurisdiction should accordingly operate as a dismissal with prejudice as to this forum, and the Court need not reach any of the arguments set forth below.

## II.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF

### A.  Legal Standard

The standards governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are well established and need no explication.  *See Ratchford v. Café Dupont, LLC*, No. 24-cv-2062, 2025 U.S. Dist. LEXIS 156747 at **3-5 (D.D.C. Aug. 14, 2025) (setting out in a clear fashion the standard for a motion to dismiss).  Suffice it to say, in evaluating the sufficiency of the complaint, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take

16

judicial notice." *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).

The Court's review in a defamation case seeking to chill the freedom of speech about a public figure is especially exacting. Then-Circuit Judge Kavanaugh began his opinion in *Kahl v. National Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) with a succinct but powerful recitation of this constitutionally rooted imperative:

> The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve the First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation lawsuits.

*Id.* at 108 (citations omitted). Because the First Amendment does not reserve its protection for professional journalists alone, this imperative applies with equal force to private citizens who speak on matters of public concern as it does to the institutional press that publishes that speech. Thus, Rule 12 plays a crucial screening role in a case like this one. "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 6 (D.D.C. 2021) (quoting *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018)). Where, as here, a plaintiff uses defamation litigation to chill the willingness of a former employee to speak candidly about matters of genuine public concern, the case for early dismissal is especially strong.

To state a defamation claim under D.C. law, a plaintiff must plead: (1) that the defendant made a false and defamatory statement of fact; (2) that the defendant published the statement without privilege to a third party; (3) that the statement was made with the requisite degree of

fault; and (4) that the statement was actionable either as a matter of law or that its publication caused him special harm. *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009); *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005). Although often identified as a single element, falsity and defamatory are treated as "distinct elements of the tort of defamation and are considered separately." *Libre by Nexus v. BuzzFeed, Inc.*, 311 F. Supp. 3d 149, 155 (D.D.C. 2018) (quotation omitted). In other words, defamation requires that a statement must not only be defamatory, but also plausibly false. *Id.* A defamatory statement is one that "tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Howard Univ. v. Best*, 484 A.2d 958, 987-89 (D.C. 1984) (quotations omitted). "While the question 'whether a statement is capable of defamatory meaning' is indisputably a 'threshold question of law,' … falsity, under some circumstances, may also be decided as a matter of law." *Libre by Nexus*, 311 F. Supp. 3d at 155 (quoting *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 275 (D.D.C. 2017) (quotations omitted)).

When applying the District's defamation law to a public figure, such as Plaintiff, the Constitution adds additional requirements that must be plausibly alleged.[9] First, the statement must be actually false to be actionable, reversing the common-law presumption that defamatory speech is false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001) ("[Appellant] must show that the potentially defamatory statements are indeed materially false."). Second, the statement must have been

---

[9] There can be little doubt that Plaintiff qualifies as a public official. The Supreme Court has made clear that government employees who have, or appear to the public to have, "substantial responsibility for or control over the conduct of governmental affairs" are public officials for purposes of the First Amendment. *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). As the president of a federal agency, Plaintiff plainly occupied a position of substantial governmental responsibility, and the claims concerning his conduct in that role relate directly to his official duties.

18

made with actual malice, meaning it was made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* Actual malice is a subjective text, requiring a showing "in convincing fashion 'that the defendant in fact entertained serious doubts as to the truth of his publication' … [and] that the defendant himself entertained a 'high degree of awareness of … probable falsity." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292-93 (D.C. Cir. 1988) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). And third, the statement "must at a minimum express or imply a verifiably false fact" about a plaintiff in order to be actionable. *Weyrich*, 235 F.3d at 624 (citing *Milkovich*, 497 U.S. at 17; *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994)). "Verifiability is therefore a critical threshold question at the Rule 12(b)(6) stage." *Id.*

### B. The Amended Complaint Fails to Adequately Allege Published Statements

Typically, a plaintiff alleging defamation should plead "the time, place, content, speaker, and listener of the allegedly defamatory matter." *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011) (quoting *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996)). A plaintiff can do that by pleading enough facts to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court need not accept as true allegations that are merely conclusory, and it should not fill gaps in a complaint with inferences that the pleading does not actually support. *Iqbal*, 556 U.S. at 678-79. That standard applies with to each of the elements of a defamation claim, including the threshold requirement that the defendant made the allegedly defamatory statement. The question, therefore, is not whether it is conceivable that Defendant Battle made the statements attributed to her by Plaintiff, but whether the complaint plausibly, as opposed to speculatively, establishes that she did.

19

The Amended Complaint fails that test in that it does not actually allege, as a matter of fact, that Defendant Battle published the specific statements that Defendant The Daily Wire published. Instead, throughout the operative claims, the Amended Complaint attributes the defamatory statements to Defendant Battle only conditionally and inferentially, based on the supposition that she was one out of an unidentified number of former assistants who worked for Plaintiff over his tenure. (*See, e.g.,* Am. Compl. ¶ 182 ("In the article, The Daily Wire Defendants attribute the defamatory statement to Defendant Battle, who purportedly gave the statement to them in advance of publication.").) Each of the three claims against Defendant Battle is then framed in explicitly hedged terms. For example: "To the extent Defendant Battle published the defamatory statement[s] to The Daily Wire Defendants, she did so with actual malice." (Am. Compl. ¶¶ 183, 205, 230.) Pleading liability in the conditional is not pleading liability at all. It is an acknowledgment of uncertainty, not an allegation of fact.

The insufficiency of this hedged pleading is compounded by the Amended Complaint's own allegations about what happened when Plaintiff sought to verify that Defendant Battle made the statements. After publication, Plaintiff's counsel asked Defendant Battle to confirm that she had, in fact, told the other defendants each of the three core allegations attributed to her, namely, that plaintiff had a tailor send a bill to the USADF, that plaintiff demanded a $1,000 per night hotel, and that plaintiff wanted his direct reports to be black. (Am. Compl. ¶¶ 182, 204, 229.) Defendant Battle declined to do so in each instance. (*Id*. at ¶¶ 182, 204, 229.) The Amended Complaint acknowledges this yet offers scant alternative factual basis to conclude that Defendant Battle made these statements. This sequence of events does not support a reasonable inference that Defendant Battle made the statements; if anything, it undermines any reasonable inference.

