**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TRAVIS ADKINS,<br><br>　　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>THE DAILY WIRE, LLC,<br>*et al.*,<br><br>　　　　　　　　*Defendants*. | No. 1:25-cv-4399<br><br>**ORAL HEARING REQUESTED** |

**PLAINTIFF TRAVIS ADKINS'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE DAILY WIRE, LLC AND LUKE ROSIAK'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 2

Background ......................................................................................................................... 4

    A.    The Daily Wire's financial crisis and preconceived narrative about USADF. ............... 4

    B.    The facts did not fit the narrative, so Defendants turned to two transparently unreliable sources with known axes to grind to manufacture a new one. ...................................... 6

    C.    Defendants published four false and defamatory allegations in a rapid-fire series of articles. ........................................................................................................................... 7

    D.    Defendants refused to retract when presented with conclusive evidence of falsity, then republished the May 9 article after this lawsuit was filed and served. .......................... 12

    E.    Mr. Adkins has suffered extensive reputational, emotional, and economic harm, particularly in D.C., where the bulk of events relevant to this action occurred. .......... 13

Legal standard ................................................................................................................... 15

Argument ........................................................................................................................... 15

I.      Defendants' Venue Argument Fails Because, at Bottom, This Is a D.C. Case. ................ 16

    A.    Venue in D.C. is proper under 28 U.S.C. § 1391(b)(2). ............................................... 16

    B.    Transfer to the Middle District of Tennessee is unwarranted under § 1404(a). ........... 18

        1.    This action could not have been brought in Tennessee. .......................................... 19

        2.    None of the relevant factors favors transfer to the Middle District of Tennessee. ... 19

II.    Mr. Adkins Has Adequately Alleged Defamation as to Each Challenged Statement ....... 22

    A.    False Statement 1: Mr. Adkins testified that he was hired at USADF "without ever applying" and that he "couldn't recall when or how he managed to be selected." ...... 22

        1.    The hiring statement is not substantially true. ......................................................... 22

        2.    Defendants published the hiring statement with actual malice. ............................... 24

        3.    The hiring statement is defamatory *per se*. ........................................................... 28

        4.    The hiring statement is emphatically not a fair report. ........................................... 29

    B.    False Statement 2: Mr. Adkins "had a tailor fit him for three custom suits, and sent the bill to the agency." ...................................................................................................... 31

1.      The tailoring statement is false. ................................................................ 31

2.      Defendants published the tailoring statement with actual malice............................. 33

C.      Statement 3: Mr. Adkins "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns." ............... 35

1.      The hotel statement is false.................................................................... 35

2.      Mr. Adkins adequately alleged actual malice. ........................................... 36

D.      Statement 4: Mr. Adkins "would not hire a white person or a veteran" and called USADF's board "them white motherf----rs."................................................................. 37

1.      Defendants published the discrimination accusations with actual malice. ............... 37

2.      The discrimination accusations are not protected by any privilege. ........................ 39

Conclusion ..................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Aftab v. Gonzalez*,
597 F. Supp. 2d 76 (D.D.C. 2009) ...................................................................................... 21

*Armstrong v. Thompson*,
80 A.3d 177 (D.C. 2013) ................................................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 15, 24

*Bartolucci v. 1-800 Contacts, Inc.*,
245 F. Supp. 3d 38 (D.D.C. 2017) ..................................................................................... 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 15

*Blake v. FBI*,
298 F. Supp. 3d 77 (D.D.C. 2018) ................................................................................ 33, 36

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998) .......................................................................................... 17

*Boley v. Atl. Monthly Grp.*,
950 F. Supp. 2d 249 (D.D.C. 2013) ................................................................................... 29

*Byd Co. v. All. for Am. Mfg.*,
No. 21-7099, 2022 WL 1463866 (D.C. Cir. May 10, 2022) ............................................. 24

*Cameron v. Thornburgh*,
983 F.2d 253 (D.C. Cir. 1993) ........................................................................................... 16

*Carey v. Piphus*,
435 U.S. 247 (1978) ........................................................................................................... 29

*Corsi v. Stone*,
2020 WL 999053 (D.D.C. Mar. 1, 2020) ........................................................................... 18

*Curtis Publ'g Co. v. Vaughan*,
278 F.2d 23 (D.C. Cir. 1960) ............................................................................................. 31

*Curtis Publishing Co. v. Butts*,
338 U.S. 130 (1967) ........................................................................................................... 26

*Dameron v. Washington Magazine, Inc.*,

    779 F.2d 736 (D.C. Cir. 1985) ........................................................................................ 30, 31, 40

*Dist. No. 1 v. Am. Maritime Officers*,

    75 F. Supp. 3d 294 (D.D.C. 2014) ............................................................................................. 35

*Douglas v. Chariots for Hire*,

    918 F. Supp. 2d 24 (D.D.C. 2013) ............................................................................................. 16

*Duffy v. Leading Edge Prods., Inc.*,

    44 F.3d 308 (5th Cir. 1995) .................................................................................................. 27, 34

*Dura Pharm., Inc. v. Broudo*,

    544 U.S. 336 (2005) ................................................................................................................... 15

*Eramo v. Rolling Stone, LLC*,

    209 F. Supp. 3d 862 (W.D. Va. 2016) ....................................................................................... 26

*Erickson v. Pardus*,

    551 U.S. 89 (2007) ................................................................................................................ 15, 26

*Etechebarne-Bourdin v. Radice*,

    982 A.2d 752 (D.C. 2009) .......................................................................................................... 16

*Foote v. Chu*,

    858 F. Supp. 2d 116 (D.D.C. 2012) ........................................................................................... 21

*Gilmore v. Jones*,

    370 F. Supp. 3d 630 (W.D. Va. 2019) ....................................................................................... 24

*Glennon v. Dan Witter Reynolds, Inc.*,

    83 F.3d 132 (6th Cir. 1996) ....................................................................................................... 21

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,

    491 U.S 657 (1989) ................................................................................... 24, 25, 26, 27, 34

*Herbert v. Lando*,

    441 U.S. 153 (1979) ............................................................................................................. 25, 28

*Hourani v. Psybersolutions LLC*,

    164 F. Supp. 3d 128 (D.D.C. 2016) ........................................................................................... 16

*Howard Univ. v. Best*,

    484 A.2d 958 (D.C. 1984) .................................................................................................... 32, 36

*Hunter v. Johanns*,

    517 F. Supp. 2d 340 (D.D.C. 2007) ........................................................................ 15

*Hutchinson v. Proxmire*,

    443 U.S. 111 (1979) ................................................................................................ 25

*In re Interbank Funding Corp. Sec. Litig.*,

    668 F. Supp. 2d 44 (D.D.C. 2009) .......................................................................... 15

*Johnson v. Johnson Publ'g Co.*,

    271 A.2d 696 (D.C. 1970) ................................................................................. 30, 39

*Johnson v. United States*,

    559 U.S. 133 (2010) ................................................................................................ 32

*Keeton v. Hustler Magazine, Inc.*,

    465 U.S. 770 (1984) ................................................................................................ 21

*Klayman v. Segal*,

    783 A.2d 607 (D.C. 2001) ................................................................................. 32, 36

*Lemelson v. Bloomberg, L.P.*,

    903 F.3d 19 (1st Cir. 2018) ............................................................................... 28, 39

*Lohrenz v. Donnelly*,

    350 F.3d 1272 (D.C. Cir. 2003) .............................................................................. 39

*Long v. Safeway, Inc.*,

    842 F. Supp. 2d 141 (D.D.C. 2012) ........................................................................ 31

*Masson v. New Yorker Mag., Inc.*,

    501 U.S. 496 (1991) ................................................................................................ 22

*Mastro v. Potomac Elec. Power Co.*,

    447 F.3d 843 (D.C. Cir. 2006) ................................................................................ 20

*McFarlane v. Esquire Magazine*,

    74 F.3d 1296 (D.C. Cir. 1996) ................................................................................ 39

*Md. Digital Copier v. Litig. Logistics, Inc.*,

    394 F. Supp. 3d 80 (D.D.C. 2019) .......................................................................... 19

*Moldea v. N.Y. Times Co.*,

    15 F.3d 1137 (D.C. Cir. 1994) ................................................................................ 29

*Myers v. Holiday Inns, Inc.*,

    915 F. Supp. 2d 136 (D.D.C. 2013) ....................................................................... 15

*Nunes v. WP Co.*,

    513 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................... 24

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,

    387 F. Supp. 2d 20 (D.D.C. 2005) ......................................................................... 25

*Oparaugo v. Watts*,

    884 A.2d 63 (D.C. 2005) ....................................................................... 29, 30, 39

*Palin v. N.Y. Times Co.*,

    940 F.3d 8804 (2d Cir. 2019) ............................................................................ 28, 39

*Relf v. Gasch*,

    511 F.2d 804 (D.C. Cir. 1975) ............................................................................... 19

*SEC v. Jeffreys*,

    2005 WL 8179790 (D.D.C. Dec. 14, 2005) ........................................................... 16

*Shoen v. Shoen*,

    48 F.3d 412 (9th Cir. 1995) ............................................................................ 27, 34

*Smartmatic USA Corp. v. Herring Networks, Inc.*,

    610 F. Supp. 3d 92 (D.D.C. 2022) ......................................................................... 18

*St. Amant v. Thompson*,

    390 U.S. 727 (1968) ........................................................................................ 34, 38

*Tah v. Global Publ'g, Inc.*,

    413 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................... 32, 34

*Tavloulareas v. Piro*,

    817 F.2d 762, 789 (D.C. Cir. 1987) .................................................................. 24, 28

*Treppel v. Reason*,

    793 F. Supp. 2d 429 (D.D.C. 2011) ....................................................................... 19

*Trout Unlimited v. U.S. Dep't of Agric.*,

    944 F. Supp. 13 (D.D.C. 1996) ...................................................................... 20, 21, 22

*Trudeau v. FTC*,

    456 F.3d 178 (D.C. Cir. 2006) ............................................................................... 31

*Twin Rivers Paper Co. v. SEC*,

934 F.3d 607 (D.C. Cir. 2019) ........................................................................................ 36