20

*Cf. Church of Scientology v. Cazares*, 638 F.2d 1272, 1288 (5th Cir. 1981) (prohibiting "build[ing] inference upon inference in order to find defamatory meaning in a statement").

The Amended Complaint's theory effectively asks the Court to treat the other defendants' attribution of statements to an anonymous former assistant as itself sufficient proof that Defendant Battle made those statements. But the Amended Complaint fails to plead that fact. It alleges only that The Daily Wire published articles attributing certain statements to a source it described as Plaintiff's former assistant, a description that could fit more than one person, and then assumes, without pleading, that Defendant Battle was that source. That inferential leap is not a well-pled factual allegation. It is speculation, and speculation does not survive *Twombly*.

Even setting aside the threshold identification problem, the Amended Complaint conflates two distinct questions: whether the other defendants published an article attributing statements to an anonymous former assistant and whether Defendant Battle was that assistant and made those statements. An article's attribution of a statement to an unnamed source does not, without more, identify who that source was or establish what they said. Reporters sometimes misquote, paraphrase inaccurately, or attribute statements more definitively than their sources intended. The Amended Complaint itself acknowledges the ambiguity, conceding that "either The Daily Wire Defendants were aware that Defendant Battle left USADF on bad terms and blamed Plaintiff for her departure, or Defendant Battle lied to The Daily Wire Defendants." (Am. Compl. ¶ 55.) That disjunctive framing, which does not even account for the possibility that The Daily Wire independently shaped or distorted whatever it heard, underscores that the Complaint is built on conjecture about what Defendant Battle said, to whom, and in what form. Where Plaintiff's own pleading acknowledges that the other defendants may have independently constructed or distorted the statements at issue, the inference that Defendant Battle is their source

21

and personally published defamatory statements is no more plausible than the inference that she is not. That is precisely the kind of allegation *Twombly* and *Iqbal* require courts to disregard.

This is not a technical pleading defect. The question of whether Defendant Battle made the allegedly defamatory statements is central to whether she can be held liable at all. If the Media Defendants mischaracterized or distorted what she said, they are responsible for the defamatory content. Absent a clear factual allegation, based on personal knowledge or documentary evidence, that Defendant Battle made the specific statements at issue, the claims against her do not cross the line from conceivable to plausible, as *Iqbal* requires. The claims against Defendant Battle should be dismissed for failure to adequately plead this threshold element.

### C. Several Allegedly Defamatory Statements Connect Be Attributed by Implication

Although Plaintiff does not use the phrase "defamation by implication," his second and third counts are precisely that. On the tailor's-bill allegation, Plaintiff concedes that the tailor's bill was, in fact, sent to USADF. (Am. Compl. ¶ 78.) His complaint is not that the article stated something false, but that placing a true fact under the heading "Using poverty funds for luxury" created a false impression, namely, that he caused USADF to pay for his suits. (*Id.* ¶ 178.) With respect to the hotel demand, Plaintiff never denies demanding an expensive hotel. (*Id.* ¶ 200.) In reality, his objection is that the article's framing implied he succeeded in obtaining one at government expense. In both instances the underlying facts are either true or undenied, and the alleged defamation arises not from any falsehood attributable to Defendant Battle but from the implication allegedly created by the other defendants.

While D.C. law recognizes defamation by implication as a form of defamation, it does so with constraints. *See, e.g., Southern Air Transport, Inc. v. American Broadcasting Companies,*

22

*Inc.*, 877 F.2d 1010, 1014 (D.C. Cir. 1989); *McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 717 F.2d 1460, 1465 (D.C. Cir. 1983).  In arguably the leading D.C. Circuit case on defamation by implication, *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990), the court held that a reader being able to draw a defamatory inference from true facts is not, standing alone, sufficient to state a libel claim.  *Id.* at 519-20.  The claim is viable only "if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or *endorses* the defamatory inference."  *Id.* at 520 (emphasis in original).  This is a two-part test: the communication must first be reasonably readable as imparting the defamatory inference, **and** must also affirmatively suggest, on the face of the publication itself, that the author intended or endorsed that inference. *Id.*

The Fourth Circuit, applying *White* and explaining its constitutional rationale, put the point with useful precision: "because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true."  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993) (citing *White*, 909 F.2d at 520).  The rigor is not incidental.  Allowing liability to attach to true statements merely because a reader might draw a damaging inference from them would chill far more than false speech, it would deter accurate reporting about legitimate matters of public concern.  The "intended or endorsed" requirement is the mechanism by which courts ensure that liability tracks the publisher's deliberate choices, not the reader's imaginative leaps.

Defamation by implication, again the assumed basis for the second and third counts, has no application to Defendant Battle at all.  This is a doctrine concerned with a defendant's communicative choices: the headline selected, the section in which a fact is placed, the other

23

facts juxtaposed with it, the overall framing and editorial architecture of a publication. Every element of the implied defamation theory in this case traces to decisions made by the other defendants. The headline "Using poverty funds for luxury" was the other defendants' editorial choice. The placement of the tailor's-bill and hotel-demand allegations under that heading was their editorial choice. Moreover, the decision to present those facts in the context of allegations about other USADF officials' luxury spending was their editorial choice. And the decision to omit context that might have negated any defamatory implication was their editorial choice.