*U.S. Dominion, Inc. v. Byrne*,

600 F. Supp. 3d 24 (D.D.C. 2022) ........................................................................ 24, 33, 40

*US Dominion, Inc. v. Herring Networks, Inc.*,

639 F. Supp. 3d 143 (D.D.C. 2022) ................................................................................ 16

*US Dominion, Inc. v. Powell*,

554 F. Supp. 3d 42 (D.D.C. 2021) ............................................................................. 18, 31

*Ventura v. Kyle*,

63 F. Supp. 3d 1001 (D. Minn. 2014) .............................................................................. 28

*Ventura v. Kyle*,

825 F.3d 876 (8th Cir. 2016) ........................................................................................... 28

*Von Kahl v. Bureau of Nat'l Affairs, Inc.*,

934 F. Supp. 2d 204 (D.D.C. 2013) ................................................................................ 24

*Walden v. Fiore*,

571 U.S. 277 (2014) ......................................................................................................... 21

*Weyrich v. New Republic, Inc.*,

235 F.3d 617 (D.C. Cir. 2001) ................................................................................... 20, 29

*Zimmerman v. Al Jazeera Am., LLC*,

246 F. Supp. 3d 257 (D.D.C. 2017) ........................................................................... 29, 34

## Statutes

28 U.S.C. § 1391(b)(2) .............................................................................................................. 16

28 U.S.C. § 1404 .................................................................................................................. 18, 19

## Other Authorities

1 Rodney A. Smolla, *Law of Defamation* (2d ed.) .................................................................... 27

2 Robert D. Sack, *Sack on Defamation* (4th ed. 2011) .............................................................. 21

David A. Elder, *Defamation: A Lawyer's Guide* (2025) ........................................................... 27

Edward W. Cleary, *McCormick's Handbook on the Law of Evidence* (2d ed. 1972) ................. 27

Restatement (Second) of Torts § 580A ..................................................................................... 28

Restatement (Second) of Torts § 611 ........................................................................................ 40

**Rules**

Fed. R. Civ. P. 12(b)(3)................................................................................................... 15

Fed. R. Civ. P. 12(b)(6)....................................................................................... 15, 22, 33

**INTRODUCTION**

In May 2025, Defendant The Daily Wire, LLC and its reporter, Defendant Luke Rosiak (together "Defendants"), published a series of articles falsely accusing Plaintiff Travis Adkins—a dedicated and venerated public servant who served as the President and CEO of the U.S. African Development Foundation ("USADF")—of: (1) being handed his position as a result of DEI politics and cronyism rather than because of his qualifications and years of experience; (2) engaging in explicitly racist and discriminatory conduct by refusing to and enacting policies not to hire white people or veterans and making overtly racist statements about the USADF board; (3) abusing taxpayer funds for luxury travel and bespoke suits; and (4) firing his assistant for calling him out on it. Each of Defendants' accusations is false and defamatory *per se*. Some statements impugn Mr. Adkins's professional qualifications and fitness, while others are tantamount to serious accusations of criminal misconduct. Defendants' readers had no trouble identifying those defamatory meanings as the publications' thrust, just as Defendants intended. Defendants knew that their statements were false, or were highly likely to be false, but they recklessly disregarded the truth in favor of their preferred, preconceived narrative that an agency designed to aid development in Africa was irredeemably corrupt, morally bankrupt, and run by unqualified DEI hires. And when confronted with a detailed retraction demand identifying the falsehoods, incredibly, Defendants did not retract. They doubled down, ***republishing the defamatory statements after Mr. Adkins filed this lawsuit***.

Defendants' Motion to Dismiss does not rest on questions appropriately addressed via a Rule 12 motion, namely whether the Amended Complaint plausibly alleges claims for defamation. Defendants have no serious argument on that front. So, instead, they demand that this Court usurp the fact-finder's role by adjudicating whether Mr. Adkins's allegations are right. To get there, Defendants attach a declaration from Mr. Rosiak, excerpt a deposition that is not part of the

2

pleadings, and urge the Court to conclude that their sources were credible, that their strained interpretations of the defamatory statements are correct as a matter of law, and that their reporting was "fair and accurate." Each of those contentions implicates factual disputes, and each underscores that this is not a motion identifying a pleading deficiency but rather a thinly veiled effort to finagle a favorable result in a fact-bound case at the pleading stage.

Co-Defendant Jasmine Battle's Motion to Dismiss underscores the factual discrepancies at issue here. Her story materially diverges from the tale Defendants spin. She suggests that Defendants "misquote" and "paraphrase inaccurately" her statements, utilizing their own "editorial framing" to advance whatever narratives they saw fit. That tension between what Defendants say about their reporting and what their purported source says about it neatly illustrates why Defendants' Motion should be denied: only discovery and a look behind the scenes at what actually took place during the reporting of these articles will reveal the truth.

Mr. Adkins alleges each of the elements of a defamation claim. The Amended Complaint details that the published defamatory statements are false and defamatory; that they have caused him significant financial, emotional, and reputational harm, especially in the District of Columbia, where he lives and works, where many purported sources for the articles live and work, where the events underlying the articles took place, and where Defendants published the articles for profit; that Defendants recklessly disregarded the truth by, among other things, relying on knowingly unreliable sources with known motive and credibility problems, purposefully ignoring and avoiding readily available contradictory evidence in their own reporting record, publishing facially implausible accusations, and then, after being served the original complaint and being on unquestionable notice of falsity, republishing the very same allegations underpinning that Complaint. Because dismissal is entirely unwarranted, Defendants' Motion should be denied.

**BACKGROUND**

Travis Adkins served as President and CEO of the United States African Development Foundation ("USADF") from January 2022 until February 2025. (Dkt. 9) (Am. Compl. ¶ 11.) He holds a master's degree in International Affairs from The New School and has held senior posts at the United States Institute of Peace, USAID, Georgetown University, Howard University, and a House foreign-affairs subcommittee. (*Id.* ¶ 36.) Throughout his USADF tenure he lived and worked in the District of Columbia, where he still resides. (*Id.* ¶ 11.)

This action arises from a profit-driven and politically motivated defamation campaign by Defendants—a right-wing media company and its "Government Efficiency reporter," Luke Rosiak—and by Defendant Jasmine Battle, a former USADF administrative assistant whose three-month tenure ended in 2022, not long after Mr. Adkins sent her home from a business trip for incompetence and insubordination. (*Id.* ¶¶ 12-14, 54.) Beginning in May 2025 and continuing through a December 29, 2025 republication, Defendants published a series of articles falsely accusing Mr. Adkins of obtaining his job "without ever applying" (*id.* ¶¶ 65-66); embezzling USADF funds for custom suits and luxury hotels (*id.* ¶¶ 76-77, 87-89); and refusing to hire non-Black people and military veterans and making other racist statements while leading USADF. (*Id.* ¶¶ 99-100.) Each allegation is provably false, something Defendants were aware of before publication. (*Id.* ¶¶ 6, 51, 57, 67-72, 89-97, 106-17, 138-41.)

**A. The Daily Wire's financial crisis and preconceived narrative about USADF.**

The Daily Wire is a for-profit right-wing media company that openly "play[s] to win," "does not claim to be without bias," and proudly caters to people "fed up" with the "illusion of objectivity" in the news. (*Id.* ¶¶ 12, 21.) Its revenue model depends on serving its paid-subscriber base stories of graft and corruption; of diversity, equity, and inclusion run amok; and of America-

last agencies helmed by unqualified, unaccountable, corrupt, and criminal leaders who hate white people and veterans. (*Id.* ¶ 3.)

In early 2025, The Daily Wire was in acute financial distress. Its CEO, Jeremy Boreing, stepped down in March 2025; the company laid off staff and even hired bankruptcy counsel. (*Id.* ¶ 24.) By the end of March 2025, The Daily Wire was more desperate than ever for content to appease and increase its paid-subscriber base. (*Id.*) And Mr. Rosiak, recently named The Daily Wire's "Government Efficiency reporter," was tasked with producing it. (*Id.* ¶ 28.)

Mr. Rosiak came to that assignment with a documented history of false attacks on political opponents, having had prior articles of his retracted for failing editorial and journalistic standards. (*Id.* ¶ 26.) He likewise published a book falsely accusing Pakistani-American House IT staffers of federal crimes, despite knowing the Department of Justice had "uncovered no evidence" of any violation. (*Id.* ¶ 27.) After the staffers sued and beat an anti-SLAPP motion, Mr. Rosiak and The Daily Caller settled. (*Id.*)

Upon learning of his new Washington, D.C.-based government efficiency beat at The Daily Wire, Mr. Rosiak wrote that he "fe[lt] like a kid on Christmas" because he could "cover DOGE"—the Elon Musk-driven movement he had unabashedly championed and fervently supported since its inception—"and hopefully tag along with the barbarians as they breach[ed] the gates" to take down government agencies, particularly those that helped developing countries, promoted diversity, equity, and inclusion initiatives, and otherwise helped progressive policies. (*Id.* ¶ 30.)

On March 5, 2025, USADF became a flashpoint in the DOGE movement when its staff refused to admit DOGE employees seeking to dismantle it. (*Id.* ¶ 33.) USADF was celebrated as "the little agency that could," while DOGE's popularity sank further. (*Id.* ¶¶ 1, 33.) Defendants, desperate to defend their pet initiative, seized on USADF as the perfect target—the agency "that

had most visibly opposed DOGE" and whose Biden-era CEO, if discredited publicly, would deliver the "red meat" Defendants' audience expected. (*Id.* ¶¶ 2-5, 34-35.) Defendants thus committed to portraying Mr. Adkins as a corrupt, incompetent, undeserving government stooge before Mr. Rosiak even began reporting. (*Id.* ¶¶ 5, 37.)

### B. The facts did not fit the narrative, so Defendants turned to two transparently unreliable sources with known axes to grind to manufacture a new one.

Mr. Rosiak promptly began looking for dirt on Mr. Adkins in government documents and other public reports. But the documents themselves did not—and do not—support the narrative. (*Id.* ¶ 38.) Rather than report on the facts, Defendants turned to two willing accomplices, former USADF employees with well-known and obvious axes to grind against Mr. Adkins and the agency: Mateo Dunne and Jasmine Battle. (*Id.* ¶ 39.)

***Mateo Dunne.*** Mr. Dunne served as USADF's general counsel for less than four months before Mr. Adkins placed him on administrative leave on his first day as USADF's President and CEO—a decision  based on more than 70 pages of complaints from colleagues alleging that Mr. Dunne had repeatedly lied to USADF's staff, flouted black-letter rules of legal ethics, was repeatedly insubordinate, failed to comply with agency rules, and, in some cases, harassed others at USADF. (*Id.* ¶¶ 45-46.) Mr. Dunne later brought meritless and doomed claims at the EEOC against Mr. Adkins and USADF for discrimination and retaliation. In dismissing his claims on summary judgment, the administrative law judge explained that, on the available evidence, "[n]o reasonable fact finder" would believe Mr. Dunne's allegations. (*Id.* ¶¶ 48-50.)