The Amended Complaint alleges that she communicated facts to a reporter in a private conversation. It does not allege that she wrote the article or selected the headline. And it does not allege that she decided where in the article to place the tailor's-bill and hotel-demand allegations, what section title to give it, or what other facts to surround it with. The defamatory implication, if it exists, is the product of the publisher's act of packaging, contextualizing, and framing the raw material it received. *See Chapin*, 993 F.2d at 1093 (asking whether "the language" of the communication itself supplies affirmative evidence of intent); *White*, 909 F.2d at 520 (asking whether "the particular manner or language in which the true facts are conveyed" endorses the inference). These inquiries are directed at the publisher's linguistic and editorial choices, not at the source's private communications.

This distinction follows directly from the structure of defamation law and the First Amendment principles that underlie it. A source is not an author. When a source tells a reporter a true fact and the reporter publishes it in a misleading context, the misleading context is the publisher's creation, not the source's. Holding a source liable for defamation by implication on the theory that the publisher's editorial framing was misleading would make sources liable not for what they said but for what the publisher did with what they said. This would be a form of

24

liability that would impose crushing chilling effects on the willingness of witnesses and former employees to speak with journalists about matters of genuine public concern. *See Murray v. Shaw*, No. 24-cv-00640, 2025 U.S. Dist. LEXIS 56247 at \*79-80 (D.D.C. Mar. 26, 2025). That result would be in deep tension with the qualified privilege for communications to the press, the policy underlying the D.C. shield law, and the First Amendment's structural interest in protecting the flow of information to the public on matters of governmental accountability.

Of course, the irony of how the Amended Complaint alleges defamation by implication should not be lost on the Court. With respect to the second count, relating to the tailor's bill being sent to the USADF, the Amended Complaint alleges:

> 176.    In the May 8 article, The Daily Wire Defendants falsely stated that Mr. Adkins "had a tailor fit him for three custom suits, and sent the bill to the agency." The statement was made under the heading, "Using poverty funds for luxury."

(Am. Compl. ¶ 176.) Indeed, throughout the Amended Complaint, in every instance where Plaintiff discusses this statement, he uses those specific words.

He further alleges that this statement, "had a tailor fit him for three custom suits, and sent the bill to the agency," came from Defendant Battle:

> 182.    In the article, The Daily Wire Defendants attribute the defamatory statement to Defendant Battle, who purportedly gave the statement to them in advance of publication. But when Mr. Adkins, through counsel, asked Defendant Battle to affirm that she had, in fact, told The Daily Wire Defendants that Mr. Adkins billed USADF for tailored suits, she declined to do so.

(Am. Compl. ¶ 182.) In doing so, he is clearly implying that these words are directly attributable to Defendant Battle; however, the May 8 article makes clear that the source of the quote is being paraphrased, not quoted: "He had a tailor fit him for three custom suits, and sent the bill to the agency, she alleged." (Am. Compl., Ex. A Luke Rosiak, *Aid Agency Pushed Official's For-Profit Pyramid Scheme on Poor Africans*, THE DAILY WIRE (May 8, 2025) at \*6.) On its face it is clear

that this statement was not a written recording of the specific words that Defendant allegedly used when speaking with the other defendants.  The only person suggesting it is, through selective quotation and by implication, is Plaintiff.

Plaintiff repeats this in his third count, which alleges that he demanded a high-priced hotel and fired a USADF employee for raising concerns about it.  In the third count, the Amended Complaint pleads:

> 198. In the May 8 and 14 articles, Defendants falsely stated that Mr. Adkins "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements." The statements in both articles were made under the heading, "Using poverty funds for luxury."

(Am. Compl. ¶ 198.)  Like with the tailor's bill, the Amended Complaint repeatedly, and only, uses those words: "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements." And like with the tailor's bill, the Amended Complaint alleges that this statement came from Defendant Battle:

> 204. In the articles, The Daily Wire Defendants attribute the defamatory statements to Defendant Battle, who purportedly gave the statements to them in advance of publication.  But when Mr. Adkins, through counsel, asked Defendant Battle to affirm that she had, in fact, told The Daily Wire Defendants that Mr. Adkins ignored government travel rules, demanded $1,000-anight hotels, and fired her for asking about it, she declined to do so.

(Am. Compl. ¶ 204.)

Once again, the Amended Complaint is clearly implying that these words are directly attributable to Defendant Battle.  But when compared to the articles, it is once again clear that this was not a written recording of what Defendant Battle allegedly said, but a reporter's paraphrasing of what a former assistant told that reporter about why a USADF assistant was fired: "Adkins, for his part, brushed off government rules about travel costs and demanded

26

$1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements, the former assistant told The Daily Wire." (Am. Compl., Ex. C at *13.)[10]  Again, this statement is not a written recording of what Defendant Battle allegedly said to the other defendants.  Yet, again, Plaintiff is implying, through the selective quotation from the May 8, 2025 and May 14, 2025 articles, that Defendant Battle actually said those words.  Now Plaintiff seeks millions of dollars from Defendant Battle, based largely on defamation by implication, by implying that Defendant Battle allegedly said the defamatory statements.

Because the alleged defamatory implication in both the tailor's-bill and hotel-demand allegations flows entirely from the other defendants' editorial choices, choices over which Defendant Battle would have had no control over and for which she bears no responsibility, the implied defamation theory in the second and third counts is inapplicable to her as a matter of law.

### D.  Several of the Statements Are Substantially True

Truth is a complete defense to defamation under D.C. law, and a court may resolve that defense where the complaint's own allegations establish that the challenged statement is substantially accurate.  *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) ("Truth is an absolute defense to defamation claims."); *see also Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 99-100 (D.D.C. 2022) (granting motion to dismiss where plaintiff failed to plausibly allege falsity).  D.C. law does not require that a statement be true in every detail; instead, it is sufficient that the "gist" or the "sting" of the statement be substantially accurate. *See Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013) ("In determining whether factual

---

[10]    The May 14, 2025 article uses nearly identical language, only adding that the source spoke on the condition of anonymity: "Adkins, for his part, brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements, the former assistant told The Daily Wire, speaking on condition of anonymity." (*See* Am. Compl. ¶ 87.)