Mr. Dunne's history of dishonesty was a matter of public record. In September 2023, *The Fairfax County Times* published "The curious case of Mateo Dunne," documenting episodes in which Mr. Dunne lied about campaign donations, falsely claimed withdrawn endorsements, and resigned from two boards after falsely attesting to representing a third organization. (*Id.* ¶¶ 41-43.)

6

Mr. Rosiak, a Fairfax County resident who previously linked to *The Fairfax County Times*'s articles in his social media posts, was familiar with the article. (*Id.* ¶ 42.) Defendants nonetheless made Mr. Dunne a featured source, assiduously avoiding the public evidence of his unreliability. (*Id.* ¶¶ 51-52.)

*Jasmine Battle.* Ms. Battle served as Mr. Adkins's administrative assistant for just a few months in 2022 before he had to send her home from a business trip for incompetence and insubordination. (*Id.* ¶¶ 14, 54.) During her brief tenure she repeatedly missed deadlines, failed to complete tasks, and spoke negatively about her coworkers and superiors, and once slept through an important meeting that she had been tasked with running. (*Id.*) She quit in a fit of spite after being reprimanded. (*Id.*)

Defendants did not just omit the actual circumstances of Ms. Battle's short tenure and departure from USADF in their published articles; they completely rewrote them, describing her only as a "former assistant" and falsely asserting that she had been fired for raising concerns about travel expenses. (*Id.* ¶ 55.) Defendants also knew Ms. Battle was among Mr. Dunne's star witnesses in his rejected EEOC case, and that her sworn EEOC affidavit, which Defendants brought up in the articles, pushed false factual assertions. For example, it attested that she was "unaware of any investigation conducted by USADF with respect to Mr. Dunne" even though sorting emails about USADF's investigation of Mr. Dunne had been part of her job. (*Id.* ¶¶ 56-57.) Despite those red flags, Defendants gave Ms. Battle a platform to spread her knowingly false accusations and made them a centerpiece of their attacks. (*Id.* ¶ 58.)

## C. Defendants published four false and defamatory allegations in a rapid-fire series of articles.

Between May 6 and May 14, 2025, The Daily Wire published a five-part series on USADF, three articles of which defamed Mr. Adkins. (*Id.* ¶¶ 59–60.) The rollout of the articles in quick

succession demonstrated that Defendants had each article canned and ready for publication by the time the first story ran. (*Id.* ¶ 61.) Only after the first two articles were published, and just hours before The Daily Wire published the third article, did Mr. Rosiak deign to seek comment from Mr. Adkins. (*Id.* ¶¶ 61-62.) His outreach consisted of a single text, sent at 11:18 p.m. on a weeknight from an unknown number, that mentioned only "a toxic work environment," "violations of procurement rules," and an allegation of discriminatory hiring—and conspicuously omitted the false accusations that Mr. Adkins was handed the USADF President and CEO positions without applying, that he got the government to foot the bill for three personal custom-suits, that he insisted on staying at $1,000-a-night-hotels and stuck USADF (and American taxpayers) with the bills, that he fired Ms. Battle when she raised concerns about his use of agency funds, and that he refused to hire veterans at USADF and lobbed racist epithets at the USADF board. (*Id.* ¶¶ 62, 74, 116.) Understandably, Mr. Adkins did not respond to Mr. Rosiak's late-night message. (*Id.* ¶ 63.)

Defendants' articles about USADF made several false and defamatory accusations about Mr. Adkins, four of which are at the heart of this action.

***False Allegation #1—"Never Applied."*** The May 8, 9, and 14 articles reported that Mr. Adkins testified in a deposition that he was selected to lead USADF "without even applying for the job" and "couldn't recall when or how he managed to be selected." (*Id.* ¶¶ 65, 154-56.) In fact, Mr. Adkins had been invited to apply for the position in October 2021; submitted a statement of interest, CV, and references; and sat for multiple interviews with USADF's board members before being awarded the position in November 2021. (*Id.* ¶ 66.) He testified about the application process at his deposition—including his submission of materials, his multiple rounds of interviews with board members, and his being awarded the position "[s]ometime in November of 2021"—and Defendants knew it, because they had a copy of the deposition transcript and cited it in their

articles. (*Id.* ¶¶ 67–72.) Instead of acknowledging that testimony, however, they cherry-picked and misrepresented his answer to a different question about whether he had submitted an application (in the sense of a form) to USADF, ignoring his testimony moments later making clear that he had applied for the job. (*Id.*) Mr. Rosiak then doubled down on X, posting in a thread viewed hundreds of thousands of times the false claim that Mr. Adkins's predecessor "was replaced in 2021 by his friend Travis Adkins without even applying." (*Id.* ¶¶ 75, 160.)

*False Allegation #2—Custom Suits.* In the May 8 article, under the heading "Using poverty funds for luxury," Defendants reported that Mr. Adkins "had a tailor fit him for three custom suits, and sent the bill to the agency." (*Id.* ¶¶ 76, 79.) Context and plain meaning left no doubt that Defendants were accusing Mr. Adkins of embezzling government funds to pay for his tailored suits. Mr. Rosiak confirmed as much when he appeared on Donald Trump Jr.'s podcast, saying Defendants' reports revealed USADF officials "taking money that was supposed to go to poor Africans and using it for themselves to do luxury travel and to buy high-end suits." (*Id.* ¶ 83.) Defendants' readers understood the accusation the same way, calling in the article's comment section for Mr. Adkins to be "fitted" for "orange jumpsuits" and decrying his "egregious theft of taxpayer money." (*Id.* ¶ 82.)

Of course, Defendants' accusation was false. Emails and bank records show Mr. Adkins did not bill USADF for the suits, but rather paid for them with his own money. (*Id.* ¶ 77.) Defendants later admitted that they never had any evidence that Mr. Adkins arranged for USADF to pay for his suits, because no such evidence exists; the embezzlement Defendants reported never happened. (*Id.* ¶ 84.) The accusation was not just false and unfounded, but also inherently improbable: federal reimbursement requires multiple levels of approval across different agencies,

9

and a scheme to have the government pay for personal suits could not plausibly have been hidden from those checkpoints. (*Id.* ¶ 85.)

**False Allegation #3—Travel-Rule Violations and Retaliation.** The May 8 and 14 articles asserted that Mr. Adkins "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements." (*Id.* ¶ 87.) Each element of that statement was false. (*Id.* ¶ 88.) Public reports of the Office of the Inspector General ("OIG") and third-party audits of USADF's finances and travel rules had reported no wrongdoing regarding USADF's travel and charge-card policies during Mr. Adkins's tenure. (*Id.* ¶ 89.) Mr. Rosiak relies on and publicly praises such audits as "indispensable," and his own USADF reporting repeatedly cited OIG's materials, making it likely he either reviewed and disregarded the exculpatory audits or purposefully avoided doing so when he determined they undermined his preferred narrative of fraud by Mr. Adkins. (*Id.* ¶¶ 90–92.)

Defendants' accusation about Mr. Adkins firing Ms. Battle for raising concerns about violations of government travel rules was also false. In fact, Ms. Battle quit after being reprimanded for incompetence and insubordination. (*Id.* ¶ 93.) Defendants' false account of her departure from USADF was, again, inherently improbable: USADF executive travel is vetted and arranged by the agency's financial department, which follows strict federal guidelines, and any attempt to have the government pay for a $1,000-per-night booking in violation of travel rules would have had to get past multiple layers of sign-offs. (*Id.* ¶¶ 96-97.). Notably, when Ms. Battle—whom Defendants cited as the source for their accusations about suits and luxury hotels—was asked to confirm that Defendants had accurately reported her statements she declined to do so (*Id.* ¶ 94) and now, in her own Motion to Dismiss, suggests that Defendants may have "misquote[d],

10

paraphrase[d] inaccurately, or attribute[d] statements more definitively than [she] intend[ed]." (Dkt. 24) (Battle Mot. to Dismiss 21).

*False Allegation #4—Racist and Anti-Veteran Hiring and Racist Statements.* The May 9 and 14 articles, and the December 29 republication, variously reported that Mr. Adkins "refused to hire white people," "was very adamant in only hiring African Americans," "said many times he would not hire a white person or a veteran," and referred to USADF's board as "them white mother----ers." (Am. Compl. ¶¶ 99, 221.) Those allegations were false and, again, Defendants knew it. (*Id.* ¶¶ 100, 103.) They knew that Mr. Adkins had hired and promoted several non-Black employees during his tenure, including USADF's first white general counsel. (*Id.* ¶¶ 101–04.) They also knew that Mr. Adkins hired veterans and military affiliates, including the veteran who replaced Ms. Battle. (*Id.* ¶ 111.) The board Mr. Adkins allegedly referred to as "them white mother----ers" was, in fact, 40% non-white, making the statement Defendants attributed to Mr. Adkins implausible. (*Id.* ¶ 103.) Adding injury to insult, Mr. Adkins's grandfather was a decorated military veteran—making this false accusation all the more heinous. (*Id.* ¶ 112.)

Sworn testimony from Mr. Dunne's EEOC proceeding—which Defendants had reviewed, cited, and quoted—discredited the hiring-bias allegations. Mr. Adkins himself testified that he harbored no anti-white or anti-veteran animus. (*Id.* ¶¶ 107, 115.) Three other USADF officials likewise testified they had never heard him express such sentiments. (*Id.*) Asked point-blank whether she had ever heard Mr. Adkins say he wanted his direct reports to be "only black people," Elizabeth Feleke responded: "No. That's ridiculous. No." (*Id.* ¶ 107.) The articles never mention that exculpatory testimony. (*Id.*) Instead, they focus exclusively on alleged statements by Ms. Battle, including in her EEOC affidavit—even though Defendants knew the affidavit contained other falsehoods and even thought it did not allege anti-veteran discrimination at all. (*Id.* ¶ 115.)

11

Defendants knew that if Mr. Adkins were given the chance, he would contradict the anti-veteran allegation, so Mr. Rosiak's 11:18 p.m. text purposefully avoided raising it. (*Id.* ¶ 116.) Asked to affirm that The Daily Wire had reported her hiring statements accurately, Ms. Battle "again declined to do so," (*Id.* ¶ 117.) And, again, her Motion to Dismiss suggests that Defendants may have "misquote[d], paraphrase[d] inaccurately, or attribute[d] statements more definitively than [she] intend[ed]." (Dkt. 24 at 21.)