27

statements in an allegedly defamatory communication are substantially true, we discount minor inaccuracies 'so long as the substance, the gist, the sting, of the libelous charge be justified.'") (quoting *Moldea*, 22 F.3d at 318; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) ("The common law of libel … overlooks minor inaccuracies and focuses on substantial truth … . Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'") (quotation omitted).  Critically, the burden of pleading and proving falsity rests with the plaintiff, not the defendant.  *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).  Therefore, a defamation claim can be disposed of as a matter of law where the plaintiff's complaint fails to plead that the statement was false or the defendant's statement is true from the face of complaint.  *See id.*; *Dall v. Pearson*, 246 F. Supp. 812, 813 (D.D.C. 1963).  Where a complaint fails to allege that a challenged statement is false, or affirmatively confirms that it is true, the claim fails at the pleading stage, and no amount of artful framing of the surrounding context can revive it.  *See Iqbal*, 556 U.S. at 678; *Farah v. Esquire Magazine*, 736 F.3d 528, 534-35 (D.C. Cir. 2013) (recognizing falsity is a threshold element that must be adequately pleaded to survive dismissal).

   *1. The Tailor's Bill Allegation Is True, and Plaintiff Admits It*

  As discussed above, the May 8, 2025 article reported the following regarding the tailor's bill:  "He [Plaintiff] had a tailor fit him for three custom suits, and sent the bill to the agency, she alleged."  (Am. Compl., Ex. A at *6.)  Furthermore, the Amended Complaint alleges that a portion of that statement, "had a tailor fit him for three custom suits, and sent the bill to the agency," is false and defamatory.  (Am. Compl. ¶ 176.)  The Amended Complaint's own narrative, however, demonstrates that this statement, which the Amended Complaint attributes to Defendant Battle, is true.

The Amended Complaint pleads, in relevant part, that in post-publication correspondence, Defendant The Daily Wire characterized its statement as communicating that Plaintiff's "personal tailor sent the bill for Mr. Adkins' personal expenses to Mr. Adkins' taxpayer-funded assistant at her taxpayer-funded email address for her to handle on her taxpayer-funded time."  (Am. Compl. ¶ 78.)  The Amended Complaint does not deny the truth of this allegation, because it cannot.

The article itself, updated after Plaintiff's counsel provided evidence, confirms the factual predicate explicitly:

> After publication, counsel for [Plaintiff] provided evidence confirming that an invoice for $9,000 in custom suits was submitted solely to his executive assistant's work email address and included USADF's office address as the billable address; however, no evidence has been uncovered that [Plaintiff] submitted this invoice for payment or reimbursement to USADF. According to [Plaintiff], he ultimately forwarded the invoice email to his private email address and provided evidence that, three weeks later, he paid the invoice from his personal funds.

(Ex. G Luke Rosiak, *Aid Agency Pushed Official's For-Profit Pyramid Scheme on Poor Africans*, THE DAILY WIRE (May 8, 2025).)[11]  The updated article shows that Plaintiff's counsel actually provided evidence that corroborated what Defendant Battle allegedly told the other defendants, namely that Plaintiff had his tailor send a bill to the agency.

As discussed above, Plaintiff's actual grievance is not that the article reported a false fact. It is that Defendant The Daily Wire placed a true fact in a section titled "Using poverty funds for luxury," creating, in Plaintiff's view, a false implication that he caused USADF to pay for his suits.  (Am. Compl. ¶¶ 79-81.)  But that is a complaint about editorial framing, not about the

---

[11]    The Amended Complaint chose to include, as an exhibit, the original article; however, the Amended Complaint, which was filed after the article was amended, discusses at length Plaintiff's counsel's interactions with the defendants and their various responses, including clarification to the original article.

truth of the reported fact.  The substantial truth defense does not examine whether the publisher's

organizational choices were editorially fair; it asks whether the challenged statement accurately

described what happened.  It did.  The tailor sent the bill to USADF.  Plaintiff's own evidence

proves it.  The claim therefore fails as a matter of law because the statement Plaintiff challenges

is, by his own admission, true.

This conclusion is reinforced by the D.C. courts' consistent insistence that the "gist" or

"sting" of a statement must be substantially accurate, not that every surrounding inference must

be benign.  *See Armstrong*, 80 A.3d at 183.  Even if a reasonable reader might have initially

understood the tailor's-bill allegation to imply something more than poor judgment, that

implication, whatever its defamatory potential, arose from the reader's construction of meaning

around a true fact, not from any false assertion by the article.  And as discussed at length in the

section addressing defamation by implication, the responsibility for any misleading framing lies

with Defendant The Daily Wire's editorial choices, not with any statement attributable to

Defendant Battle.

### 2.  *The Hotel-Demand Allegation Is Not Alleged to Be False*

The May 8, 2025 article, in reporting largely repeated in the May 14, 2025 article, stated

that: "[Plaintiff], for his part, brushed off government rules about travel costs and demanded

$1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel

arrangements, the former assistant told Defendant The Daily Wire."  (Am. Compl., Ex. C at *13.)

Furthermore, the Amended Complaint alleged in the third count that a portion of that reporting,

"brushed off government rules about travel costs and demanded $1,000-a-night hotels,

summarily firing an assistant who raised concerns about his travel arrangements," is false and

defamatory. (Am. Compl. ¶ 198.) A careful reading of the Amended Complaint reveals a striking omission: Plaintiff never actually alleges that he did not demand expensive hotels.

The pleading is worth examining closely. Paragraph 88 asserts that the contention about Plaintiff "brushing off travel rules, demanding $1,000-a-night hotels, and summarily firing Ms. Battle" is "provably false." (Am. Compl. ¶¶ 88, 198.) But the paragraphs that follow, ostensibly offered as proof, do not deny that Plaintiff made such a demand. Instead, they argue that the government's multi-layered travel approval process would have made it difficult for any such demand to succeed: executive travel at USADF was arranged by the finance department, which followed strict federal guidelines and would have required multiple levels of approval and sign-offs to book a hotel above the per diem rate. (Am. Compl. ¶¶ 96-97.)