### D. Defendants refused to retract when presented with conclusive evidence of falsity, then republished the May 9 article after this lawsuit was filed and served.

After publication of the May articles, Mr. Adkins presented Defendants—through counsel—with proof of falsity: his USADF application materials; receipts showing he paid for his own suits; audit results and contact information for his travel coordinator; and a photo array and public information about non-Black employees hired and promoted during his tenure. (Am. Compl. ¶ 138.) Defendants refused to retract or apologize for a single one of their false and defamatory statements and instead doubled down through counsel, falsely accusing Mr. Adkins of perjury. (*Id.* ¶ 139.) The Daily Wire admitted it never had any evidence showing that Mr. Adkins in fact "followed through" on any racial discrimination in hiring, and did not deny having seen the evidence on LinkedIn before publication of non-Black hires and promotions. (*Id.* ¶ 140.) It similarly admitted it had no evidence that the government paid for any of Mr. Adkins's suits or luxury hotels, yet stubbornly refused to retract and remove from the articles those false allegations, appending instead a jumbled word salad of an editor's note framing bits of the documentary proof in Mr. Adkins's favor as merely "According to Adkins." (*Id.* ¶ 141.)

Mr. Adkins filed this lawsuit on December 18, 2025 (Dkt. 1.) That evening, his counsel emailed the filed complaint to Defendants' lawyers, who acknowledged receipt on December 24. (*Id.* ¶¶ 9, 143.) Five days later, on December 29, 2025, Defendants doubled down and republished

the May 9 article in its entirety to a new and distinct URL, this time as part of The Daily Wire's "Best of 2025" series. (*Id.* ¶¶ 9, 144.) The republished article appeared under a new title and subheading ("Them White Motherf-ers"—words Ms. Battle purportedly attributed to Mr. Adkins), with a new editor's note touting the article (but omitting the fact that Mr. Adkins had filed this defamation lawsuit), and drew a new audience as evidenced by fresh comments to the new URL. (*Id.* ¶¶ 145, 161, 227.) It verbatim repeated the false accusations that Mr. Adkins had not applied for his position, had refused to hire veterans and non-Black people, and had made racist statements about USADF's board. (*Id.* ¶ 144.) The republication came after Defendants had received not merely informal retraction demands but an operative federal complaint and documentary support laying out, precisely, the falsity of every statement they chose to re-promote. (*Id.* ¶¶ 143, 170, 244.)

> **E. Mr. Adkins has suffered extensive reputational, emotional, and economic harm, particularly in D.C., where the bulk of events relevant to this action occurred.**

Mr. Adkins is D.C. citizen. (*Id.* ¶ 11.) He has built his life here and his career in international affairs is centered here. (*Id.* ¶¶ 36.)

Defendants' articles, too, center on D.C. The article report on a D.C. agency, relying on sources who live and work in D.C., and on documents produced and maintained by other D.C. agencies in D.C.-based proceedings. (*Id.* ¶ 12.) Mr. Rosiak's whole job at The Daily Wire involves reporting on developments in D.C., including the events underlying the articles at issue here. (*Id.*) The articles were published online for consumption in (among other locations) D.C., where Defendants focus a significant amount of their reporting and where Defendants solicit business derive substantial revenue from their publishing activities. (*Id.* ¶ 17.)

Especially because D.C. is ground zero for the articles, and because D.C. is also where Mr. Adkins has made his life, it is no surprise that the articles have devastated him personally and

13

professionally (*Id.* ¶ 7.) Professional organizations have dropped him as a speaker or refused to host him; job opportunities have disappeared; even longtime friends and associates have changed how they interact with him. (*Id.*) The articles have generated "the most heinous, racist, hateful, and threatening messages one could imagine," many directed to Mr. Adkins personally—including messages to his Georgetown University email asking "How's the only hire blacks going?" and public demands that he be "hang[ed] for treason," sent to "Alcatraz," fitted for "orange suits," or lynched (commenters referring to "strange fruit"). (*Id.* ¶¶ 8, 121, 125–27.) Defendants have refused to remove the articles or moderate the racist comments they generate, despite the fact that their inaction violates The Daily Wire's own Community Guidelines. (*Id.* ¶¶ 126, 148-49.)

Mr. Adkins has been disinvited from speaking engagements in Zambia and Washington, D.C., because organizers feared the articles would overtake the events. (*Id.* ¶¶ 129-30.) He has been unable to find full-time employment commensurate with his USADF role; by comparison, his predecessor moved from USADF to a position at the PepsiCo Foundation paying over $500,000 per year—a track now foreclosed because the applications would not have received serious consideration. (*Id.* ¶ 132.) He lost a fellowship for which he was deep into the hiring process when the articles were published, and was frozen out of another at an organization where he had long-standing connections; the articles made him toxic in the philanthropic community. (*Id.* ¶ 133.) Friends and family now engage with him pityingly, and every interaction is colored by the possibility that the person he was interacting with mistakenly thought he had committed crimes. (*Id.* ¶ 134.) The mental anguish and social stigma from Defendants' defamatory falsehoods has been, to put it mildly, extreme. (*Id.* ¶ 135.)

**LEGAL STANDARD**

Dismissal (or transfer) for improper venue under Fed. R. Civ. P. 12(b)(3) is appropriate only if the plaintiff's chosen venue is improper or inconvenient. *Myers v. Holiday Inns, Inc.*, 915 F. Supp. 2d 136, 144 (D.D.C. 2013). "While the plaintiff bears the burden of proving that venue is proper, a court should accept the plaintiff's well-pled factual allegations as true, resolve any factual conflicts in the plaintiff's favor, and draw all reasonable inferences in favor of the plaintiff." *Id.* Although a "court need not accept the plaintiff's allegations as true, [] the defendant must present facts that will defeat the plaintiff's assertion of venue in order to prevail on the motion." *Id.* (citing *Hunter v. Johanns*, 517 F. Supp. 2d 340, 342 (D.D.C. 2007).

Dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is appropriate only where the plaintiff fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is a low bar, one "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The plausibility standard is "not a probability requirement"; it simply "asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making that determination, courts must accept as true the plaintiff's well-pled factual allegations, view any ambiguities in the light most favorable to the plaintiff, resolve any factual conflicts in the plaintiff's favor, and otherwise give the plaintiff the benefit of every reasonable inference drawn from the facts and allegations in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *In re Interbank Funding Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 47 (D.D.C. 2009).

**ARGUMENT**

Neither ground for dismissal identified by Defendants—improper venue or failure to state a claim—withstands even basic scrutiny. As to venue, this is a D.C. case in every way that matters: a D.C. citizen suing for injuries he suffered in D.C. as a result of articles that were published in

15

D.C. and authored by a media outlet's touted "D.C." reporter, which dealt entirely with D.C. events, agencies, and sources. As to stating a claim, Mr. Adkins's detailed allegations far exceed the "short, plain statement" that suffices under Rule 8(a).

## I. Defendants' Venue Argument Fails Because, at Bottom, This Is a D.C. Case.

Defendants assert that the Court should either dismiss this action for improper venue or transfer it to the Middle District of Tennessee. The basic problem with both assertions is that D.C. is an entirely proper and suitably convenient forum for an action like this one, which is a quintessentially D.C. case. For that reason, Defendants do not—and cannot—make the showing required to defeat Mr. Adkins's choice to litigate this action in his home district.

### A. Venue in D.C. is proper under 28 U.S.C. § 1391(b)(2).

Under 28 U.S.C. § 1391(b)(2), venue is proper in a judicial district where "'a substantial part' of the events or omissions giving rise to the claim occurred." *US Dominion, Inc. v. Herring Networks, Inc.*, 639 F. Supp. 3d 143, 159 (D.D.C. 2022). Multiple districts may satisfy that standard simultaneously, and the chosen district need not be the best forum or even the one with the strongest connection to the underlying claim. *Douglas v. Chariots for Hire*, 918 F. Supp. 2d 24, 28-29 (D.D.C. 2013); *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). In determining whether venue in a given district is proper, the plaintiff's choice of forum receives "substantial deference … particularly where the plaintiff has selected [his] home venue and the activities forming the basis of the suit are significantly connected to the forum selected." *SEC v. Jeffreys*, 2005 WL 8179790, at *2 (D.D.C. Dec. 14, 2005) (collecting and citing cases).

This District is clearly a proper venue. At all times relevant to this action, Mr. Adkins has lived and worked here. (Am. Compl. ¶ 11.) D.C. law thus presumes he suffered injury here. *See Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 139 (D.D.C. 2016); *Etechebarne-Bourdin v. Radice*, 982 A.2d 752, 763 n.9 (D.C. 2009). But Mr. Adkins did not just suffer presumed injury

16

in D.C.; he suffered *actual* injury here, including harms to his career in international policy, to his professional and personal relationships, and to his psychological wellbeing—all harms centered in D.C., where he has built his life. (Am. Compl. ¶¶ 11, 17.) USADF, the main topic of the articles, is headquartered in D.C. (*Id.* ¶ 15.) Defendants relied on sources working in D.C., including Ms. Battle and Mr. Dunne. They directed their pre-publication outreach—including the late-night text—to Mr. Adkins in D.C. (*Id.* ¶ 62.) Both the original publications and the December 29, 2025 republication were published to readers in the District, from which Defendants derive substantial revenue and where Defendants actively solicit more business through publications like their defamatory articles. (*Id.* ¶ 17.)

Even Defendants' framing of this case confirms that D.C. was the locus of their articles. In their Motion, for instance, Defendants repeatedly cite Ms. Battle's affidavit. (*E.g.*, Dkt. 23 at 1, 9, 26, 30-32.) But that affidavit was created by a D.C.-based employee, for an investigation that took place in D.C., that was conducted by officials in D.C., all related to an agency headquartered in D.C. And, of course, the cited portions of the Ms. Battle's affidavit concern Mr. Adkins, a D.C. citizen who has lived and worked in D.C. at all relevant times.

Each of the above facts independently supports venue. Together, they make this District the focal point of the parties' dispute and, thus, the natural forum. *See Blumenthal v. Drudge*, 992 F. Supp. 44, 52–54 (D.D.C. 1998) (venue proper in this District when defamatory reporting focuses on D.C.-based activity and actors).