The updated article itself reflects Plaintiff's position precisely: "Adkins refutes the claims and further claims, if he did stay at a hotel costing above that permitted under the government travel rules, he paid for the overage with his own money." (Ex. G.) The structure of that statement, "if he did stay," is not a denial that he demanded such accommodations; instead, it is an acknowledgment that the operative question is who paid, not whether the demand was made.

The distinction between demanding something and obtaining it is not a technical one. A person who demands a $1,000-per-night hotel and is told by his finance department that it exceeds the per diem rate has nonetheless demanded it. The article did not assert that Plaintiff successfully obtained $1,000-per night hotel room at government expense; it asserted that he demanded them. Plaintiff's argument, that government travel controls would have prevented success, does not speak to whether the demand was made. It speaks only to whether the demand was honored. Accordingly, Plaintiff has not pled that the challenged statement is false. He has pled that it was inactionable because oversight mechanisms existed. That is not the same thing,

31

and it does not satisfy his constitutional burden of pleading falsity.  *Hepps*, 475 U.S. at 776.

Because the falsity of the hotel-demand allegation is not pleaded and because of Plaintiff's subsequent admissions to the other defendants the claim fails at its threshold for the same reason as the tailor's-bill allegation: the plaintiff who does not plead falsity has not stated a defamation claim.  And as with the tailor's-bill allegation, any implication that Plaintiff succeeded in obtaining luxury accommodations at government expense, as opposed to merely demanding them, is a product of the article's framing rather than any false statement of fact, which is a distinction that, for all the reasons addressed in the preceding section, cannot sustain a claim against Defendant Battle.

### E.  Statements Derived from Defendant Battle's Affidavit Are Privileged

Statements in the course of judicial and quasi-judicial proceedings are absolutely privileged under D.C. law.  *See, e.g.*, *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001), *overruled in part on other grounds by McNair Builders, Inc. v. Taylor*, 3 A.3d 1132 (D.C. 2010); *Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1, 8 (D.D.C. 2001) (applying privilege with full force to EEOC adjudications, which perform a quasi-judicial function).  The privilege applies regardless of malice, and extends to all statements made in connection with a judicial proceeding if they are relevant to the subject matter of the proceeding.  *See Finkelstein*, 774 A.2d at 338.  Defendant Battle's sworn affidavit and the statements contained therein are, therefore, entitled to absolute immunity because they were part of the adjudication of Dunne's EEOC complaint against Plaintiff.

The fourth claim of the Amended Complaint confirms that its claims against Defendant Battle are substantially premised on the EEOC affidavit.  It quotes from the affidavit directly and describes other defendants as having "cited" and relied upon it.  (Am. Compl. ¶¶ 57, 221, 236.)

The statements that the other defendants quoted directly from Defendant Battle's affidavit are:

> 4. On at least three occasions, Mr. Adkins told me that he wanted his entire team (to include the General Counsel) to consist only of Black people.  He wanted all of his direct reports to be Black.

> 5. When USADF hired a new HR specialist, Mr. Adkins insisted that USADF hire a Black person.  USADF complied with his instructions and hired a Black woman, Sheila Hicks-Martin.

(Ex. F Battle Aff. ¶¶ 4-5; *compare* Am. Compl. ¶ 221; *id.* Ex. B Luke Rosiak, *'Them White Motherf-ers': Racist Agency Framed Its Lawyer After He Discovered Lawbreaking, He Said*, THE DAILY WIRE (May 9, 2025) at *4.)  To the extent the claims against Defendant Battle rest on statements she made in the EEOC affidavit, they are absolutely privileged and must be dismissed.

### F.  Several Statements Are Protected Opinion or Are Not Objectively Verifiable

A threshold requirement of any defamation claim under D.C. law is that the allegedly defamatory statement be one of verifiable fact; that is, a statement objectively capable of being proven true or false.  Statements that express pure opinion, convey an impression, or are otherwise not susceptible to objective verification are constitutionally protected under the First Amendment and cannot support a defamation claim regardless of how damaging they may be.  This principle is firmly established in D.C. law and independently requires dismissal of at least portions of the claims against Defendant Battle.

The foundational authority is *Milkovich*, which holds that the First Amendment protects statements that cannot "reasonably [be] interpreted as stating actual facts."  497 U.S. at 20.  The analytical framework developed in *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) identifies four factors for distinguishing actionable statements of fact from protected opinion: (1) the specific language used; (2) whether the statement is objectively verifiable; (3) the full context of

33

the statement, including the surrounding text; and (4) the broader social context or setting in which it appeared. *Id*. at 979. The D.C. Court of Appeals has embraced and applied this framework, holding that only statements that reasonably appear to state or imply actual, objectively verifiable facts are actionable in defamation. *See, e.g., Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 589 (D.C. 2000). Applying these principles, the statements attributed to Defendant Battle fall into two analytically distinct categories: specific factual assertions and impressionistic characterizations. The former may, in principle, be verifiable; the latter are not, and they are protected.

Consider first the characterizations attributed to Defendant Battle about the Plaintiff's general hiring intentions and preferences. The Amended Complaint alleges that Defendant Battle told Defendant The Daily Wire that Plaintiff "wanted his entire team (to include the General Counsel) to consist only of Black people," that he "wanted all of his direct reports to be Black," and that he "was very adamant in only hiring African Americans, mainly female." (Am. Compl. ¶ 221.) These are not statements of discrete, observable fact; instead, they are characterizations of what Defendant Battle perceived or believed about Plaintiff's subjective motivations and unstated intentions. A person's "wants," "desires," and the degree to which they were "adamant" about preferences are quintessentially matters of impression and inference, not objective fact. Statements that report a source's perception of another person's unexpressed state of mind, rather than objectively observable conduct, lean heavily toward protected opinion.