Defendants attempt to sidestep the obvious connections to D.C. by asserting that courts here "have consistently found in defamation cases that events giving rise to a defamation case occurred where the alleged defamation was published." (Dkt. 23 at 12.) That assertion is flat-out wrong, and neither of the cases Defendants cite for it actually supports it. *Corsi v. Stone*, for

17

example, was an unpublished decision in which the *only* connection to D.C. was the alleged "motivation [of the Defendant] for saying and writing the things he did." 2020 WL 999053, at *2 (D.D.C. Mar. 1, 2020). The *Corsi* court simply held that was not enough to lay venue here. *Id.* The *Corsi* court did not hold—and could not have held, since the question was not before it—that venue in this District would be improper in a case like this one, which arises out of a multitude of other connections to D.C. And the *Corsi* court certainly did not announce a rule like the one Defendants propose: that the "events giving rise to a defamation case" necessarily occur where the defendant publisher is headquartered or based. Indeed, recent decisions straightforwardly contradict that rule. *E.g.*, *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 68-71 (D.D.C. 2021) (denying venue-transfer motion by individual defendant-publishers based in Texas and Minnesota).

Nor did the court in *Smartmatic USA Corp. v. Herring Networks, Inc.*, 610 F. Supp. 3d 92 (D.D.C. 2022), make such a sweeping and novel proclamation. It merely held that venue *was proper* in this District when the plaintiff alleged that the defamatory statement was disseminated here. *Id.* at 100.[1] Mr. Adkins likewise alleges that Defendants do business here and earn profit here from their publishing work, including the defamatory articles. (Compl. ¶ 17.) He also alleges many other relevant connections to this District. If anything, therefore, *Smartmatic* shows precisely why venue is properly laid here.

### B. Transfer to the Middle District of Tennessee is unwarranted under § 1404(a).

Given the centrality of D.C. to this case, and the deference that Mr. Adkins's choice of his home forum is due, there is also no basis for Defendants' alternative request that the Court transfer this case to the Middle District of Tennessee under 28 U.S.C. § 1404. Indeed, the *only* material

---

[1] To the extent there is any question whether The Daily Wire has paid subscribers in D.C. and that the articles were disseminated here (*see* Compl. ¶ 17), Plaintiff can easily amend to be even more specific about that uncontested fact.

18

connection to that district is that one of the four parties in this case is headquartered there. That is nowhere near enough for Defendants to carry their burden on a motion to transfer, which "is a heavy one, particularly in light of the strong weight a plaintiff's choice of forum is generally afforded." *Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 87 (D.D.C. 2019).

To carry their heavy burden, Defendants must show both (1) that the action could have been brought in the Middle District of Tennessee and (2) that the relevant factors—primarily convenience of the parties, the convenience of the witnesses, and the interests of justice—favor transfer. *See Treppel v. Reason*, 793 F. Supp. 2d 429, 435 (D.D.C. 2011). Defendants can't make either showing.

### 1. This action could not have been brought in Tennessee.

Whether an action could have been brought in the transferee district depends on two subsidiary requirements: "(1) 'venue must be proper in the transferee district;' and (2) 'the defendants must be subject to the process of the federal court in the transferee district at the time the action was originally filed.'" *Bartolucci v. 1-800 Contacts, Inc.*, 245 F. Supp. 3d 38, 45 (D.D.C. 2017) (quoting *Relf v. Gasch*, 511 F.2d 804, 806-07 (D.C. Cir. 1975)). Defendants cannot satisfy those requirements because the third defendant in this case, Ms. Battle, is not and never has been subject to the jurisdiction or process of the Middle District of Tennessee. For that reason, Mr. Adkins could not have brought this action in the Middle District of Tennessee, which is one reason Defendants' motion to transfer must be denied.

### 2. None of the relevant factors favors transfer to the Middle District of Tennessee.

Even if Mr. Adkins could have brought this action in the Middle District of Tennessee, moreover, Defendants' motion to transfer under § 1404 would still fail, since they cannot satisfy any of the three factors enumerated in § 1404(a).

19

***Convenience of the parties.*** Three of the four parties to the case live either in this District or within minutes of it. Mr. Adkins lives in D.C., Mr. Rosiak lives in Northern Virginia and focuses his reporting on D.C., and Ms. Battle lives in Maryland (but works in D.C.). (Am. Compl. ¶¶ 13–14.) Only The Daily Wire has any proximity to Tennessee. And even then, it is more than a little bold of The Daily Wire to argue that it is inconvenient for it to litigate in D.C., given that it is a national media company which focuses a significant portion of its reporting on the D.C. landscape, employs a Fairfax-based reporter to report on developments in D.C. and is already represented by counsel in this Court. (*Id.* ¶¶ 12-13.)

***Convenience of the witnesses.*** The most significant witnesses in this action—Mr. Adkins, Mr. Rosiak, Ms. Battle, and other current and former USADF personnel—are also all concentrated in or near this District. So is the documentary record, including USADF's agency records, the materials from Mr. Dunne's EEOC proceeding, and the federal oversight materials cited by Defendants themselves. (Am. Compl. ¶¶ 12-15.) Transfer to the Middle District of Tennessee would be less convenient, not more convenient, given those facts. That, presumably, is why Defendants have not identified any specific witness, document, or logistical burden that their proposed transfer would meaningfully alleviate.

***The interests of justice.*** The interests of justice "are best served by having a case decided by the federal court in the state whose laws govern the interests at stake." *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 19 (D.D.C. 1996). Here, the governing law will be D.C.'s defamation law, since Mr. Adkins, as a D.C. citizen who lives and works in D.C., is deemed to have suffered injury here. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857-58 (D.C. Cir. 2006) (citing *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626-27 (D.C. Cir. 2001)); *see also*

20

*Glennon v. Dan Witter Reynolds, Inc.*, 83 F.3d 132, 136-37 (6th Cir. 1996) (looking to similar factors in a Tennessee case).

Even setting aside that D.C. law will govern Mr. Adkins's claims, the interests of justice would still favor venue in D.C. because of its interests "in having this localized controversy decided at home." *Trout Unlimited*, 944 F. Supp. at 19. As noted, this case involves claims by a D.C. citizen, based on reports that were published in D.C., concerning the workings of a D.C.-based agency, ostensibly predicated on interviews with people working in D.C. and documents developed and maintained by D.C.-based officials. (Am. Compl. ¶¶ 11–18.) In short, this is a D.C. case in every meaningful way.

Tennessee's interest, by contrast, is limited to the fact that The Daily Wire is based in Tennessee. Defendants repeatedly try to spin that one fact into an argument that Tennessee is the place of publication for the defamatory articles (Dkt. 23 at 12, 14), but they are wrong about that, too. In defamation law, the "place of publication" refers, not to the publisher's location when circulating the defamatory statement, but rather to where the defamatory statement was heard or read. 2 R. Sack, Sack on Defamation § 15:3.1 at 15-48 (4th ed. 2011); *see also Walden v. Fiore*, 571 U.S. 277, 288 (2014) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984), for a similar point). Properly understood, then, the "site of publication" provides no basis whatsoever for preferring Tennessee over D.C. as a forum, since the defamatory articles were published online and read in both venues.

Defendants' docket-congestion statistics (Dkt. 23 at 21) also don't change the analysis because relative congestion is at most a minor factor and rarely overcomes a plaintiff's home-forum choice. *See Foote v. Chu*, 858 F. Supp. 2d 116, 123 (D.D.C. 2012); *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 83 (D.D.C. 2009). There is simply no escaping the reality that this is a D.C. case

with a D.C. plaintiff. For that reason, above all, Defendants' motion to transfer on the ground that venue is improper here should be rejected. *See Trout Unlimited*, 944 F. Supp. at 20.

## II. Mr. Adkins Has Adequately Alleged Defamation as to Each Challenged Statement.

Defendants separately assert that Mr. Adkins's four claims must be dismissed for failing to state a claim. But their arguments along those lines require the Court to disregard Mr. Adkins's well-pled allegations, construe purported ambiguities to favor Defendants, and resolve factual conflicts in Defendants' favor. In other words, Defendants' Motion asks this Court to turn the Rule-12 standard on its head and impermissibly appoint itself as factfinder at the pleading stage. Even in those instances where Defendants' arguments hew to the pleadings, moreover, they misstate and misapply the relevant law. Simply put: Defendants' arguments for dismissal under Rule 12(b)(6) are not ones this Court can or should credit.

### A. False Statement 1: Mr. Adkins testified that he was hired at USADF "without ever applying" and that he "couldn't recall when or how he managed to be selected."

The May 8, 9, and 14 articles, as well as the December 29 republication, all report that Mr. Adkins had testified that he was selected to lead USADF "without ever applying for the job," and that "he couldn't recall when or how he managed to be selected." (Am. Compl. ¶¶ 65, 154-56, 161.) That is all false. Nevertheless, Defendants offer four grounds for dismissing Mr. Adkins's claim based on that statement. None of those grounds holds up to scrutiny.

#### 1. The hiring statement is not substantially true.

Defendants first assert that the hiring statement is nonactionable because it is substantially true. (Dkt. 23 at 18.) But a statement is only substantially true if its "gist" or "sting" is true. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991). The hiring statement does not meet that bar.

The hiring statement's gist is that Mr. Adkins "received his position at USADF 'without even applying for the job,'" and could not recall when or how he was selected. (Dkt. 9 at ¶ 66;

Dkt. 23 at 18.) The Amended Complaint gives the lie to that assertion, pointing out that Mr. Adkins was invited to apply for the position; that he then submitted his statement of interest, CV, and list of professional references to the chair of USADF's selection committee; that he then sat for a series of interviews with USADF board members; and that, at the close of that process, in November 2021, he was notified that he had been selected as USADF's president and CEO. (Dkt. 9 at ¶¶ 66, 69.) In short, the hiring statement was no minor or technical departure from the pleaded truth; it was the exact opposite of the pleaded truth in every material respect. Whereas the pleaded truth shows that Mr. Adkins earned his job at USADF after an application process based on his qualifications and credentials, Defendants' hiring statement tells readers that Mr. Adkins was handed the position due to cronyism. That substantial departure takes the hiring statement outside the bounds of substantial truth. *See Armstrong v. Thompson*, 80 A.3d 177, 183 (D.C. 2013) (substantial truth doctrine only discounts "minor inaccuracies").