This distinction is sharpened by examining precisely what is and what is not verifiable in each statement in the fourth count. Whether Plaintiff hired or refused to hire specific individuals on specific occasions is verifiable because employment records either reflect such decisions or they do not. But whether he harbored a desire or intention to build an all-black team is not a

34

statement about what happened.  (Am. Compl. ¶¶ 101-103.)  It is a statement about what a person believed another person wanted.  Statements asserting the speaker's interpretation of another's motives or intentions are not objectively verifiable and thus are not actionable.  *See Mason v. American Prospect, Inc.*, No. 23-cv-2238, 2024 U.S. Dist. LEXIS 176674 at *28-29 (D.D.C. Sept. 30, 2024) (finding that statements about consequences of management style are not verifiably objective); *Armstrong*, 80 A.3d at 187-88; *cf*, *Moldea*, 22 F.3d at 315 (noting that evaluative statements, rather than empirically verifiable ones, receive First Amendment protection); *Stevens v. Tillman*, 855 F.2d 394, 401-02 (7th Cir. 1988) (noting that characterization of another's motives constitutes protected opinion).

Ultimately, the broader characterizations of his motivations, preferences, and intentions, such as assertions about what he "wanted" or was "adamant" about privately, are not objectively verifiable and are therefore not actionable under D.C. law.  The Court should dismiss the claims against Defendant Battle to the extent they rest on those non-verifiable characterizations, and at minimum should narrow the scope of any surviving claims accordingly.

## G.  The Amended Complaint Fails to Adequately Plead Actual Malice

Even if the Complaint adequately alleged that Defendant Battle published a defamatory statement, it fails to plead actual malice with the particularity required by law.  Because Plaintiff is a public official or, at minimum, a public figure, he must plead and prove that Defendant Battle made any allegedly false statement with "actual malice," meaning with knowledge that the statement was false or with reckless disregard for its truth or falsity.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331-32 (1974).  In doing so, Plaintiff must plead actual malice with sufficient factual specificity to make the claim plausible and not merely recite the legal formula.  *Iqbal*, 556 U.S. at 678; *see also Mason*,

35

2024 U.S. Dist. LEXIS 176674 at *44-48 (concluding that plaintiff had failed to meet her burden of pleading actual malice with sufficient plausibility to raise claims above speculation. Bare recitation of the actual malice standard, without factual support tied specifically to the defendant's state of mind, is insufficient. As explained above, actual malice is a subjective text, requiring a showing "in convincing fashion 'that the defendant in fact entertained serious doubts as to the truth of his publication' … [and] that the defendant himself entertained a 'high degree of awareness of … probable falsity." *Liberty Lobby*, 838 F.2d at 1292-93 (quotations omitted).

The Amended Complaint falls short of this standard as applied to Defendant Battle. The actual malice allegations against Defendant Battle are conclusory. The Amended Complaint alleges, in virtually identical language across all three claims that, "[t]o the extent Defendant Battle published the defamatory statements to The Daily Wire Defendants, she did so with actual malice, in that she was aware at the time of publication that the statement[s] were false." (Am. Compl. ¶¶ 183, 205, 230.) But alleging that a defendant "knew" the statements were false, without more, is precisely the sort of conclusory pleading that *Iqbal* and *Twombly* prohibit. *See Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) (finding that threadbare assertion that defendant knew statement was false or was reckless to falsity is insufficient to plead actual malice); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C. 2016) (dismissing defamation claims where plaintiff failed to allege any facts showing statements were made with actual malice); *see also Arpaio*, 414 F. Supp. 3d at 91-92 (finding that pleading defendants were motivated by "malice and leftist enmity" do not impact on actual malice).

The Amended Complaint's factual allegations concerning Defendant Battle's alleged state of mind rest primarily on the theory that she had a "personal vendetta" against Plaintiff stemming from the circumstances of her departure from USADF, and that she was aware of the USADF

36

hiring practices firsthand.  (Am. Compl. ¶¶ 184, 192, 206, 231.)  Actual malice focuses on a defendant's attitude toward the truth or falsity of the allegedly defamatory statement, not on the defendant's animosity toward the plaintiff, or even on the defendant's negligence in verifying facts.  *See, e.g., St. Amant*, 390 U.S. at 731.  Hatred, spite, ill will, or a desire for revenge, without more, do not establish actual malice.  *Masson*, 501 U.S. 496 at 510-11.  Indeed, the D.C. Circuit "has made clear that evidence of ill will 'is insufficient to support a finding of actual malice.'" *Tah v. Global Witness Publ., Inc.*, 991 F.3d 231, 243 (D.C. Cir. 2021) (citation omitted).

There are no specific facts pled in the Amended Complaint from which the Court could plausibly infer that Defendant Battle knew, at the time she allegedly spoke to the other defendants, that any particular statement was false.  On the contrary, many of the allegations concern events to which Defendant Battle had firsthand exposure as Plaintiff's administrative assistant—the very circumstances from which she formed her impressions.  That she may have perceived or recalled events differently from how Plaintiff recounts them does not establish that she knew her account was false.  *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666-67 (1989) (actual malice is not measured by what a reasonable person would have believed, but by what the defendant actually knew or believed).  Because the Complaint does not plausibly plead actual malice by Defendant Battle with the specificity required when a public official or figure is the plaintiff, the claims against her must be dismissed.

### H.  Plaintiff Cannot Prove an Actionable Injury

In this case, Plaintiff has pled each of the three counts against Defendant Battle as defamation per se.  (Am. Compl. ¶¶ 176, 188, 199, 220.)  The District has long adhered to one of the most restrictive defamation per se doctrines in the country.  In most jurisdictions, defamation per se encompasses several categories beyond criminal accusations, such as statements that

injure a person in their trade or profession, impute a loathsome disease, or allege sexual

misconduct.  In the District, courts have rarely, if ever, relied on one of those expanded

categories in any well-settled way.  The only circumstance where D.C. courts have consistently

applied the doctrine is to its narrowest application of falsely accusing someone of committing a

crime of moral turpitude.  *See, e.g., Raboya v. Shrybman & Assocs.*, 777 F. Supp. 58, 59 (D.D.C.