Perhaps sensing as much, Defendants try moving the goalposts. They contend that, even if Adkins applied, his "hire was not the result of a traditional, competitive hiring process." (Dkt. 23 at 18.) There are at least two problems with that maneuver. First, the hiring process Mr. Adkins went through—being invited to apply, submitting materials and references, undertaking multiple rounds of interviews with a selection committee, and ultimately being chosen from a field of other candidates—is about as traditional a process as one can imagine, particularly for the position of CEO at an agency. Defendants do not say what part of that process is irregular or non-competitive and, especially at the pleading stage, there is no basis for crediting their unadorned contention.

Second, and more importantly, Defendants did not report that Mr. Adkins had been hired after a non-traditional application process. Rather, they repeatedly conveyed that he got the job

23

without applying at all and had simply been handed the job as a lackey. And, again, that is materially false. (Dkt. 9 at ¶ 66.)

### 2. Defendants published the hiring statement with actual malice.

Defendants next contend that Mr. Adkins has not adequately pled that they published the hiring statement with actual malice—*i.e.*, with at least reckless disregard for its truth. That contention rests alternately on misstatements of the law and willful blindness to Mr. Adkins's well-pled facts.

This Court must examine the totality of the allegations to determine whether, collectively, they plausibly allege actual malice—not, as Defendants' repeatedly urge, consider whether each fact, in isolation, sufficiently alleges malice. *Tavloulareas v. Piro*, 817 F.2d 762, 789, 794 n.43 (D.C. Cir. 1987); *U.S. Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 33 (D.D.C. 2022). Thus, for example, although bias or ill will may not *alone* suffice to demonstrate actual malice, "evidence concerning motive" *is* a relevant evidentiary building block toward proving actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S 657, 668 (1989). Likewise, although a failure to properly investigate may not *alone* prove actual malice, it *is* one piece of evidence that can be probative of actual malice. *Nunes v. WP Co.*, 513 F. Supp. 3d 1, 8 (D.D.C. 2020) (referring to "the general proposition that a 'failure to investigate or observe journalistic standards, although not determinative, is relevant to the actual malice inquiry'") (quoting *Gilmore v. Jones*, 370 F. Supp. 3d 630, 671 (W.D. Va. 2019)).

Relatedly, Defendants mistakenly suggest that Mr. Adkins's burden at this stage is to "adduce 'clear and convincing evidence'" of actual malice. Not so. At the pleading stage, a plaintiff need only proffer facts giving rise to a "plausible inference" of actual malice. *See Byd Co. v. All. for Am. Mfg.*, No. 21-7099, 2022 WL 1463866, at *1 (D.C. Cir. May 10, 2022) (citing *Iqbal*, 556 U.S. at 678)); *Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 934 F. Supp. 2d 204, 218 (D.D.C. 2013).

24

And since defamation defendants are notoriously "prone to assert their good-faith belief in the truth of their publications," such that "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself," *Herbert v. Lando*, 441 U.S. 153, 170 (1979), "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks*, 491 U.S. at 668. Because "proof of 'actual malice' calls a defendant's state of mind into question," where lack of fault is not clear, this element "does *not* readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979); *see also OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 49 (D.D.C. 2005) ("the question of actual malice is ordinarily one for the jury").

With respect to Defendants' hiring statement, Mr. Adkins pled a multitude of facts constituting circumstantial evidence of actual malice, including that: (1) Defendants had reviewed a deposition transcript showing that Mr. Adkins applied for the job at USADF; (2) Defendants purposefully avoided the truth by deliberately omitting the false allegation about hiring from their late-night text message to Mr. Adkins, which was sent just hours before Defendants first published the false allegation; (3) Defendants published the false statement because they knew it would generate attention and revenue from their intended audience; (4) Defendants purposefully omitted any description or acknowledgment of Mr. Adkins's application process from their articles because it contradicted their preconceived narrative; (5) Defendants refused to correct or retract the false assertion even after being confronted with Mr. Adkins's application materials and being pointed to the exact part of Mr. Adkins's deposition testimony conclusively refuting the contention that he did not apply for the job at USADF; (6) Defendants were motivated by ill will and inherent bias against Mr. Adkins; and (7) with regard to the December 29 article, Defendants published the false

25

statement about Mr. Adkins's hiring after having received the initial complaint in this matter. (Dkt. 9 ¶¶ 163-70.)

Courts have consistently upheld jury verdicts based on similar fact patterns. *E.g.*, *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) ("Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact."). The Supreme Court has done so repeatedly. In *Curtis Publishing Co. v. Butts*, for example, the Court upheld a verdict finding actual malice simply because the plaintiff had shown (1) that there was reason to question an informant's veracity and a source's account, and (2) that the defendant did not solicit and review information that could have presented facts contradicting the defendant's narrative. *See* 338 U.S. 130, 157 (1967). And in *Harte-Hanks*, the Court upheld another verdict finding actual malice based on nothing more than (1) the defendants' failure to interview a corroborating witness and (2) the defendants' failure to review materials in their files that refuted their story. 491 U.S. at 692. Mr. Adkins has pled those factors and several more.

Defendants attempt to circumvent those allegations and precedents by misstating the allegations and misapplying the precedents. For instance:

- Defendants deny that they understood Mr. Adkins's deposition to include testimony showing that he applied for his job. (Dkt. 23 at 20.) But that is, at most, a contested fact issue that the Court is bound to resolve against Defendants at this stage. *Erickson*, 551 U.S. at 94.

- Defendants dispute the relevance of Mr. Adkins's allegation that they deliberately refrained from asking him about the hiring statement. According to Defendants, they

had no obligation to follow-up on the issue. (Dkt. 23 at 21.) That misstates the nature of Mr. Adkins's allegation, which is not merely that Defendants failed to follow-up, but that they purposefully avoided asking him about it (while asking him about many other topics) because they wanted to avoid contradictory information. (Dkt. 9 ¶ 74.) The latter is unquestionably evidence of actual malice. *Harte-Hanks*, 491 U.S. at 692 ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.") (internal citation omitted).

- Defendants assert that motive, ill will, and bias do not, on their own, establish actual malice. (Dkt. 23 at 21-22.) But while a "brick is not a wall," many bricks stacked on top of one another are. E. Cleary, McCormick's Handbook on the Law of Evidence § 185 (2d ed. 1972). The law, similarly, is clear that motive, ill will, and bias are all relevant circumstantial evidence that can, in cumulation with other such evidence, warrant a finding of actual malice. *Harte-Hanks*, 491 U.S. at 668; *see also Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("ill will *is* considered circumstantial evidence of actual malice"); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("evidence of ulterior motive can often bolster an inference of actual malice").

- Defendants contend that purposefully omitting favorable or exculpatory details (to paint a false and disparaging picture of Mr. Adkins) is not evidence of actual malice. (Dkt. 23 at 21.) That is wrong, as a matter of black-letter law. *See* D. Elder, Defamation: A Lawyer's Guide § 7:13 (2025 update) (collecting cases); 1 R. Smolla, Law of Defamation § 3:68 (2d ed.) ("In short, 'the deliberate omission of important information that would have substantially modified, qualified, or eliminated the defamatory meaning can support a finding of actual malice.'").

27

- Defendants argue that refusing to retract the hiring statement after being confronted with evidence falsifying it does not show actual malice. Again, the law is exactly the opposite. *Tavoulareas*, 763 F.2d at 1477 ("Evidence of the [defendant's] steadfast refusal to retract [is] properly considered as bearing on the issue of actual malice") (citing Restatement (Second) of Torts § 580A cmt. d)); *see also Ventura v. Kyle*, 63 F. Supp. 3d 1001, 1014 (D. Minn. 2014) (noting that "most authorities" so hold), *rev'd on other grounds*, 825 F.3d 876 (8th Cir. 2016).

- Finally, Defendants urge that repeating the hiring statement in the December 29 republication, after Defendants had seen Mr. Adkins's complaint in this matter, is not evidence of malice because Mr. Adkins's "protests of defamation does not mean [Defendants] suddenly believed their reporting to be false." (Dkt. 23 at 22.) But neither Mr. Adkins nor the Court is obligated to take Defendants' word for that. *See Herbert*, 441 U.S. at 170. The fact of the matter is that the Complaint catalogued for Defendants in painstaking detail the specific evidence debunking the hiring statement. Despite being on notice of that evidence, however, Defendants published the December 29 article. That is potent evidence of actual malice. *E.g.*, *Palin v. N.Y. Times Co.*, 940 F.3d 8804, 814-15 (2d Cir. 2019) (actual malice plausibly pled where speaker had seen articles contradicting his false statements); *Lemelson v. Bloomberg, L.P.*, 903 F.3d 19, 25 (1st Cir. 2018) ("actual malice can be shown where the speaker is in possession of information that seriously undermines the truth of its story").

### 3. The hiring statement is defamatory *per se*.

Defendants further assert that the hiring statement is not defamatory. (Dkt. 23 at 22-23.) A statement is defamatory "if it tends to injure plaintiff in his trade, profession or community

28

standing, or lower him in the estimation of the community." *Weyrich*, 235 F.3d at 627. The hiring statement readily surmounts that low bar. It asserts that Mr. Adkins did not earn his position at USADF by competitive selection but was instead corruptly handed the position as a lackey. (Dkt. 9 at ¶ 73.) Such a statement—disparaging a major career accomplishment and implicating Mr. Adkins in a corrupt process—injures Mr. Adkins in his trade and in his community standing. Indeed, because the allegation goes directly to Mr. Adkins's professional qualifications, D.C. law regards it as defamatory *per se*. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 272 (D.D.C. 2017) (quoting *Carey v. Piphus*, 435 U.S. 247, 262 n.18 (1978)).

Defendants assert that this Court should nevertheless dismiss Mr. Adkins's claims based on the hiring statement because "whether a statement is capable of defamatory meaning is a question of law." (Dkt. 23 at 23.) That assertion is incomplete, at best. In actuality, the question of law for this Court is limited to whether any reasonable person could conclude that the statement has a defamatory meaning; so long as the answer to that question is *yes*—and that is the answer here, for reasons just described—it is for a jury to decide whether the statement in fact conveyed a defamatory meaning. *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1142-43 (D.C. Cir. 1994). Defendants' invitation to dismiss the count on defamatory-meaning grounds should be rejected.

### 4. The hiring statement is emphatically not a fair report.

Defendants also argue that the statement is not actionable under the fair report privilege. (Dkt. 23 at 23-24.) But the privilege only applies to fair and accurate representations of an official proceeding, and only then to statements made without actual malice. *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 257 (D.D.C. 2013); *Oparaugo v. Watts*, 884 A.2d 63, 81 (D.C. 2005). Defendants' reporting on Mr. Adkins's deposition flunks that test twice.