1991); *see also Harmon v. Liss*, 116 A.2d 693, 695 (D.C. 1955) (requiring for a statement to be

actionable per se that it "impute to [the plaintiff] the commission of some criminal offense for

which he may be indicted and punished, if the charge involves moral turpitude and is such as will

injuriously affect his social standing', or, as was said in [*Caldwell v. Hayden*, 42 App. D.C. 166

(D.C. Cir. 1914)], the question is whether, from the language attributed to defendant, there is

something from which the commission of a crime involving moral turpitude can be inferred.").[12]

Even the availability of presumed damages in defamation per se cases is severely curtailed for

public figures.  The Supreme Court held in *Gertz* that public figures may not recover presumed

damages regardless of the per se designation, and must plead and prove actual injury.  418 U.S.

at 349-50.  That rule forecloses much of the practical value Plaintiff seeks to derive from the per

---

[12]    It is conceivable that the application of defamation per se could be applied to statements beyond those accusing a plaintiff of the commission of a crime.  The substantial body of case law on the application of defamation per se to D.C. law, however, shows that it is only consistently applied in the narrow circumstance where criminality is falsely alleged.  *See, e.g., Larue v. Johnson*, No. 16-cv-00504, 2018 U.S. Dist. LEXIS 238815 at *16 (D.D.C. Feb. 22, 2018) ("The [plaintiff] accuses Ms. LaRue of a variety of actions which would otherwise constitute crimes including fraud, identity theft, and threats to do bodily harm. … Accordingly, the statements are defamatory per se, thereby satisfying the final element necessary to state a defamation claim."); *Grossman v. Goemans*, 631 F. Supp. 972, 973-74 (D.D.C. 1986) ("[P]laintiffs have met the fourth element of a libel cause of action, because false allegations of criminal conduct are libelous per se and thus actionable without proof of special damages.") (citation omitted); *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697-98 (D.C. 1970) ("The language of the article is thus defamatory since it imputes to appellant 'conduct that would render him liable to punishment, or make him odious, infamous, or ridiculous.' The words used charge an assault, a crime, and to accuse one of a crime is libel per se.") (quotations and citations omitted).

se theory in any event.

    *1. The allegedly defamatory statements do not constitute defamation per se*

Applying D.C.'s narrow rule to the four challenged statements, the per se theory fails across the board.  The second and third challenged statements, that Plaintiff sent the tailor's bill to the agency, and that he demanded $1,000-per-night hotels, could be stretched to imply attempted misuse of federal funds, which might theoretically constitute a federal crime.  But Plaintiff's per se theory as to these statements encounters compounding problems beyond the narrow scope of D.C.'s doctrine.  As discussed above, the tailor's bill was, by Plaintiff's own admission, in fact sent to USADF.  A true statement cannot be defamatory, per se or otherwise.  As to the hotel demand, Plaintiff never actually pleads that he did not make it.  A statement whose falsity is not pleaded cannot form the basis of any defamation claim, let alone a per se one.

To the extent either the tailor's bill or the hotel demand could be read to imply an attempted crime, as opposed to the more modest implication of poor judgment, that criminal implication was generated by the other defendants' editorial framing, not by any statement attributable to Defendant Battle.  *See Murray*, 2025 U.S. Dist. LEXIS 56247 at *80 ("Given that [the defendant] is not responsible for the media's editorial choices, which [the plaintiff] argues caused her harm, … the court cannot conclude that [the plaintiff] has plausibly alleged that [the defendant] defamed her by implication with these statements.") (citations omitted).  A source who accurately reports that a tailor's bill was submitted to a government email address has not accused anyone of a federal crime.

The fourth challenged statement, that Plaintiff said he would not hire white people or veterans, is the most straightforwardly fatal to the per se theory.  Employment discrimination on

39

the basis of race is a civil wrong under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Discrimination against veterans in federal employment is a civil wrong under the Veterans Employment Opportunities Act, 5 U.S.C. § 3304, and related statutes. But neither statute makes intentional employment discrimination by a federal official a criminal offense subject to indictment, conviction, and imprisonment. D.C.'s defamation per se doctrine extends to statements that accuse someone of criminal conduct, not to statements that, if true, would describe a civil rights violation subject to administrative proceedings and civil remedies. *See Raboya*, 777 F. Supp. at 60. Accusing a federal official of maintaining discriminatory hiring preferences, whatever its moral valence, is not the same as accusing him of a crime, and D.C. defamation law does not treat it as such.

Because none of the three allegedly defamatory statements that Plaintiff attributes to Defendant Battle constitute an accusation of criminal, odious, infamous, or ridiculous conduct under D.C.'s narrow defamation per se doctrine, the Complaint's per se theory fails as a matter of law. This is true even if criminal overtones could be conjured from any of the three allegedly defamatory statements attributed to Defendant Battle because the underlying factual predicate for each is either admitted, not denied, or attributable only to the publisher's framing. Given the independent, authoritative pre-existing sources of reputational harm catalogued above, that causation showing is implausible on its face.

### 2. *The Amended Complaint fails to adequately plead injury*

Although each of the counts in the Amended Complaint plead defamation per se, it does not mean that Plaintiff may dispense with pleading facts demonstrating actual damages. The per se designation does not relieve a plaintiff of the obligation to plead real, cognizable harm; it merely means he need not prove the precise dollar value of his losses if he can first establish that

40

actual injury occurred.  *Gertz*, 418 U.S. at 350.   As a result, a public figure pursuing a defamation per se claim must still allege and ultimately prove "actual injury," meaning real harm to reputation, professional standing, or emotional wellbeing, caused by the specific challenged statements.  *Id*. at 350.