*First*, for reasons set out above, Mr. Adkins has more than adequately pled that Defendants published the hiring statement with actual malice. That is independently sufficient to defeat

29

Defendants' fair-report defense. *Oparaugo*, 884 A.2d at 81; *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 698 (D.C. 1970); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739-40 (D.C. Cir. 1985).

*Second*, Defendants' description of Mr. Adkins's deposition testimony was neither fair nor accurate. At his deposition, Mr. Adkins explained, in some detail, the application process he went through, testifying that he submitted his CV (or bio) to USADF's hiring committee along with other materials he could not recall, and that he then went through multiple rounds of interviews with USADF's board before finally being notified, in November 2021, that he had won the job. (Dkt. 9 at ¶¶ 68-69.) In other words, he testified about applying for the job and then explained when and how he was selected. That is the opposite of what Defendants reported when they said he had not applied for the job and could not recall when or how he was selected.

The heart of Defendants' fair-report argument is a decontextualized snippet from a few pages earlier in the same deposition transcript. In that snippet, after being asked "When did you submit an application to join USADF?," Mr. Adkins responded, "I did not submit an application to join USADF." (Dkt. 9 at ¶ 71.) But the succeeding pages in the transcript show that Mr. Adkins used the word "application" to mean, as dictionaries define it, a literal "form used for making a request," of the sort one submits to obtain any number of jobs in the federal government. (Dkt. 9 at ¶ 72.) Thus, when Mr. Adkins testified that he "did not submit an application to join USADF," it was clear that he meant only that he did not complete and submit a form as part of the process he subsequently described. There is no question that is what he meant because, otherwise, his testimony from moments later in the same deposition—recounting that he submitted materials and underwent multiple rounds of interviews as part of a "selection process"—would have been incoherent. (Dkt. 9 at ¶ 72.)

30

It is neither fair nor accurate to excerpt a fragment of a deposition, wrench it out of context, and present it to convey a false or misleading imputation that would not exist had a full and accurate report of the deposition been made. *Dameron*, 779 F.2d at 739 (quoting *Curtis Publ'g Co. v. Vaughan*, 278 F.2d 23, 29 (D.C. Cir. 1960)). But that is precisely what Defendants did—reporting that Mr. Adkins testified that he did not apply for the USADF job when, in fact, he testified at length about how he applied for the job.

Even if there were some ambiguity about what Mr. Adkins conveyed in his deposition, at this stage that ambiguity must be resolved against Defendants. *Long v. Safeway, Inc.*, 842 F. Supp. 2d 141, 144 (D.D.C. 2012). The question for the Court is not which party's reading of Mr. Adkins's deposition transcript is the best one; the question is simply whether, based on the allegations in the complaint, *any* reasonable juror could interpret Defendants' characterization of Mr. Adkins's deposition testimony as inaccurate and misleading. *See Trudeau v. FTC*, 456 F.3d 178, 194 (D.C. Cir. 2006); *US Dominion,* 554 F. Supp. 3d at 56-58. Because, in context, reasonable people could—indeed, would—read Mr. Adkins's transcript to establish that he did, in fact, apply for his job at USADF and to recount when and how he was hired, Defendants' report saying the opposite is neither fair nor accurate.

### B. False Statement 2: Mr. Adkins "had a tailor fit him for three custom suits, and sent the bill to the agency."

The May 8 article falsely reports that Mr. Adkins "had a tailor fit him for three custom suits, and sent the bill to the agency." Defendants offer just two reasons for dismissing Mr. Adkins's claim based on the false tailoring accusation. Both fall flat.

### 1. The tailoring statement is false.

Defendants first contend that the tailoring statement is true, at least in the hyper-literal sense that Mr. Adkins's tailor did email a digital invoice to Mr. Adkins's assistant at USADF. But

31

that interpretation ignores the rule that, in determining the meaning of a statement within a publication, "the publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984). D.C. law thus eschews Defendants' hyper-literal and acontextual approach, instead requiring courts to consider statements in light of their "(1) context, (2) [the] plain or fair and natural meaning of the words used, and (3) [the] average or common mind or ordinary and common acceptance." *Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001); *see also Johnson v. United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context determines meaning").

Context and fair meaning illustrate why no reasonable person would or could interpret the tailoring statement as Defendants suggest. First, the charge that Mr. Adkins "sent the bill to the agency" comes in a section of the May 8 article titled "Using poverty funds for luxury"—a section devoted to stories of USADF officials supposedly using agency funds to enrich themselves. (Dkt. 9 ¶ 79, 81.) Second, there would be no point in reporting that a former assistant received an innocuous email, which she then forwarded to her boss; no reasonable person would deem such an occurrence newsworthy. (Dkt. 9 ¶ 80.)

The Daily Wire's own readers understood the statement to allege that Mr. Adkins embezzled funds from the government for his own personal gain, not just that his tailor emailed a receipt to Mr. Adkins's assistant. (Dkt. 9 ¶ 82.) Real-world individuals' understandings of a statement is "beyond, and supportive of, what a hypothetical reasonable [person] might have understood the [statement] to mean." *Tah v. Global Publ'g, Inc.*, 413 F. Supp. 3d 1, 11-12 (D.D.C. 2019). If that weren't enough, Mr. Rosiak himself has publicly referred to the statement as alleging that USADF officials were taking money "that was supposed to go to poor Africans and using it for themselves … to buy high-end suits." (Dkt. 9 ¶ 83.) So it is more than a little bold of Defendants

32

to insist to this Court that no reasonable reader could understand the tailoring statement to accuse Mr. Adkins of using official funds to buy himself high-end suits.

Even if Defendants' hyper-literal reading of the tailoring statement were plausible—and context and ordinary usage show that it isn't—that would at most mean the statement is susceptible of multiple interpretations, *i.e.*, that it is ambiguous. And, again, in deciding a Rule 12(b)(6) motion, any ambiguity must be resolved against Defendants. *Blake v. FBI*, 298 F. Supp. 3d 77, 78 (D.D.C. 2018). Regardless of how the Court approaches the issue, therefore, at this stage, the tailoring statement must be interpreted as Mr. Adkins alleges, not in the fanciful and self-serving manner that Defendants now suggest.

Giving the tailoring statement its natural and in-context meaning effectively disposes of Defendants' contention that the statement is true. Emails and bank records, all shared with Defendants, show Mr. Adkins paid for the suits with his own money. (Dkt. 9 ¶¶ 77-78.) The Daily Wire has also admitted it never had any evidence that Mr. Adkins arranged for USADF to pay for his suits, precisely because no such evidence exists. (Dkt. 9 ¶ 84.) The tailoring statement must be taken as false.

### 2. Defendants published the tailoring statement with actual malice.

Defendants also argue that Mr. Adkins has not adequately pled that they published the tailoring statement with actual malice. (Dkt. 23 at 26-27.) Most of the arguments they make along those lines are carbon copies of the same flawed arguments about malice they make in connection with the hiring statement. Defendants argue, for instance, that reliance on a source known to be biased or unreliable does not, by itself, establish actual malice, which is true but irrelevant when, as here, reliance on a source known to be biased or unreliable is just one of several pieces of circumstantial evidence of actual malice. *E.g.*, *U.S. Dominion*, 600 F. Supp. 3d at 33 (finding actual malice based on reliance "on facially unreliable sources" in addition to other evidence). The same

33

goes for Defendants' arguments that evidence of a preconceived narrative, ill will, or bias is not independently sufficient to justify a finding of actual malice. *See Harte-Hanks*, 491 U.S. at 668; *Shoen*, 48 F.3d at 417; *Duffy*, 44 F.3d at 315 n.10; *Tah*, 413 F. Supp. 3d at 13. And, with respect to the allegation that they purposefully avoided comment from Mr. Adkins before publishing the tailoring statement, Defendants again misconstrue the issue: It is not merely that they failed to seek confirmation; it is that they deliberately avoided asking Mr. Adkins about the comment because they feared his answer would undermine their preferred narrative—which is strong evidence of actual malice. *See Harte-Hanks*, 491 U.S. at 692

Apart from those familiar and flawed arguments, Defendants make just three further points in support of their actual-malice argument. *First*, they repeat their argument that their report should be read—hyper-technically and contextually—to allege only that Adkins had his tailor send a receipt to his assistant. (Dkt. 23 at 26, 27.) For reasons set out above, that argument is at odds with the plain meaning of the tailoring statement, informed by surrounding context, and, just as importantly, irreconcilable with the law governing how such statements are to be interpreted at the pleading stage.

*Second*, Defendants argue that, because they purportedly relied on Ms. Battle as a source for the tailoring statement, they cannot have made the statement with actual malice. (Dkt. 23 at 26.) That is wrong on the law for at least two reasons. First, reliance on a purported source does not immunize a publisher from actual malice. *E.g.*, *Zimmerman*, 246 F. Supp. 3d at 281-84 (plaintiffs sufficiently pled actual malice based on evidence showing that defendants doubted their source for key allegations). Second, reliance on a known unreliable or biased source is, in fact, well-recognized circumstantial evidence of actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968).

34

*Third*, Defendants' suggest that Mr. Adkins "failed to allege facts showing any actual doubts [Defendants] harbored as to [Ms.] Battle's reliability." (Dkt. 23 at 26.) That again misstates the contents of the Amended Complaint, which alleges unequivocally that, "To the extent [Defendants] accurately reported what [Ms.] Battle told them, they did so knowing she was an entirely unreliable source." (Dkt. 9 at ¶ 187; *see also* Dkt. 9 at ¶¶ 53-58 (describing several reasons why Defendants knew Ms. Battle to be an unreliable source regarding Mr. Adkins).) Defendants might disagree with that allegation, but that sort of bare factual dispute is not a valid basis for granting Defendants' motion, since, at this stage, all factual disputes must be resolved in Mr. Adkins's favor. *Dist. No. 1 v. Am. Maritime Officers*, 75 F. Supp. 3d 294, 306 (D.D.C. 2014).

**C. Statement 3: Mr. Adkins "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns."**

The May 8 and May 14 articles reported that Mr. Adkins "brushed off government rules about travel costs and demanded $1,000-a-night hotels, summarily firing an assistant who raised concerns about his travel arrangements." (Am. Compl. ¶¶ 87, 198.) Defendants make the same two arguments as to why the hotel statement is non-actionable: (1) that Mr. Adkins has not pled the statement is false, and (2) that Mr. Adkins has not adequately pled actual malice. Once more, Defendants' arguments are baseless.