Furthermore, the causation requirement does not disappear simply because a plaintiff labels his claim per se.  It requires the plaintiff to establish that an allegedly defamatory statement, made by a particular defendant, caused specific harm.  Where, as here, the plaintiff's reputation on the precise subjects addressed by the challenged statements had already been devastated by independent, authoritative, and far more prominent sources, the causal chain between the challenged statements and the claimed harm collapses entirely.  A public figure whose reputation has been leveled by a United States Senate investigation, a federal criminal conviction of his own subordinate, and a cascade of OIG and GAO findings cannot invoke the per se label to short-circuit the causation requirement that *Gertz* imposes on him.

Plaintiff asserts that the three sets of statements allegedly made by Defendant Battle carried such a sting as to cause him actual harm.  But his alleged harm cannot be examined in a factual vacuum.  It must be examined in the context of a congressional letter naming Plaintiff personally, a federal criminal conviction of his direct subordinate for corruption, and OIG and GAO reports documenting systemic failure and fraud concealment under his watch.  The specific reputational interests Plaintiff claims were injured by these statements—such as his integrity as a financial steward, his honesty, his fitness to lead a federal agency, his treatment of employees, and his management practices—had already been publicly scorched by sources carrying far greater institutional weight than an anonymous former employee speaking to a reporter.  The fourth element of a District defamation claim, whether styled as per se or per quod, requires

41

causation, and causation requires that the specific defendant's specific statement caused harm the plaintiff would not otherwise have suffered. That showing is not remotely plausible here, and the claims should be dismissed.

Even if anything remains of Plaintiff's professional reputation after being publicly devastated, the Amended Complaint improperly aggregates multiple statements by multiple defendants across multiple publications and then appends a single block of injury allegations, making no effort to attribute particular harms to particular defendants or particular statements. This does not satisfy the causal element as to any individual defendant. Indeed, an undifferentiated injury pleading does not plausibly establish that any statement attributable to Defendant Battle, as distinguished from Defendant The Daily Wire's own editorial choices, Defendant Rosiak's reporting, or the cascade of OIG, GAO, congressional, and criminal investigations that preceded the articles, caused Plaintiff any cognizable harm.

In paragraphs 119 through 126 of the Amended Complaint, Plaintiff catalogues racist and threatening online comments posted online after the articles were published. The Amended Complaint's allegations of online harassment fail as to Defendant Battle for a reason the Complaint itself supplies. Plaintiff specifically pleads that the other defendants "knew their false allegations about Plaintiff would elicit such public commentary" because "[t]hey had seen the same racist dogpiling play out in connection with other articles they had published." (Am. Compl. ¶ 126.) That is an allegation that the other defendants caused the harassment by knowingly cultivating a racist audience. It is not an allegation that Defendant Battle caused it. The Amended Complaint's own theory of how the racist commentary came about points exclusively to Defendant The Daily Wire and its editorial choices, its audience, and its history of inflammatory coverage. Defendant Battle did not write the articles, select the headlines, choose

42

the photographs, post the content to social media, or cultivate the readership that responded to it. The harassment allegations, as pled, are simply not connected to Defendant Battle by any causal chain the Defendant Complaint articulates.

The Amended Complaint further alleges that Plaintiff was disinvited from two speaking engagements, one in Zambia and one in Washington, D.C., "because of the publications." The Zambia organizer is quoted explaining: "this is a conference that's going to be filled with journalists. You cannot be onstage without this coming up. We are afraid it will take up our entire seminar." (Am. Compl. ¶ 129.) The Amended Complaint asserts that the Washington, D.C. conference disinvited him "on much the same rationale." (Am. Compl. ¶ 130.)

This alleged harm fails in two independent respects. First, the organizers' stated concern was with the controversy surrounding the articles generally, and not with any particular statement within the articles and certainly not with any statement attributable to Defendant Battle as opposed to the statements made by the other defendants. A causal chain that runs from "the articles" generically to reputational harm does not satisfy the obligation to plead how Defendant Battle's alleged statements specifically caused that harm. Second, neither disinvitation allegation identifies the specific statement or statements that prompted the organizer's decision.

The Complaint's centerpiece injury allegations are that because of the articles, he has been unable to find full-time employment, that his current work is in lower-paying jobs than his qualifications warrant, and that he has lost the opportunity to pursue positions that "people coming out of similar government leadership roles routinely" obtain, paying over $500,000 annually. (Am. Compl. ¶¶ 131-32.) These allegations suffer from multiple, compounding deficiencies. Most fundamentally, Plaintiff pleads no specific job he sought and was denied. He identifies no employer, no application, no rejection, and no communication from any prospective

43

employer indicating that the articles, let alone any statement attributable to Defendant Battle, were a reason for declining to hire him.  Instead, Plaintiff pleads that because of the articles, he "could not even apply for such positions because the applications would not have received serious consideration."  (Am. Compl. ¶ 132.)  That is a pleading of self-imposed inaction based on Plaintiff's own prediction of futility, which is not an actual injury.  And an injury that Plaintiff inflicted on himself by choosing not to pursue opportunities does not satisfy *Gertz*'s actual injury requirement and is not fairly traceable to any statement Defendant Battle may have made.

None of the injury allegations make any effort to connect specific harms to specific statements or to Defendant Battle specifically.  This is fatal to the claims against her.  And it is not a technicality.  It is the absence of properly showing causal chain between Defendant Battle and any cognizable harm, the fourth element of a D.C. defamation claim is simply not pled.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendant Jasmine Battle's motion to dismiss Plaintiff's Amended Complaint with prejudice.

Dated: March 30, 2006                          Respectfully submitted,

/s/ Sean W. O'Donnell  
Sean O'Donnell (D.C. Bar No. 90040392)  
Michael Bekesa (D.C. Bar No. 995749)  
JUDICIAL WATCH, INC.  
425 Third Street SW, Suite 800  
Washington, DC 20024  
Tel: (202) 646-5180  
Email: SODonnell@JudicialWatch.org

*Counsels for Defendant Jasmine Battle*