**1. The hotel statement is false.**

Defendants argue that the hotel statement is not false because it merely asserts that Mr. Adkins demanded $1,000-a-night hotels, not that he in fact purchased or got the government to pay for those hotel rooms. (Dkt. 23 at 28.) There are two problems with that argument. First, it ignores the second half of the false statement: that Mr. Adkins fired Ms. Battle for raising concerns about his travel arrangements. Indeed, Defendants never address that falsehood, meaning they've

35

forfeited any argument on it. *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019).

Second, Defendants' falsity argument again rests on a cramped and acontextual reading. The question here is how a reasonable reader, viewing the statement in the context of the publication as a whole, would have understood it. *See Klayman*, 783 A.2d at 614; *Best*, 484 A.2d at 989. And there are several reasons to conclude that reasonable readers would have—and, in fact, did—construe the statement to accuse Mr. Adkins of obtaining luxury hotel rooms on the government's dime, not just requesting such rooms. To give just two: (1) the hotel statement appears in a section of the articles titled "Using poverty funds for luxury"; and (2) Mr. Rosiak himself has publicly described his reporting as describing USADF officials taking money "that was supposed to go to poor Africans and using it for themselves to do luxury travel." (Dkt. 9 ¶¶ 83, 198, 200.)

But even if Defendants were right that the hotel statement is at least susceptible of their preferred interpretation, that would simply mean there are multiple plausible readings of the hotel statement. And at this stage, that ambiguity must be resolved against Defendants. *Blake*, 298 F. Supp. at 78. So understood, the hotel statement is false, as Mr. Adkins has pled and as Defendants do not dispute.

### 2.  Mr. Adkins adequately alleged actual malice.

Defendants' actual malice argument regarding the hotel statement is almost entirely a rehash of the misstatements and misconceptions raised in connection with the hiring statement. (Dkt. 23 at 28-29.) It fails for all the same reasons that argument fails. Otherwise, Defendants' actual-malice argument boils down to a dispute about the meaning of the hotel statement. That argument, for reasons explained immediately above, is not only unsupported by the context and

plain meaning of the statement, but also not a suitable basis for resolving a motion to dismiss in Defendants' favor.

### D. Statement 4: Mr. Adkins "would not hire a white person or a veteran" and called USADF's board "them white motherf----rs."

The May 9 and 14 articles, and the December 29 republication, falsely accuse Mr. Adkins of discriminating against white people and veterans, specifically asserting that he "refused to hire white people," was "very adamant in only hiring African Americans, mainly female," and said "many times he would not hire a white person or a veteran." (Dkt. 9 ¶ 221.) In support of these discrimination accusations, Defendants published that Mr. Adkins even called USADF board "them white motherf----rs." (*Id.*) Defendants offer two bases for dismissing Mr. Adkins's claim based on the discrimination accusations: (1) that Mr. Adkins has not adequately pled that they published the statements with actual malice, and (2) that the statements are protected by the fair report privilege. Neither is correct.

### 1. Defendants published the discrimination accusations with actual malice.

Defendants (1) knew, and later admitted, that during Mr. Adkins's tenure, non-Black employees and veterans were hired and promoted at USADF; (2) knew Ms. Battle was an unreliable source; (3) knew the substance of the false accusation was inherently improbable (in particular the racist quote from Mr. Adkins about the USADF board); (4) knew Ms. Battle's EEOC affidavit contained falsehoods and made no reference to veterans or the most incendiary allegations of discriminatory and racist conduct; (5) knew that the substance of the discrimination accusations had been repudiated, under oath, by multiple affiants; (6) purposefully avoided giving Mr. Adkins the opportunity to respond to the most sordid details of the accusations; (7) were motivated by profit and keeping The Daily Wire afloat amidst significant financial troubles; (8) made the discrimination statements in furtherance of a preconceived narrative of racism and unethical and

illegal conduct at USADF; and (9) were motivated by ill will and inherent bias against Mr. Adkins. (Dkt. 9 ¶¶ 232-43.) Regarding the December 29 republication, Defendants were on yet more notice of falsity because they had seen Mr. Adkins's original complaint. (Dkt. 9 ¶ 244.)

Rather than meaningfully confront that evidence of actual malice (most of which Defendants never even mention), Defendants try rewriting the discrimination accusations to allege, not that Mr. Adkins engaged in discriminatory practices at USADF, but rather that he said overtly racist things to his former assistant. (Dkt. 23 at 30.) That argument ignores the context and plain meaning of the discrimination accusations—which assert, for example, not just that Mr. Adkins said racist things, but that he affirmatively "refused to hire white people" and "was adamant in only hiring African Americans." Those are not statements about what Mr. Adkins said; they are assertions about how he in fact went about hiring during his tenure at USADF.[2]

Nor is it availing that Defendants purportedly "relied on a source" (Ms. Battle) for the discrimination accusations. For one thing, as Mr. Adkins has pled at length (Dkt. 9 ¶¶ 53-58, 234), Defendants had reason to, and in fact did, seriously doubt Ms. Battle's credibility. *See St. Amant*, 390 U.S. at 731-32 (holding that such doubts are strong evidence of actual malice). For another, Defendants knew of other facts contradicting Ms. Battle's allegations, including, for instance, that numerous non-Black people and veterans were onboarded at USADF during Mr. Adkins's tenure, and that multiple other affiants had contradicted Ms. Battle's assertion that Mr. Adkins harbored animus toward non-Black people or veterans. (Dkt. 9 ¶¶ 93, 101-04, 108, 115.) Even if Defendants

---

[2] Defendants' efforts to spin the fact that Mr. Adkins is not suing them over the false claim that he referred to another junior employee as a "white b---h" as evidence that he in fact made such a statement (and others like it) is as legally incorrect as it is insulting. Discovery will show that Mr. Adkins never said any such thing, either, which will itself be powerful evidence of Defendants' reckless disregard for the truth and intent to harm Mr. Adkins and destroy his career.

had no prior opinion about Ms. Battle's credibility, there was ample evidence putting them on notice that her claims about Mr. Adkins were false.

Defendants cite *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003), for the proposition that it is not evidence of actual malice to rely on a single source over other, contradictory sources. (Dkt. 23 at 31.) But *Lohrenz* makes clear that is only true when, unlike in this case, "there is no 'obvious reason to doubt' [the single] source." 350 F.3d at 1285 (citing *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1305 (D.C. Cir. 1996)). What is more, the holding in *Lohrenz* was limited to the point that a publisher need not "investigate allegedly contradictory evidence." *Id.* Here, by contrast, Defendants already had the contradictory evidence and they simply ignored it. Courts regularly hold that fact pattern suffices to show malice. *See Palin*, 940 F.3d at 814-15; *Lemelson*, 903 F.3d at 25.

### 2.  The discrimination accusations are not protected by any privilege.

Defendants' attempt to shield themselves from liability for the discrimination accusations by invoking the fair report privilege likewise fails for several reasons. *First*, D.C. recognizes only a qualified fair report privilege, *see Oparaugo*, 884 A.2d at 81; *Johnson*, 271 A.2d at 698; *Dameron*, 779 F.2d at 739-40—something Defendants conspicuously omit mentioning in their brief. Because Defendants published their false statements about Mr. Adkins with actual malice, the privilege would not shield them from liability even if they had only republished verbatim Ms. Battle's affidavit.

*Second*, Defendants did not merely republish Ms. Battle's affidavit or attribute the discrimination accusations to it; they embellished, editorialized, and endorsed statements Ms. Battle *made directly to them exclusively for the article*. Indeed, the discrimination accusations specifically state that Ms. Battle "told The Daily Wire" her accusations "on condition of anonymity." (Am. Compl. Exs. B, C, D.) That fact takes the accusations outside the fair report

privilege, which only applies to reports of, and attributed to, government proceedings, not interviews conducted in private. *Byrne*, 600 F. Supp. at 34.

*Third*, Ms. Battle's affidavit pointedly makes no mention of Mr. Adkins discriminating against veterans (which is compelling evidence that Defendants were on notice to doubt such an accusation), nor did it say anything about the accusation that Mr. Adkins made racist statements about the USADF board. Defendants cannot assert a privilege over statements that are not even in the underlying proceeding for which they claim gives rise to the privilege. *See Byrne*, 600 F. Supp. 3d at 34-35 ("Byrne made statements beyond the contents of the affidavit, which means he did more than accurately report on a qualified government source"); Restatement (Second) of Torts § 611 cmt. f.

*Fourth,* Ms. Battle's own Motion to Dismiss undermines the contention that Defendants' statements are attributable to her, let alone to her affidavit. She suggests that the defamatory meaning behind her statements in the article were "generated by the other defendants' editorial framing, not by any statement attributable to [her]," and emphasizes that reporters may "misquote, paraphrase inaccurately, or attribute statements more definitively than their sources intended." (Dkt. 24 at 21.) While only discovery will tell what happened behind the scenes between Ms. Battle and Mr. Rosiak in the lead up to publication, one thing is clear: Defendants published statements that Ms. Battle allegedly fed directly to them (statements not in any affidavit), and then surrounded those statements with scandalous and salacious headlines and language endorsing the veracity of what Ms. Battle supposedly told them. Those actions, in and of themselves, forfeit any privilege to the extent one existed in the first place. *Dameron*, 779 F.2d at 739-40 (fair-report privilege does not apply "where the government record is 'merely part of one's research'").

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion in full.

40

DATED: April 30, 2026                            Respectfully Submitted,


                                            By: */s/ Dustin A. Pusch*
                                            Dustin A. Pusch (D.D.C. Bar No.1015069)
                                            Mark Thomson (D.D.C. Bar No.1048004)
                                            Meier Watkins Phillips Pusch LLP
                                            1120 20th Street, NW, Suite 550
                                            Washington, DC 20036
                                            dustin.pusch@mwpp.com
                                            mark.thomson@mwpp.com

                                            Karianne Jones (D.D.C. Bar No. 1177335)
                                            Brandon Faske (*pro hac vice*)
                                            Evergreen Legal Strategies, LLP
                                            1763 Columbia Rd NW, Suite 100
                                            Washington, DC 20009
                                            karianne@evergreenlegalstrategies.com
                                            brandon@evergreenlegalstrategies.com

41